John Jung                                            March 5, 2021

IN THE SUPERIOR UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

_____
                                    )
CHRISTOPHER KING, J.D.              )
A/K/A KINGCAST,                     )
and                                 )
JOHN NOVAK,                         )
                                    ) CASE NO. 2-20-cv-01494-RAJ
        Taxpayer Plaintiffs,        )
                                    )
vs.                                 )
                                    )
LIQUOR AND CANNABIS BOARD OF        )
THE STATE OF WASHINGTON             )
"LCB"; JANE RUSHFORD, CHAIR         )
OF LCB AND RICK GARZA,              )
DIRECTOR OF LCB, in their           )
Individual and Official             )
Capacities,                         )
                                    )
                Defendants.         )
                                    )
_____

DEPOSITION UPON ORAL EXAMINATION OF

JOHN JUNG

_____

REPORTED BY:  Thad Byrd, CCR
REPORTED ON:  March 5, 2021

John Jung                                        March 5, 2021

 1                    A P P E A R A N C E S:

 2
       For the Plaintiff:
 3
              CHRISTOPHER KING
 4            Pro Se
              721 East Fifth Street
 5            Suite B
              Arlington, Washington 98223
 6            (617) 543-8085
              kingcast955@icloud.com
 7

 8     For the Defendant:

 9            MICHELLE CARR
              Washington State Office of
10            Attorney General
              1125 Washington Street SE
11            Olympia, Washington 98504-0110
              (360) 586-2644
12            michelle.carr@atg.wa.gov

13     Also Present:

14            BRIONNE CORBAY
              IAN EISENBERG
15            CYNJO RAYLENE HALL
              JOHN NOVAK
16

17

18

19

20

21

22

23

24

25

John Jung                                          March 5, 2021

                                                        Page 3

 1                E X A M I N A T I O N   I N D E X

 2

     Witness:

 3

          JOHN JUNG

 4

     Examination By:                           Page

 5

          MR. KING                             5 - 74

 6

          MS. CARR                             74 - 75

 7

          MR. KING                             75 - 77

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John Jung                                            March 5, 2021

Page 4

1                     E X H I B I T   I N D E X

2    No.      Description                          Page

3    A        Chris Thompson's letter to Roger     10
              Goodman
4
     B        Document Forwarded Pursuant to       17
5             Discovery Request

6    C        State of Washington Classified       57
              Job Specification
7
     D        WAC 139-05-200                       35
8
     E        Cowlitz County Search Warrant        14
9
     F        Request for Production of            54
10            Documents Per GR 31.1 and
              RCW 42.56
11
     G        Statement of WSLCB Officer           50
12            John Jung

13   1        Assessment of the Equivalency        56
              Academy
14
     2        Email Written by John Jung           57
15
     9        Email Exchange Communication         64
16            Between the Chief of Enforcement
              and LCB
17
     12       Email Written by John Jung           65
18
     15       Public Records Request               42
19

20

21

22

23

24

25

John Jung                                                    March 5, 2021

                                                                  Page 5

1                    FRIDAY, MARCH 5, 2021

2                         10:03 a.m.

3                      -- oo 0 oo --

4

5              MS. CARR:  Mr. King, while we're on the

6    record, I want to make clear that I am aware that you are

7    videotaping this.

8         And that is -- that is within your right, but I want

9    to make it clear also that your private video does not

10   constitute an official record of the proceeding and is

11   not itself admissible as evidence of the witness'

12   testimony.

13             MR. KING:  Of course.  We'll use the

14   transcript for that.

15   JOHN JUNG,                    having been duly sworn,

16                                 testified under oath

17                                 as follows:

18                        EXAMINATION

19   BY MR. KING:

20   Q.   Agent Jung, good morning, sir.  How are you?

21   A.   Fine.

22   Q.   Okay.  Could you please state your full name and

23   your occupation for the record?

24   A.   Full name is John Jung, and I am currently employed

25   by the Washington State Liquor and Cannibis Board as an

John Jung                                          March 5, 2021

Page 6

1   enforcement agent or Officer 2.

2   Q.   Okay.  When -- how long have you been in that

3   position?

4   A.   Since 2008.

5   Q.   Okay.  Tell me a little bit about your background

6   before then.  We'll go back the last 15, 20 years.

7   A.   I was a King County public defense coordinator where

8   I managed over four hundred defense attorneys in King

9   County, King County's public defender services.

10        That included ACA, Accused Counsel of -- Associated

11   Counsel of the Accused, counsel for the public, and

12   Northwest Public Defenders Association and the Defender

13   Association, TDA.

14   Q.   Okay.  And you were in -- you say you did that --

15   you did that for more than a decade I take it.

16   A.   Yeah, basically I reviewed all felony cases that

17   would walk through the King County courthouses and

18   assigned them according to their specialized field of

19   defense, also coordinated with the expert witness

20   monitoring programs.

21        And also I was also the juvenile case coordinator

22   where I handled truancy cases for King County's School

23   District during the course of that duty.

24   Q.   Very well.  Thank you, sir.  Sir, who is Cynjo

25   Raylene Hall?

John Jung                                           March 5, 2021

Page 7

1   A.   She's one of my -- a failed compliance case.

2   Q.   Okay.  And what is your involvement with that case,

3   sir?

4               MS. CARR:  Objection, relevance.

5               MR. KING:  Noted for the record.

6   Q.   Please answer the question.

7               MS. CARR:  Mr. Jung, if you're not

8   comfortable discussing an ongoing case, you do not need

9   to answer that question.

10        And if Mr. King continues down this road, I will

11  stop this deposition and I will go to the court to

12  protect this information.

13              MR. KING:  I'll meet you right there.

14  Q.   Sir?

15  A.   I don't know what's going on with this case, so I'd

16  rather not discuss it.

17  Q.   Okay.  That's fine.

18  A.   And it's still pending, so I'd rather not.

19  Q.   Okay.  That's fine.

20  A.   Yes, sir.

21  Q.   So when you -- from my knowledge after reviewing

22  Ms. Hall, she is being accused of underage sales.

23              MS. CARR:  Objection, relevance again,

24  Mr. King.  This is not about your case against the LCB.

25  It is not connected, and you need to move on.

MR. KING: I haven't asked a question yet. Could you wait till I ask a question, please? Thank you. I appreciate that.

Q. Sir, what is your degree of involvement in cases where there are underage sales alleged in respect to Ms. Hall's case?

A. Generally speaking, I am the primary agent that conducts the checks. And if there's a failure, then I proceed with the criminal and also administrative violation notices to the businesses.

Q. Okay. In that role, let's talk about the criminal role mostly right now. In that role, are you comfortable in your role doing that, and if so, why, and if not, why not?

A. This was brought up with my previous supervisors at the agency in multiple personal and also in writing that the last couple of years I've been doing some research about the role of our agents, our officers and come to find out there was a lot of inconsistency with the laws that did not conform to the daily practical operation of agents.

And so I questioned that and told them that, you know, that I wasn't -- I didn't feel legally able to draft up criminal notices.

Q. Okay.

John Jung                                        March 5, 2021

                                                    Page 9

 1   A.   And so -- yeah.

 2   Q.   We're going to follow up on it in just a minute.

 3   A.   Okay.

 4   Q.   So you didn't feel -- okay, yeah.  We heard it.

 5   We'll come right back to that.  Just one more preliminary

 6   question before we delve into more of what you just

 7   started on; okay?

 8        Have you ever seen the LCB coordinate cases with the

 9   federal authorities?

10   A.   Yeah.

11   Q.   Okay.  Would they -- and how often does this happen?

12   Well, never -- strike that.

13        So when the agents came down to work with you all on

14   these cases, was it your belief that they were working to

15   implement federal policy?  They weren't there for high

16   tea and crumpets, were they?

17   A.   When you say agents, are you referring to the

18   federal or the state agents federal?

19   Q.   Just federal, yeah.

20   A.   No.  I believe they came down.  Obviously, it had

21   some federal implications to the cases they were working

22   on.  Otherwise, they would not be with us.

23   Q.   That makes sense.  That's fine.  You've answered.

24        To your knowledge, have you ever seen a situation in

25   which the feds would actively prosecute someone, a

John Jung                                          March 5, 2021

                                                            Page 10

1    licensee for cannabis even when the licensee was fully

2    state compliant?

3    A.   I do not know, so I'm not able to answer that

4    question for you.

5    Q.   So you don't know?  To your knowledge, you've never

6    seen that happen?

7    A.   Correct.

8    Q.   Okay.  All right, sir.  I'm going to virtually hand

9    you -- there's two sets of exhibits in this deposition,

10   sir.

11        There are those that you provided to me and to Agent

12   -- to Agent, to Co-Plaintiff Novak.  Then the set that I

13   have culled up.

14        We're going through mine first and then yours, so if

15   I could have you refer to Exhibit A, I'm going to

16   virtually hand you Exhibit A.

17   A.   Yes, sir.  I'm looking at it, just give me a few

18   minutes here.  I have another laptop opened --

19   Q.   Of course.

20   A.   (Continuing) -- with your documents on it.  Okay, so

21   it's on.

22   Q.   All right, so can you identify the document for us?

23   A.   Just give me a few minutes to just go over it.

24   Q.   Well, let's do it this way.  I'll warrant to you

25   that this is an email that was received by Plaintiff

John Jung                                          March 5, 2021

Page 11

1    Novak from Chris Thompson at LCB to Roger Goodman, who

2    was the chair of security for the State of Washington at

3    the time, may still be.  I don't know.

4              MR. EISENBERG:  Let me clarify just briefly.

5    It is a public record that I received in a public records

6    request from the Liquor Control Board that contained the

7    email.  It was not an email to me.  It was a public

8    record that I requested.

9              MR. KING:  Correct, okay.

10   Q.   So given that now, Agent Jung, have you had time to

11   review this email?

12   A.   Yes, I have.  I briefly looked over it this morning.

13   Q.   Okay.  What is your takeaway from this email?

14   A.    It appears that the agency was seeking authority to

15   conduct criminal investigations in vape, tobacco and

16   marijuana.

17   Q.   Okay.  So I want you to focus on the last phrase,

18   kind of the first paragraph where it states, extending

19   authority in the alcohol domain to cannabis, tobacco and

20   vapor products.

21        Okay.  So when you read that, sir --

22   A.   What page is that on?  I'm not --

23   Q.   There's only -- it's only the -- it's going to be

24   the first page of that, of that exhibit.

25   A.   Okay.

John Jung                                        March 5, 2021

                                                      Page 12

1    Q.   So, yeah, then the first page -- yeah, so when you

2    say extending authority in the alcohol domain to

3    cannabis, tobacco and vapor products, okay, based on that

4    email, what do you believe your authority as a police

5    officer would be limited to?

6    A.   Based on this?

7    Q.   Mm-hmm.

8    A.   I don't know.

9    Q.   Well, let me ask it this way.  As you reviewed this

10   document, sir, does he make any indication that LCB

11   enforcement officers do not have the same authority under

12   cannabis, tobacco and vapor as they do under alcohol?

13             MS. CARR:  Objection, calls for speculation.

14             MR. KING:  Just his opinion based on the

15   email.

16   Q.   Please answer the question.

17   A.   Opinion?  I guess they do not.

18   Q.   Okay.  And what happened with House Bill 1626?  Do

19   you know?

20   A.   It fell.  That, I know.

21   Q.   Okay.  All right then, so did you ever receive this

22   email in your daily routines at LCB?

23   A.   No.

24   Q.   When was the first time you saw this?

25   A.   This is the first time I'm seeing it when I got --

John Jung                                          March 5, 2021

Page 13

1    when I got the exhibit.

2    Q.   Okay.  Thank you.  Could you go to the second page

3    of that exhibit?

4    A.   Okay.

5    Q.   Do you see that document there?  There's another

6    email chain from Chris Thompson.

7    A.   Yeah.

8    Q.   Okay.  Actually, let's go on to the very next page.

9    A.   Okay.

10   Q.   There we go, so this is Legislative Report 7.  And

11   at that time in March of 2019, there is a notation about

12   House Bill 1626.

13        And it states that it's sponsored by State Rep

14   Pettigrew, and it would extend the same authority

15   concerning alcohol for cannabis, tobacco and vapor

16   products, and it's currently in the House Rules

17   Committee.  Do you have any reason to doubt the veracity

18   of that statement?

19   A.   No.

20   Q.   And for the record, do you know who Chris Thompson

21   is, Agent Jung?

22   A.   You're asking me?  No, I don't.

23   Q.   Huh, so you don't know who the legislative affairs

24   director is for your agency?

25   A.   I don't -- I'm in the enforcement side, so I don't

John Jung                                           March 5, 2021

Page 14

1    engage too much with headquarter personnel, so -- and

2    they have -- each division has their own role, so it's a

3    pretty big agency for what it is.

4    Q.   Of course it is, but nobody ever communicated any of

5    these statements from your legislative affairs director

6    to you?

7    A.   Correct.

8    Q.   Okay.  Let's move on.  I want to virtually hand you

9    Exhibit E, which contains two documents.

10   A.   Stand by, please.

11   Q.   Of course.

12   A.   E as in Edward you said?

13   Q.   That is correct, so it's a two-part document.

14   A.   Okay, stand by.  I'm --

15   Q.   Sure.

16   A.   All right, I'm on it.

17   Q.   Okay.  So this exhibit is two documents.  The first

18   10 pages are one document, and the next page is something

19   signed by a judge.  Let's start with the first document;

20   okay?  Let me know when you've had a second to see it.

21   A.   Yes.  I have the first document, the first set.

22   Q.   We're going to focus on the first three pages of

23   this document for now; okay?  First of all, can you

24   identify what type of document this is or purports to be?

25   A.   It appears to be a search warrant.

John Jung                                            March 5, 2021

1    Q.    Okay.  And is there a name indicated on who is

2    issuing this warrant affidavit?

3    A.    It says Officer Robbie Satterly.

4    Q.    Okay.  Do you know Officer or Agent Satterly

5    personally?  I mean, professionally, do you know him?

6    A.    I only met him -- we only worked on one warrant

7    together, and I ran into him maybe once or twice because

8    he works down south.

9    Q.    Got you.

10   A.    So yeah.

11   Q.    That's fine.  I have other questions for that later.

12   That's fine.

13         Now, if you were not a certified peace officer,

14   okay, would you have any hesitation about drafting such a

15   document?

16   A.    Yeah, because typically warrants are issued by

17   police officers or peace officers in the state.

18   Q.    Okay.  And is -- to your understanding then, is that

19   the type of authority that House Bill 1626 was attempting

20   to manifest?

21   A.    I believe so.

22   Q.    Okay.

23   A.    Again, it's just my personal opinion on that.

24   Q.    You're a professional in your job; right?  You've

25   been there how long again?

John Jung                                    March 5, 2021

```
                                                    Page 16
 1   A.    Since 2008.

 2   Q.    Okay.  I want to direct you to page 3.  At the

 3   bottom -- let's go to the bottom of page 2, and it starts

 4   with training and experience.  Do you see that?

 5   A.    Yes, sir.

 6   Q.    Okay.  Go to page 3.  There's some bullet points

 7   there.

 8   A.    Okay.

 9   Q.    The first one, he states that he has attended Basic

10   Law Enforcement Academy.  Now, sir --

11           MS. CARR:  Objection, relevance.  This is not

12   about Agent Jung's qualifications, which I think you

13   should be asking about versus another agent with whom he

14   is not acquainted.

15           MR. KING:  I'm asking about policy,

16   Counselor.  Okay, and first off, you don't know he's not

17   acquainted.  I haven't even asked those questions yet.

18     I'm trying to lay a foundation.  Can I do that?  All

19   right.  That's how it works; right?  Yeah, that's how it

20   works.  Okay.

21           MS. CARR:  Be careful, Counselor, because

22   you're treading into yet again another unrelated case.

23           MR. KING:  I'm not even talking about a case.

24   I'm talking about this guy's background.  That's the

25   whole issue is whether or not these guys are
```

John Jung                                              March 5, 2021

Page 17

1    misrepresenting their capacity.

2              MS. CARR:  You can ask Mr. -- you can ask

3    Mr. Jung about his background, but please do not go into

4    areas that Mr. Jung is not -- that Mr. Jung lacks

5    knowledge.

6              MR. KING:  You don't know that he lacks

7    knowledge, Counselor, you don't because I believe he

8    does.

9    Q.   Next, so he indicated that he had attended Basic Law

10   Enforcement Academy, to come back to my line of

11   questioning; correct?  Is that correct, sir?

12   A.   Are you asking me?

13   Q.   Yes.  You are the deponent.

14   A.   I'm seeing the Basic Law Enforcement Academy --

15   Q.   Yeah.

16   A.   (Continuing) -- listed on his -- this document, yes.

17   Q.   Okay.  Now, if I warrant to you -- okay.  In your

18   discussions with Agent -- Officer -- I'm sorry, Agent

19   Satterly, do you know if or when he attended Basic Law

20   Enforcement Academy?

21   A.   That, I don't know.

22   Q.   Okay.  I'm going to virtually hand you Exhibit B.

23   Take a look at that.

24   A.   Okay.  I'm on it.

25   Q.   Yeah, I'll warrant to you that this document was

John Jung                                          March 5, 2021

                                                         Page 18

 1    forwarded to me by your counselor pursuant to my

 2    discovery request.

 3         I want you to draw your attention down to the middle

 4    of that first block there dealing with Robbie Satterly

 5    where it says WSCJTC, Basic Law Enforcement Equivalency

 6    Academy.  Do you see that there?

 7    A.   Yes, sir.

 8    Q.   And is there a date that corresponds to that

 9    activity?

10    A.   I see it marked as 040, dot 27, dot 220 through 05,

11    dot 08, dot 220.

12    Q.   Thank you.  Now, if I warrant to you that Exhibit E

13    was authored in 2019, that would mean that Agent Satterly

14    had not attended BLEA training, wouldn't it?

15              MS. CARR:  Lacks foundation.  He has no

16    knowledge of that.

17              MR. KING:  I just warranted to him that that

18    document was written in 2019, so he's allowed to answer

19    the question based on my representation and my personal

20    knowledge of when it was written.

21    Q.   Now, please answer the question.

22    A.   What was the question again?

23              MR. KING:  Okay.  You know, Counselor, this

24    deposition is going to cost me a whole lot of money if

25    you keep interrupting me without reason, please stop.

John Jung                                          March 5, 2021

Page 19

1   Q.    Okay.   The question was if I warrant to you that the

2   document I just showed you, Exhibit E, was authored in

3   2019, that would mean that he had not attended BLEA when

4   he wrote that document; right?

5   A.    You know, I could tell you this much.   The term

6   BLEA, the Basic Law Enforcement Academy, the acronym for

7   that, BLEA, is very unique to Washington State.

8         The other states all use the term POST, which is

9   P-O-S-T, which stands for Police Officer Standard and

10  Training.

11        Had he attended BLEA here, based on the date that he

12  attended equivalency, there would be no need for him to

13  attend the equivalency if -- had he attended at least in

14  2019 based off of that warrant date.

15  Q.    Okay.   But, sir, what I'm asking you is if you look

16  at his list, if you look at Exhibit B, which was provided

17  to me by your counsel, it lists -- I asked for his

18  training qualifications since he arrived in 2017; okay?

19        So, therefore, if the only notation for BLEA is for

20  that time period, isn't it true that he couldn't have

21  attended BLEA when he wrote Exhibit E?

22                MS. CARR:   Objection, lacks foundation, lacks

23  knowledge.

24                MR. KING:   Counselor, your own document -- I

25  asked you for the training documents commensurate with

John Jung                                        March 5, 2021

Page 20

1    that agent.  That's what -- that's what Exhibit E is, so

2    you can't contradict your own exhibit.

3                 MS. CARR:  Those documents relate to training

4    that was secured here in the State of Washington.

5    Mr. Jung does not have knowledge about any other training

6    other than what is on paper in front of him, so he lacks

7    the foundation and the knowledge to answer your question.

8                 MR. KING:  We're going to get there if you

9    want to play that.

10   Q.   Hey, Agent Jung, do you know where Agent Satterly

11   was a previous law enforcement officer?  Was it Colorado?

12   Correct?

13   A.   Yeah, that's what I know.

14   Q.   Okay.  And what do they call their training there?

15   Do they call it BLEA?

16   A.   No.

17   Q.   Okay.  So BLEA --

18   A.   Like I said before, most of the other states,

19   including Oregon, California, Idaho and many other states

20   in this U.S., they refer to BLEA that we call as POST,

21   P-O-S-T, for their training.

22   Q.   Yeah, so as you were just saying then, if he

23   indicated on that warrant that he had attended BLEA, then

24   that's not true?

25   A.   That, I -- I really can't answer that one with

John Jung                                                    March 5, 2021

                                                              Page 21

1    certainty, but yes.  It would not be the case.

2    Q.   Okay.  Thank you.  All right.  Let's continue with

3    Exhibit E.

4    A.   Okay.

5    Q.   Let's go down to -- and by the way, let's go back to

6    the first page of this exhibit; okay?  There's a case

7    caption on it.

8         Can you identify -- actually, there's not yet, never

9    mind, never mind now.  Let's go back.  Let's go to page

10   -- numerically it's going to be page 28; okay?

11   A.   All right, stand by.  I'm assuming it's the

12   conclusion page.

13   Q.   Yes.

14   A.   28?

15   Q.   Yes.

16   A.   Okay.

17   Q.   All right.  You'll note that it says 2019 on it,

18   does it not?

19   A.   Yes, sir.

20   Q.   Okay.  And is there any signature on that?

21   A.   No.

22   Q.   Okay.  Would it surprise you to know that we've

23   asked for a signed affidavit, and I've never seen one?

24   A.   You know, I don't know why this is relevant to my --

25   Satterly's issue.  I don't know.

John Jung                                      March 5, 2021

Page 22

1   Q.   Well, sir, with all due respect, with all due

2   respect, sir, if someone at the agency is overstepping

3   their boundaries, that's kind of the point of the whole

4   lawsuit.

5        So just answer my question until or unless Attorney

6   Carr and I disagree to a material point; all right?  Just

7   answer my question.

8   A.   Well, I don't know why he didn't sign it or what was

9   your question again?

10  Q.   Would it surprise you to find out that there -- that

11  the world has never seen a signed version of this

12  affidavit?

13            MS. CARR:  Objection, he lacks foundation as

14  to whether the world has ever seen a signed copy of that

15  affidavit.

16            MR. KING:  I asked him if it would surprise

17  him.  He's allowed to answer that.

18  A.   Am I surprised there's no signed copies --

19  Q.   Yes.

20  A.   (Continuing) -- of the warrant?

21  Q.   Yes.

22  A.   Yeah, it would surprise me because --

23  Q.   Sir, did you say would or would not?

24  A.   Would surprise me if it was not signed.

25  Q.   Please continue.  I didn't mean to interrupt, please

John Jung                                          March 5, 2021

Page 23

 1   continue.

 2   A.    I've served -- I've served quite a few warrants when

 3   I was with feds, and we made sure that every signature,

 4   guidelines or whatever were checked off, and so to see

 5   one that is not signed and call it a warrant is invalid

 6   based on my training and experience.

 7   Q.    Thank you.  And I assume you wouldn't have any

 8   knowledge of Agent Satterly, whether or not he was

 9   punished for not signing it.

10   A.    I would not know that.

11   Q.    Okay.  Let me ask you this.  Do you know who Levi

12   Lyon is?

13   A.    No, sir.

14   Q.    Okay.  If I were to tell you that this affidavit or

15   this unsigned affidavit was used to maintain a criminal

16   prosecution for about a year, would you -- would that be

17   something that you would feel comfortable doing yourself

18   personally if you were in this position with an unsigned

19   affidavit?

20   A.    No.

21   Q.    Why not?

22   A.    Like I said, based on the last question, I've served

23   with federal agents on multiple warrants or whatnot, and

24   we always had signatures, whether it was the agent's

25   signature or the judge's signature to execute the

John Jung                                      March 5, 2021

Page 24

1   warrants.

2   Q.   Thank you, thank you.  I'll warrant to you that --

3   speaking of warrants, I'll warrant to you that Levi

4   Lyon's case was dismissed without prejudice about a month

5   and a half ago.

6        Okay.  Has anybody at the agency informed you that

7   Robbie Satterly, the other deponent for today, has

8   anybody informed you that he went on leave yesterday?

9   A.   No.

10  Q.   Has anybody informed you that his last day at the

11  agency is the 14th of March?

12  A.   No.  I didn't know that.

13  Q.   Okay.  Let's time out.  Agent Jung, Plaintiff Novak

14  and I filed this lawsuit in October of last year, 2020;

15  okay?  So since October of 2020, what changes have you

16  noticed in staffing at LCB among the managerial staff?

17  A.   You know, I know that the chief, Justin Littlehorn,

18  left the enforcement division.  Now he's over at the

19  director's office as a community outreach director.

20  Q.   Okay.

21  A.   Deputy Johnson, his last day is next Friday.

22  Q.   Wait a minute.  Deputy Johnson, what's his full

23  name?

24  A.   Steve Johnson.

25  Q.   Okay.  What was his role?

John Jung                                          March 5, 2021

Page 25

1    A.    He was the enforcement chief of operation of the

2    LCB.

3    Q.    Okay.  And he's put in an abrupt resignation like --

4    well, withdrawn.

5    A.    Yeah, it was a resignation, and he stated that his

6    last day was the 12th of March.

7    Q.    Are you guys having a party for him?

8    A.    Not that I'm aware of.  I didn't receive any

9    notices.

10   Q.    Isn't there usually a party?  I've worked in

11   government before.  When people in big brass leave,

12   there's usually a party.  What's your typical protocol

13   there for when big brass leaves?

14   A.    Yeah, we had some in the past, and due to the

15   current pandemic, I think the last one we had was for

16   somebody -- it was actually a captain who retired.  We

17   had a Zoom farewell party.

18   Q.    Okay.  Any other changes going on there as far as

19   the big brass moving and --

20   A.    The marijuana commander position got eliminated, and

21   she's now a captain.  And I'm not sure exactly which area

22   she'll be in charge of, so there's been some shift in

23   personnel I believe up at the top as of late.

24   Q.    Okay.  Let me ask you this.  Has the management of

25   your fieldwork in any way changed since October of 2020?

John Jung                                          March 5, 2021

Page 26

1   A.    I would say to some degree, yes.  I've worked on a

2   couple of -- it was interesting.  When I first joined the

3   marijuana unit, they were sending me to some of these

4   licensed locations, possible grow reports coming through

5   as a complaint.

6         And I was directed to go in and conduct surveillance

7   and to see if I could observe the grow, illegal illicit

8   grows and come back and report back to the agency for

9   them to take further action.

10        Recently I was assigned to a complaint of unlicensed

11  location, and I was told not to do anything about it, and

12  they just closed the complaint out as unfounded and also

13  recently contacted by a local police department that had

14  a subject with 68 pounds of marijuana that another agent

15  referred me to follow up.

16        And I was told that the supervisor was going to

17  handle it, whereas in the previous case, they directed me

18  to go investigate and work with that local PD.

19        And it wasn't -- unfortunately, it was the same

20  police department, Lakewood -- Lake Forest Police, so the

21  first time around, which was about last -- about a year

22  and a half ago, I actually contacted the officer and

23  discussed the possible illicit grow or transaction, and

24  this time around they told me not to do anything about

25  it.

John Jung                                              March 5, 2021

Page 27

1   Q.   Interesting.  Let me ask you this.  Who is David
2   Stitt?  Do you know who David Stitt is?
3   A.   Yeah, he used to be a former officer of the agency.
4   Q.   Okay.  I interviewed David Stitt, and he recounted
5   to me a story.  I'm going to ask you if you're familiar
6   with this, a situation at a shopping mall plaza in South
7   Seattle where an LCB agent witnessed a potential drug
8   activity.
9        The suspect threw a bag of drugs under a van, and
10  Mr. Stitt warranted that he was involved in this and that
11  he told me that they went to get local police, but the
12  local police wouldn't do anything because they had no
13  authority because Stitt was not a licensed peace officer.
14  Have you heard anything about that incident?
15  A.   Yeah, David actually told me about that incident
16  some time ago.
17  Q.   And what's your recollection of it?  Did I nail it
18  or is there something more you'd like to add or --
19  A.   Well, the story is that they were -- he was with two
20  other agents of our agency.  They were doing a --
21  conducting just a regular premises check at this
22  location.
23       And when they made eye contact, I guess the
24  individual thought that David, along with two other
25  agents, were cops and he threw a baggy of substance under

John Jung                                               March 5, 2021

Page 28

1    the car and ran.

2         And apparently the suspect as he was running ran

3    into a local Seattle police officer, who was doing normal

4    patrol, and one of the agents yelled out.  It was -- the

5    agent chased him.

6         And when they caught up to him, the agent reported

7    that the suspect threw a baggy under the car.  They

8    retrieved the baggy.  The officer at the scene, the

9    Seattle police officer at the scene took the individual

10   into custody.

11        And at the station, apparently they dismissed the

12   case because this agent -- the station supervisor said

13   that their officer, the Seattle police officer did not

14   witness the connection between the suspect and the drug.

15        And they were not able to take a witness statement

16   from LCB agent because they lack the merit of training

17   and experience as a peace officer.

18   Q.   Okay.  Thank you.  Sir, who is Roger Goodman if you

19   know?

20   A.   Yeah, Roger Goodman is the Washington State public

21   safety director or the chairperson.

22   Q.   Yeah, chair, yeah.  Have you ever had occasion to

23   have lunch with my co-plaintiff and Roger Goodman?

24   A.   Mr. Novak and I had several contacts during my state

25   case, and he reached out to me and said, hey, let's

John Jung                                          March 5, 2021

Page 29

1   schedule a meeting with lawmakers.  It'd be interesting

2   in coming and sharing your story, so, yeah, that's how I

3   met Roger Goodman at one time.

4   Q.    So you did have a lunch with --

5   A.    It was actually a breakfast.

6   Q.    Okay.  And where was it, and who all was present?

7   A.    Mr. Novak, myself and Mr. Goodman.

8   Q.    And where was it if you remember?

9   A.    It was -- it was -- it was in Kirkland at a

10  restaurant.

11  Q.    That's good enough.  Based -- what was the subject

12  of your conversation?

13  A.    It was just an overall to discuss about the lack of

14  proper authority of LCB, and again this was just a casual

15  meeting for me to engage in a conversation to make things

16  right in terms of legal authority.

17        And that's when I found out -- Mr. Goodman said

18  that, oh, you know, the liquor board's trying to seek the

19  same legal criminal investigation authority in marijuana,

20  vape and tobacco.

21        And at that point I had no idea that we did not have

22  that authority, and Roger Goodman quickly finished up his

23  breakfast and left the premises using the backdoor.  And

24  I ended up paying for his meal, and I -- to this day, I

25  have that receipt to prove that he was there.

John Jung                                          March 5, 2021

Page 30

1   Q.   Wow, huh.

2   A.   And he told me that he wanted to work to, you know,

3   fix this, so what I did was -- he provided or he asked me

4   to draft up an email, which I followed up next day to him

5   and his assistant and to the state.  I haven't heard

6   anything.

7   Q.   Okay.  You know, what's interesting -- never mind,

8   but I'll let the record reflect that I have tendered a

9   public record request to Roger Goodman, and he indicated

10  to me we'd get the documents, correspondence files to me

11  today.

12      I wrote them last night and asked them if it was

13  going to come right after this deposition, which

14  apparently that's going to happen.  They'll probably wait

15  till I hang up, and they'll send me those documents.

16      Okay.  Anyway -- okay.  So outside of Roger Goodman,

17  let's move on to your peers as agents.  Have you

18  discussed with other agents their concern that they are

19  not certified peace officers?

20  A.   I have been discussing this matter with -- from the

21  chief of the enforcement down to co-workers.  Yes.  I

22  have for the last couple years.

23  Q.   Right, but I -- right now I'm focusing on the

24  co-workers and any steps -- anything that they have

25  representing to you or steps you know that they have

John Jung                                        March 5, 2021

                                                        Page 31

 1   taken as a result of this concern.

 2        So we want to focus on that, and I want you to name

 3   each one of them by name and summarize your

 4   correspondence with them, please.

 5   A.   Right now a previous co-worker, Caine Hilario -- his

 6   first name is C-A-I-N-E, last name is spelled -- Hilario

 7   is spelled H-I -- one second -- H-I-L-A-R-I-O.

 8        One time he advised me that there were a couple of

 9   white officers attending equivalency training after years

10   of enforcement role with LCB.

11        And during my grievance hearing for HR and the chief

12   of enforcement, I called the LCB out that they were

13   sending some of these agents to get their certification

14   behind the backdoor because I didn't know anything about

15   it until Caine told me.

16        And sure enough, I did check to confirm that one of

17   the agents -- and his name is Robert Raecia, and the last

18   name is -- I can't remember his exact spelling, but it's

19   R-A-E-C-I-A I think.

20        Anyway, so he's -- he was the first one to go

21   through the process, and so I made that very clear to the

22   chief and next thing I know the chief decided to enroll

23   me into the equivalency myself and I couldn't figure that

24   out.

25        Why would he send me to equivalency when I'm not

John Jung                                    March 5, 2021

Page 32

1    even eligible for an equivalent class?  Basically the

2    chief of enforcement offered equivalency class to me.

3        And I wasn't sure why I was enrolled in that class

4    because I wasn't eligible to attend that class based on

5    the prerequisite requirement.

6    Q.    So from my understanding, and it's a little

7    confusing, but correct me if I'm wrong, Verbeka -- well,

8    time out.

9        Do you have knowledge of Robbie Satterly going for

10   equivalency training as well?

11   A.    I found that out apparently when -- during our

12   marijuana enforcement meeting.  This was before --

13   Q.    Sir, the quick is, yes, you do have knowledge.  Then

14   please explain; correct?

15   A.    Yes, yes.  I do have the knowledge.

16   Q.    Okay.  Please tell us.

17   A.    This happened before pandemic.  We actually had a

18   team of -- in-person meeting, a marijuana team meeting at

19   the headquarter.

20       As soon as I sat down, Robert -- Robbie, who I

21   rarely contact, came rushing in to me and said, hey,

22   John, I heard that you were going to the equivalency.

23       And I had no idea how he would know that I'm going

24   to equivalency because I don't talk about things to

25   anybody else when it comes to that stuff.

John Jung                                          March 5, 2021

Page 33

1        Anyway, so he asked me about it.  I said, yeah, I'm

2    going to equivalency, and he said he was going to

3    equivalency and that was the end of that conversation.

4        During my hourly lunch break I ran into him in the

5    parking lot, and I asked him why he was going to

6    equivalency because he's been here for years.

7        And when I asked him why he was going, he said he

8    did not feel comfortable doing criminal investigations

9    without being certified.

10       And at that moment I felt the rush of emotion

11   because that's what I've been asking for this agency to

12   do, to do the right thing for me.

13       And I said this agency is racist, and within two

14   days I received a phone call from my supervisor telling

15   me that somebody reported in that I called this agency

16   racist and I called my supervisor out on that.

17   Q.   Let's back up just a little bit.  Let's back up a

18   little bit for continuity sake; okay?  So you are I

19   assume by your name an Asian male; correct?

20   A.   Correct.

21   Q.   Okay.  Now, Satterly and Verbeka, Caucasian males?

22   A.   They're both white.

23   Q.   Okay.  Now, again, correct me if I'm wrong.  Both of

24   them were certified peace officers in other jurisdictions

25   before coming to LCB; correct?

John Jung                                          March 5, 2021

Page 34

1    A.    Yes.

2    Q.    So by getting equivalency training, then now these

3    two white guys are full certified peace officers;

4    correct?

5    A.    Correct.

6    Q.    So you, however -- and by the way, that equivalency

7    is like 440 hours; right?

8    A.    No.

9    Q.    No?

10   A.    It's 80 hours.

11   Q.    80?  Okay.  So let's go back to -- okay, never mind,

12   so -- but you can't use equivalency because you were

13   never a law enforcement officer.  In order for you to be

14   a certified peace officer, you need the whole BLEA;

15   right?

16   A.    Yeah, the equivalency is only for lateral transfers

17   from other states or if there's a break in service of law

18   enforcement activity, and that's very clear in the WAC

19   rules under the --

20   Q.    Okay.  It's time for a WAC rule, hold on.  Let's

21   talk about what's required when you come to LCB and

22   what's represented.  Now I'm going to hand you back to

23   Exhibit B.

24   A.    All right, stand by.  Okay.  I'm on there.

25   Q.    Okay.  Let's -- we've already discussed Satterly,

John Jung                                          March 5, 2021

                                                           Page 35

 1    and that was in, as we see, late April 2020, travel south

 2    to Verbeka, please.

 3    A.    Yeah.

 4    Q.    Do you see a date for his attendance?

 5    A.    October 25th, 2019.

 6    Q.    Okay.  Now, sir, are there any rules regarding your

 7    duty to update your certifications when you enter

 8    employment with LCB?

 9    A.    Yeah, based on the current administrative code for

10    peace officer training, they have to attend within six

11    months of their employment.

12    Q.    Okay, hang on.  Is there a code section for that

13    that you know of, sir, that supports your --

14    A.    I believe it's in the 139-05-200 administrative

15    code.

16    Q.    Okay.  Just a second.  Yes.  I thought I had that.

17    Exhibit D, please, D as in dog.

18    A.    Okay.

19    Q.    And that is WAC 139-05-200; correct?

20    A.    Yes.

21    Q.    And could you please review paragraph 1?

22    A.    Yes.

23    Q.    Okay.  And does that confirm what you just stated,

24    the six months?  You should be doing equivalency within

25    six months?

John Jung                                                    March 5, 2021

Page 36

1   A.    The equivalency or the basic training, one of the

2   two.

3   Q.    Great.  Now, to your personal direct knowledge,

4   let's travel back now to Exhibit -- virtual Exhibit B as

5   in boy.

6   A.    Okay.

7   Q.    Okay.  Do you have personal knowledge -- let's start

8   with Robbie Satterly.  Do you have personal knowledge

9   that he was an employee at LCB more than six months

10  before his BLEA training?

11  A.    Yes.

12  Q.    Approximately how long to your recollection?

13  A.    I believe he was hired back in 2017.

14  Q.    So three years went by, and then Levi's case comes

15  up and then he goes for BLEA.  Okay.

16              MS. CARR:  Objection.

17              MR. KING:  I'm just establishing a timeline,

18  Counsel.  It is accurate; right?  Yeah, it is.

19              MS. CARR:  We object to the fact that you

20  characterize it in connection with an unrelated case.

21  Again, Levi Lyon's case is not related to your case

22  against the State of --

23              MR. KING:  I'll leave it up for Judge Jones

24  to decide.  I'm pretty comfortable in my position,

25  Counsel.

John Jung                                        March 5, 2021

Page 37

1   Q.   Next, Officer Robert Verbeka, his BLEA was

2   10/25/2019.  Sir, do you have personal knowledge that he

3   has been with the LCB for more than six months prior to

4   that?

5   A.   Yes.

6   Q.   Approximately how long?

7   A.   I believe he was hired around 2016.

8   Q.   Even longer?  Okay.

9           MR. KING:  So you see, Counselor, just for

10  edification, the fact that it was Levi's case doesn't

11  really matter so much in this question.  The question is

12  whether or not they did what the WAC rule told them to

13  do, and they didn't, so it's clear.

14  Q.   All right.  Moving along, let's go back to your

15  peers, sir; okay?

16       Did you ever have conversations with your peers --

17  this is a two-part question.  First, A is going to be

18  peers.  B is going to be something else, but did you ever

19  have a conversation with your peers where you were

20  concerned that you didn't have qualified immunity?  Well,

21  first, let me back up.

22       Do you know what qualified immunity is, sir?  What's

23  your perception of it?

24  A.   Yeah, qualified immunity applies to officers when --

25  let's go back.  You want -- you have immunity from civil

John Jung                                           March 5, 2021

Page 38

1   liability in case of physical injuries or property damage

2   while acting as a police officer.

3   Q.   And was there any concern among your peers in the

4   last few years that you all don't enjoy qualified

5   immunity?

6   A.   I know David Stitt and I had many discussions about

7   that when he was here.  And when I started to research

8   and investigate this agency's mishandling of their

9   training, David himself actually was scared of the fact

10  that he was carrying a gun and potentially had to pull it

11  out and shoot somebody.

12       So he asked for BLEA training, and the chief at the

13  time told him that he was okay as is.  And long story

14  short, he ended up just quitting because he wasn't able

15  to continue knowing that.

16  Q.   And so do you find that similar to the concern that

17  Agent Satterly told you in a parking lot?

18  A.   That's exactly what it was, and he knew that at the

19  time.

20  Q.   Thank you.  We're moving along here, hold on.

21       Sir, if you were in the field and you had an

22  occasion where a theft was going on and let's say you're

23  at a store, a retail store.  You're investigating.

24       You're doing your work, and a criminal suspect walks

25  in with a gun, and they hold someone hostage.  They hold

John Jung                                           March 5, 2021

Page 39

1   a budtender hostage; okay?

2       If Cynjo's at the door working, if she still had a

3   job, so she's still at her job working and someone comes

4   in and puts a gun to her head.  You're standing there

5   with your service pistol.  Do you have pistols or

6   revolvers?

7   A.   We have a semiautomatic.

8   Q.   Is it a 9 or what?

9   A.   9 mil.

10  Q.   Okay.  What brand?

11  A.   Smith and Wesson.

12  Q.   That's classic.  Okay.  Anyway, now, you're standing

13  there.  You got your Smith and Wesson, and you see this

14  going on.  What's your response going to be?  Are you

15  going to draw your weapon?

16  A.   Based on current level of training and experience

17  and my knowledge of my status, I would walk away.  I will

18  not jeopardize two families over that.

19       I'd rather be the subject of the incident, but I

20  will not pull my trigger.  I had a discussion with the

21  assistant commander of CJTC too, and you'll see that in

22  the exhibit that I submitted to my counsel, but --

23  Q.   I've seen it.  We'll get there.

24  A.   I -- knowing that I was able to really confirm my

25  belief on the lack of qualified immunity, there's no way

John Jung                                      March 5, 2021

Page 40

1    in the world that I would pull my gun out for anybody,

2    even in the case of my own life at this point.

3    Q.   And, sir, do you feel that that ultimately

4    compromises the safety of all the taxpayers?  If you

5    can't pull your gun, doesn't that compromise the safety

6    of all the taxpayers?

7    A.   It compromises everybody including myself.

8    Q.   Thank you.

9              MR. KING:  Let's take a break for a minute,

10   guys.  I have just a couple more questions, and then

11   we'll take a breather.

12   Q.   Sir, do you know what a Laurie List is?

13   A.   Yes, sir.

14   Q.   Okay.  We got a couple more questions, and we'll

15   take a break.

16        Based on our previous discussion about Agent Robbie

17   Satterly, do you believe he should be placed on a Laurie

18   List?  Wait, wait, back up, sorry, sorry, sorry.  What is

19   a Laurie List?

20   A.   It's a list that the prosecutors create to help

21   remind themselves of cops that potentially will be a

22   credibility issue in criminal cases.

23   Q.   And isn't the premise that the -- when someone has a

24   credibility issue as a cop -- by the way, I say cop.  I

25   just say it affectionately.

John Jung                                                March 5, 2021

Page 41

1      I was a law enforcement attorney, so I don't mean to

2  downgrade or anything.  I'm just saying cop because

3  that's what we say.  We say cops or whatever, LEOs, cops,

4  whatever.

5      So if someone is deceitful as a cop, isn't it the

6  duty of law enforcement, of the prosecutor to let the

7  defendant and defendant's counsel know about it?  Isn't

8  that the point of a Laurie List?

9  A.   That is so, and I'm speaking based on my prior

10  experience as a public defense coordinator because we

11  often -- when I engage in conversation with the defense

12  counsels on, you know, many criminal cases, we discuss

13  that and that's how I know about that list.

14  Q.   Great, great, so you do have knowledge, terrific.

15  And based upon our conversation about Agent Satterly

16  earlier and his qualifications, do you believe he should

17  be Laurie listed?

18  A.   That, I cannot answer with certainty, but based

19  on the --

20  Q.   Can't or won't?

21  A.   What was that again?

22  Q.   Can't or won't?  What is your opinion?

23  A.   My personal opinion?  He should be.

24  Q.   Thank you.  Have you personally witnessed other

25  agents falsely claiming to be peace officers?

John Jung                                          March 5, 2021

Page 42

1   A.   My quest for that started back in 2017 when one of

2   the agents at the board -- his last name is Chue, spelled

3   C-H-U-E.

4        I participated in his search warrant for a cigarette

5   case, which was a roll your own cigarette tax evasion

6   case where he listed his activities to get the search

7   warrant, and I obtained a copy of it because I

8   participated in the warrant.

9        In that warrant, in the training and experience

10  section he listed himself as a limited authority peace

11  officer, and I knew at that point for a fact that he

12  wasn't because he came from IRS.

13       And so I filed a public records request, and I was

14  able to get admission from the agency that because he did

15  not attend the Washington State Criminal Justice Training

16  Commission's Basic Law Enforcement Academy, he was not a

17  Washington State peace officer.

18  Q.   Thank you, and I believe that is your Exhibit 15

19  we're going to get into in the next hour; correct?

20  A.   I'm not sure which one it is on the exhibits, but I

21  know I submitted that.

22  Q.   Okay.  Thank you.  Sir, who is William Clark, Bill

23  Clark?  Have you heard that name?

24  A.   No.

25  Q.   Okay, skip that.

John Jung                                          March 5, 2021

Page 43

1          MR. KING:  Let's take a break, guys, about
2    five minutes.
3                (Recess taken.)
4    Q.   Sir, earlier I asked you if you knew an agent by the
5    name of Bill Clark, and you said no.
6    A.   Correct.
7    Q.   Okay.  I will warrant to you as proved in a YouTube
8    video a couple days ago that Mr. Clark telephoned me, and
9    I will quote from that video.
10        He said the cronyism and ineptitude is a cover for
11   maliciousness.  You will not speak in a manner that does
12   not support this agency or you will not get a promotion.
13        Okay.  On a scale of 1 to 10, 1 vehemently disagree,
14   10 vehemently agree, where would you place yourself on
15   that continuum regarding that statement?
16   A.   10.
17   Q.   I'm sorry?
18   A.   10.
19   Q.   Okay, thanks.  He also said that -- he labeled the
20   entire enforcement modus operandi as, quote, arbitrary
21   and capricious, end quote.
22        Do you know what arbitrary and capricious means, and
23   if so, how would you characterize it?
24   A.   I would agree with that.  As a matter of fact, I
25   testified before the Commerce Committee to -- with the

John Jung                                           March 5, 2021

                                                    Page 44

 1   same notion that we have serious issues here at the
 2   agency.
 3        One day certain policies are acceptable.  Within a
 4   week that policy changes without any reasoning behind it,
 5   and the agents are -- actually, we find out the changes
 6   to policies from licensees.  We don't even get that
 7   message through the chain of command.
 8   Q.   Yes.  I know earlier you said you never got the memo
 9   from Chris either on the H.B. 1626; correct?
10   A.   Yeah, yeah, so when I heard that one, particularly
11   from the chairperson himself, I was in shock that we were
12   acting, yet we didn't have this bill approved.
13        At that point on I did additional research that
14   resulted in tons of other bills that LCB attempted to
15   pass for not only the authority within those, you know,
16   four categories or three categories of marijuana, tobacco
17   and vape, but they were attempting to expand their
18   criminal investigation authority into Title 9 of the
19   Washington RCWs.
20   Q.   Oh, wow.
21   A.   Even into the general authority, and all that went
22   down the tube.
23   Q.   Time out, time out.  Sir, sir, time out.  You froze
24   for a second.  So after you mentioned Title 9, you said
25   something and it blocked for a second, please repeat.

John Jung                                              March 5, 2021

Page 45

1  A.   So the agency not only attempted to expand the three

2  categories of the current field of regulatory

3  enforcement, but they also attempted to expand their

4  authority beyond that into criminal investigation

5  authority, into Title 9 and other stuff and all of that

6  went down as well as House Bill 1626.

7  Q.   Yeah, there were about five or six bills, were there

8  not during your tenure, five or six bills that were

9  launched in the same vein, were there not?

10  A.   Yeah, it was pretty much a year after year, attempt

11  after attempt, and I remember back in 2014 when the

12  marijuana enforcement regulatory component came into our

13  hands after the 502 passed.

14      The agency attempted to gather agents' training

15  records to be submitted to CJTC because they were seeking

16  peace officer authority, and the CJTC wanted to review

17  our training records to see if they could just simply

18  grandfather us into the program.

19      And upon review, they said no.  You guys are not

20  qualified.  You want -- you want peace officer status?

21  You all need to come back to the training, and at that

22  point the agency decided to take a different route to

23  continue their current mission.

24  Q.   Which basically is just acting as if; isn't that

25  right?

John Jung                                                  March 5, 2021

Page 46

1   A.    Based on current standing, yes.

2   Q.    Okay.  Sir, are you aware of the concept that a

3   state agency can be found liable for a civil rights

4   violation for acting in an arbitrary and capricious

5   manner?

6   A.    Yes, and that's the reason why I refuse to pull my

7   gun out, and I refuse to take any criminal enforcement

8   activity knowing the fact that I'm in that position.

9         And I've made it very clear to the management that

10  not only me, but then again my supervisor, who's

11  directing me, could end up being in the same situation,

12  so --

13  Q.    So you feel like a sitting duck then, yeah?

14  A.    Oh, yeah, very much so.

15  Q.    Okay.  Have you ever heard of a case -- you probably

16  have not, but in your training has anybody at LCB ever

17  told you about the case of Hayes versus City of Seattle,

18  934 P.2d 1179, 1977?  Have you ever heard of that case?

19  A.    No, sir.

20  Q.    Okay.  Never mind, that's okay.

21              MR. EISENBERG:  So, Officer Jung, could I get

22  you to summarize your testimony that you gave in front of

23  the Commerce and Gaming Committee?

24  A.    Yeah, basically I told the committee members that we

25  have a bunch of officers that are acting with

John Jung                                              March 5, 2021

Page 47

 1    inconsistent authority.  Some have served the warrants

 2    that -- or listed in the warrants that they were not

 3    properly trained, and, in essence, falsifying the

 4    warrant.

 5         And I told them that I had examples and whatnot,

 6    but, you know, based on those testimony, there being such

 7    a time sensitive or time limited that I wasn't able to

 8    provide all the documents, and so that's pretty much all

 9    I know or remember obviously.

10              MR. EISENBERG:  Well, it's my understanding

11    that this was a committee hearing that was brought

12    forward due to pressure that was put on by a letter from

13    10 different legislators.

14         And in this letter, there was -- they brought up the

15    term toxic culture, and I've heard that term a lot when

16    relating to the Liquor Control Board and I've heard it

17    from several agents.

18         So what does that term mean really to you when you

19    hear that the LCB has a toxic culture?

20    A.   I consider LCB to be a family run business.  It's a

21    Mafia oriented agency.  I've heard of Director Garza's

22    family member being hired into a position working and

23    practically doing nothing, yet they have -- you know, get

24    high praises in their performance evaluations.

25         I have also heard of LEO agents being hired through

John Jung                                              March 5, 2021

Page 48

1   special treatment.  I've actually identified one guy

2   whose name is Jordan Anderson, common spelling last name.

3        He failed the physical agility test at the agency

4   when he was first hired on, but was allowed to come into

5   the agency, train, being prepared for CJTC police

6   academy's physical agility test because of his

7   connection.

8        And it turns out -- I did a little background

9   investigation.  It turns out his mother works for Finance

10  Department of LCB.

11       And we had another white Caucasian officer who got

12  hired, and he was fast tracked to a sergeant within I

13  think, what, two, three years because his aunt was a -- a

14  person -- was the HR person.

15       If you're not with the program with this agency,

16  you're not part of the agency.  In other words, sooner or

17  later you are shown the door.

18  Q.   Okay.  The second agent you just discussed, he was

19  hired -- you said they fast tracked in three years.  What

20  was his terminal position or where did he -- what level?

21  A.   He was initially hired as an entry, and he went

22  through the academy, and he became a sergeant and he left

23  the agency.  He went to Des Moines Police Department now

24  because he was able to lateral over to that agency.

25                  MR. KING:  Okay.  So, John, does that answer

John Jung                                              March 5, 2021

Page 49

1   your question?

2            MR. EISENBERG:  Yeah, pretty much.  I think

3   so.

4        So the only other question I really have on this is

5   in the years that I have lobbied and spoken with the

6   directors and the chief and everybody, it seemed that the

7   state had a definite bias when it came to people who use

8   cannabis.

9        Did you -- do you find that was part of the toxic

10  culture when the agency began regulating the actual

11  passage of 502?

12           MS. CARR:  Objection, relevance.  This is a

13  lawsuit about LCB officers and their authority, their

14  legal authority.  This is not a lawsuit about the LCB and

15  its general culture.

16           MR. KING:  Well, with all due respect,

17  Counselor, that general culture pervades how it runs its

18  affairs and that's my theory of the case.

19       You can't really disturb that, and I think -- so

20  your objection's noted for the record, but you can't

21  interfere with my theory of the case.

22           MR. EISENBERG:  Well, my issue is that this

23  is an agency that has put emphasis on enforcement that

24  they don't have over regulating a cannabis product that

25  patients like myself were told that it would be regulated

John Jung                                              March 5, 2021

Page 50

 1   in a model, that we would have protections and proper

 2   testing.

 3        And from everything that I'm hearing, it sounds like

 4   they're more interested in going after people like

 5   myself, and I'm wondering if that seems to be part of the

 6   culture that exists within the agency.

 7             MR. KING:  That's correct, so yes.  I think

 8   it's a valid question.

 9   Q.   Please answer the question, Agent.

10   A.   Initially when the 502 passed, many of the agents or

11   the -- even the captains within my own region, you know,

12   identify these growers as drug dealers or criminals, and

13   that we need to really take a hardcore approach in

14   enforcing it.

15        And that's one of the reasons why they attempted all

16   these bills, extended authority, general authority

17   because they knew that there was a huge gap in our

18   ability to get the job done, but to my surprise even with

19   these failed bills, they forged on anyway.

20   Q.   Great, that's a perfect segue.  Let's take you on to

21   a virtual handout of Exhibit G, please.

22        Sir, as you start to review this document, I warrant

23   to you that this is a -- that there has been a

24   modification to this document because I found it on my

25   co-plaintiff's website.

John Jung                                        March 5, 2021

Page 51

1       And the modification is that there is a police crest
2   placed on it that you did not place when you allegedly
3   wrote this, and so I just want to clarify that for the
4   record that you did not attach this.
5       But while we're on the logo, when you look at that
6   logo, does it imply to you that -- let me ask it a
7   different way.  Well, no.  I'm going to ask it two ways.
8       Okay.  Does it imply to you, looking at it, that the
9   Liquor Cannabis Board are police officers?
10  A.   I've been a reserve police officer before in another
11  city, and I know those shoulder patches and I was -- it
12  came to a shock to me when LCB decided to put that on
13  their uniforms.
14      I think -- I believe this was back in 2015.  Any
15  general public when they see that shoulder patch believes
16  -- they would assume it's a general authority.
17  Q.   Thank you.  You answered both my questions in one.
18  Thank you.  So could you review the rest of the document,
19  not withstanding that logo?
20  A.   I wrote that letter.  That's my writing, yes.
21  Q.   Okay.  And so you -- and today you stand by
22  everything that you wrote within that letter?
23  A.   Yes.
24  Q.   And when did you write it?  Well, that's a compound
25  question, stop.  When did you write it?

John Jung                                          March 5, 2021

Page 52

1   A.   I believe this was actually a letter that I prepared

2   for the hearing, the safety committee hearing because my

3   attorney told me that -- that, you know, if I was

4   comfortable testifying and to prepare a statement because

5   during that timeframe, I also was contacted by the

6   Washington State Cannabis Association representative.

7         And we kind of coordinated this testimony, and I had

8   drafted up a huge letter and my attorney said you don't

9   have much time to say all that, so I kind of revised the

10  testimony.

11  Q.   Okay.  I want to draw your attention to the bottom

12  of the first page; okay?

13  A.   Okay.

14  Q.   There is a paragraph that starts with essentially.

15  A.   Yes.

16  Q.   And I want you to read the last three paragraphs on

17  that page, and then the first three on the next page.

18  A.   First three paragraphs and then the next three

19  paragraphs on the next page you said?

20  Q.   Yeah, so the last paragraph you're going to read on

21  the next page, it starts with these troubling.

22  A.   Okay.

23  Q.   So please, for the record.

24  A.   It says, essentially WSLCB created a substandard

25  police training for recruits, thereby not meeting the

John Jung                                              March 5, 2021

                                                              Page 53

1    requirement of being a Washington peace officer, in

2    parentheses, RCW 43.101.095, parentheses, but yet calling

3    themselves peace officers.

4         Soon after Washington State privatized liquor sales

5    and legalized marijuana, the agency met with many

6    challenges to these -- to this new role and

7    responsibilities according to the internal agency

8    documents.

9         Most notably the agency attempted year after year to

10   expand LEOs' authority including grandfathering in

11   existing LEOs to peace officer status in order to

12   alleviate these legal challenges.

13        Unfortunately, it never gave enough support to

14   expand and legalize LEOs as peace officers.  However, in

15   late 2017, the agency with another set of actions

16   implemented policies not only identifying LEOs as peace

17   officers, but also encroached into general authority law

18   enforcement activities.

19        These troubling actions have left me with doubts

20   about agency's integrity including misinformation in

21   LEOs' annual performance evaluation forms which indicate

22   as if LEOs attended and completed BLEA training,

23   regardless of previous training records.

24   Q.   That's fine, and so just to be clear, you stand by

25   that statement today; correct?

John Jung                                    March 5, 2021

Page 54

1    A.    Yes.

2    Q.    Thank you.  I think we're almost ready to move on to

3    your exhibits, hang on.  All right, then yes.  Let's move

4    on to -- you can pull up your -- no, one second.

5          Before we move on, let's go to Plaintiffs' Exhibit

6    F, please.  I'll represent that this is a --

7    A.    What page is that on?

8    Q.    Page 34 numerically.

9    A.    Okay.

10   Q.    I will for the record just identify this document as

11   an email that was generated involving Stafne Law Office

12   about January 8th, 2020, and have you reviewed the

13   document, sir?

14   A.    Yes, sir.

15   Q.    Okay.  Do you understand what it is?  Let me ask you

16   this.  Who's it from?  There's an email that --

17   A.    It looks like it was from Lewis County to the law

18   firm.

19   Q.    Is there a title associated with whoever wrote this?

20   A.    Yeah, it's a request for production of documents per

21   GR 31.1 and/or RCW 42.56.

22   Q.    Okay.  But who signed the email, sir?  Who signed it

23   on the second page?

24   A.    The senior deputy prosecutor.

25   Q.    Correct, correct, and would it surprise you that the

John Jung                                          March 5, 2021

Page 55

1    Lewis County prosecutor could never find a signed

2    affidavit from Robbie Satterly in the Levi Lyon case

3    either?

4              MS. CARR:  Object to relevance.

5              MR. KING:  Arbitrary and capricious and

6    overextension of authority.

7    Q.   Please answer the question.

8    A.   Would it surprise me?

9    Q.   Yes.

10   A.   Yeah, it's surprising that he didn't sign it.

11   Q.   Thank you.  Okay.  Let's move to your list, your

12   documents rather.  Here we go.

13        So before we start, can I get you to verify that you

14   have not altered any of these documents that were

15   presented?

16   A.   Yes, sir.

17              MR. KING:  Okay.  Counsel, could we have a

18   stipulation that these documents occurred in the ordinary

19   course of business then?  Counselor?

20              MS. CARR:  I'm reviewing them quickly.  I

21   need to decide.

22              MR. KING:  Okay.

23              MS. CARR:  These all appear to have occurred

24   during the ordinary course of business, yes.

25              MR. KING:  Very well, thank you.

John Jung                                                    March 5, 2021

                                                                  Page 56

1    Q.    So let's start with page 1, sir, of your Exhibit 1.

2    A.    Okay.

3    Q.    Why did you generate this document?

4    A.    I was told to by the chief to provide him with the

5    equivalency academy's assessment report.

6    Q.    Your assessment of the equivalency academy?

7    A.    Correct.

8    Q.    Okay.  And let's understand about paragraph 2, which

9    seems to be the paragraph -- could you read the second

10   paragraph for us and explain that?

11   A.    Are you talking about the one that starts with the

12   biggest takeaway?

13   Q.    That one.  Seeing as that's probably the major

14   premise of your letter, yes, please.

15   A.    The biggest takeaway from attending the class was

16   the fact that I was able to reconfirm my current status

17   as being a non-peace officer, despite agency's policies

18   claim.

19         In fact, it was abundantly clear from CJTC's email

20   that I wasn't even eligible to attend this equivalency

21   class unlike the other two Caucasian officers, Robbie

22   Satterly and Robert Verbeka.

23         At the end of this course, I was no better off than

24   before the class whereas the other two officers took the

25   necessary steps forward to peace officer certification.

John Jung                                        March 5, 2021

Page 57

1    Q.   Great.  Now let's go back for a quick minute to

2    plaintiffs' exhibits; okay?  I forgot something.  Okay.

3    Let's pull up Exhibit C for cocaine.  Are you there?

4    A.   Yes, I'm on it.

5    Q.   One second.  Okay.  In the first page under

6    distinguishing characteristics, what was your impression

7    of what that meant for you to be an LCB Enforcement

8    Officer 1?

9    A.   That I was going to complete CJTC's Basic Law

10   Enforcement Academy.  In fact, when I applied for the

11   job, that was listed as one of the -- a continued

12   employment requirement.

13       And I've actually contacted -- when I was using

14   references for this job, I had listed one of the

15   detectives out of the police department because I knew

16   him.

17       And he was very excited that I was actually going to

18   the academy, to the BLEA training course, and he told me

19   that in case LCB doesn't work out, there will be a red

20   carpet to his department.

21       And so I pretty much had another job offer before I

22   completed this class, and so, yeah, my impression was

23   that I was going to have the certification as a peace

24   officer in Washington State.

25   Q.   Thank you.  Now let's move on to your Exhibit 2;

John Jung                                                    March 5, 2021

Page 58

1    okay?  And it's going to be numerically page 4.

2    A.    Okay.

3    Q.    You sent this on or about May 15th of 2019.  Was

4    this after or before your meeting with Roger Goodman?

5    A.    I'm not sure.

6    Q.    Was it around the same time?

7    A.    I don't know.  I know it was in 2019.  I'm not sure

8    when I had a meeting with Roger.  I'd have to go back and

9    look at my receipt.

10   Q.    Well, okay.  So my take on this email, and correct

11   me if I'm wrong, is that you were reprimanded for not

12   doing things in the field that you weren't comfortable

13   doing because of your status.

14   A.    Correct.

15   Q.    And this is your response to that?

16   A.    Correct.  I couldn't stay silent.  I needed to speak

17   up.  I needed to make a documentation of it.  That's what

18   my attorney told me, advised me at the time that from

19   here on, she told me very clearly to have everything

20   documented and so that's what I did.

21   Q.    Yes.  Let's go down to the beginning of -- well,

22   let's go down to the end of that page, and about a

23   quarter of the way up there is a paragraph that starts

24   with I was duped.  Do you see that?

25   A.    What page is that?

John Jung                                                    March 5, 2021

Page 59

1    Q.    It's going to be numerically the same page.

2    A.    Page 4?

3    Q.    Yes.

4    A.    Okay.

5    Q.    Okay.  And that paragraph that starts with I was

6    duped.

7    A.    Yeah.

8    Q.    Could you read the first sentence of that paragraph,

9    please?

10   A.    I was duped to think that I was a certified limited

11   authority law enforcement officer after completing my

12   training at CJTC and receiving a certificate.

13   Q.    Thank you.  Do you still stand by that today?

14   A.    Yeah.

15   Q.    Okay.  Let's move along, next page.

16   A.    Okay.

17   Q.    All right, see that paragraph that has the bold, the

18   italics in there?

19   A.    Yes.

20   Q.    Could you read that paragraph into the record for

21   us?

22   A.    Initiatives 1183 and 502 --

23   Q.    No, no, back up, back up, back up, back up.  I want

24   the whole paragraph.  What is clear, that one.

25   A.    Oh, what is clear?  Okay.  What is clear, according

John Jung                                                    March 5, 2021

Page 60

1  to the 2013 House Bill 1876, is that the fact -- is the

2  fact that in part, Initiative 1183 and 502 require these

3  WSLCB officers to do more than what they actually have

4  the legal authority to do.

5      Currently, the WSLCB officers do not have the

6  authority to arrest a person in a bar due to shooting,

7  who may be wanted on a warrant or even due to a bar brawl

8  or prostitution.

9  Q.   Okay.  Do you still stand by that today?

10 A.   Yes.

11 Q.   Thank you.  Moving along, I'd say we got probably

12 another 15 minutes or so.  I think we'll be wrapping up

13 soon.  Let's go to No. 3, and numerically, sir, I'm going

14 to be looking at page 8.

15 A.   Okay.

16 Q.   All right.  So this was written on May 5, 2019.

17 First, identify what that document is, please, and what

18 letterhead is it on?

19 A.   It's on official Washington State Liquor Cannibis

20 Board interoffice communication.

21 Q.   Okay.  And who's it from?

22 A.   It's from Agency Chief Steve Johnson.

23 Q.   That's the guy that reprimanded you, right, because

24 he's got -- he's the guy that reprimanded you; right?

25 A.   Correct.

John Jung                                          March 5, 2021

                                                   Page 61

1    Q.    Okay.  Now, this was four months after -- go to

2    Plaintiffs' Exhibit A, please.

3    A.    Okay.

4    Q.    Could you identify Exhibit A for us real quickly?

5    A.    It's Chris Thompson's letter to Roger Goodman.

6    Q.    Yes, and she's asking for what?

7    A.    It's requesting extended authority in the alcohol

8    domain to cannabis, tobacco and vape products.

9    Q.    Right, okay.  But you never got that, but on May

10   5th, 2019 you got written up by Thompson --

11   A.    By Johnson.

12   Q.    By Johnson for not doing activity that was

13   questionable to you?

14   A.    Correct.

15   Q.    Okay.  Thank you.

16   A.    And for the record, I ended up actually getting

17   monetarily penalized.

18   Q.    Is that right?

19   A.    I had a reduction in pay for several months for

20   defying their orders, which I believed to be illegal

21   activity.

22   Q.    Is that right?  Did you have a Loudermill hearing?

23   Do you know what a Loudermill hearing is?

24   A.    Yes, sir.  As a matter of fact, I included that as

25   part of the package when I submitted it to my counsel.

John Jung                                          March 5, 2021

Page 62

1   Q.   I see.  I see that one.  I'm just clarifying it for

2   the record.  What is a Loudermill hearing just so we

3   understand that you know what it is?

4   A.   Well, it's basically -- you know, it's an

5   investigation done on performance evaluations and

6   conducted by HR.

7   Q.   You had an opportunity -- you get an opportunity to

8   clear your name?  Is that what you --

9   A.   Yeah, at least that's what they say, but I've heard

10  from other agents, past, present of how they conduct

11  their work here by HR.

12       As a matter of fact, I chased away approximately

13  four or five HR consultants through the course of my time

14  here.

15  Q.   What do you mean by that?

16  A.   They left the agency when I complained --

17            MS. CARR:  I object to the relevance to this

18  line of questioning.  This is not about John Jung's HR

19  encounters.

20            MR. KING:  Well, with all due respect, it

21  certainly is because we're talking about retaliation and

22  the theory of the case is arbitrary and capricious.

23       I got another agent just called me on the phone.  On

24  Facebook -- on YouTube you could hear it saying that if

25  you speak about them in a way they don't want, they're

John Jung                                                March 5, 2021

Page 63

1    going to punish you.  The heck it isn't relevant,

2    Counselor.  It's the most important thing.

3    Q.   Please answer the question.

4    A.   What was that again?

5    Q.   I keep getting distracted, man, hold on.  Let me

6    circle back, just hold on.  You were describing --

7              MR. KING:  Court Reporter, could you please

8    read back what he was saying?

9              (The answer was read back.)

10   A.   Yeah, basically when I confronted on the lies, how

11   they conducted their investigations, and so the last one

12   being -- his name is Samuel Young, common last name

13   spelling where he identified himself as an internal

14   affairs investigator.

15        And typically when you say internal affairs

16   investigator, you're referencing yourself as a detective

17   in a police department.

18        One time he identified to a licensee that he was an

19   outside consultant looking into HR's -- I mean the LCB's

20   practice to gain access to some information from a

21   licensee, and he also listed on one of my documents that

22   LCB agents worked 24/7/365 days a year, which is far from

23   the truth.

24        We only work under 60 hour work block in 28 days.

25   We do not work on holidays because the state does not

John Jung                                          March 5, 2021

Page 64

1    want to pay us time and a half.

2         And we do not have engagement of officers out there

3    around the clock, but that's how he listed on my job

4    description, which I had to correct at the time of my

5    vocational counseling because I had an on duty accident

6    that required surgery.

7         And so there was a lot of misleading information,

8    different misleading tactics, and the end result were

9    that five or six -- I would say four or five HR

10   consultants ended up leaving the agency.

11   Q.   Thank you.  Let's move on to Exhibit 9, please.

12   This is going to be page 179.

13   A.   Okay.

14   Q.   All right, one second.  All right.  Is that an

15   e-mail that -- identify the document, please.

16   A.   It's my email exchange communication between the

17   chief of enforcement and LCB.

18   Q.   Okay.  And what's the content going on?  What's

19   going on in the email regarding your BLEA training?

20   A.   Basically when I called the chief out, I then

21   learned that there was a backdoor of equivalency training

22   offered to these Caucasian officers.

23        He turned around and told me it was a pilot program,

24   and that they were running this to determine if the

25   agents with the board required it or needed it and

John Jung                                           March 5, 2021

Page 65

1    extended that offer to me, so essentially that's what

2    that content is.

3    Q.    Okay.  Let's go to Exhibit 12 numerically.  I want

4    to go to page 192 followed by 193; okay?

5    A.    Okay.

6    Q.    There's a paragraph that starts with honestly, and

7    in that paragraph you state that honestly LCB has yet to

8    provide even an ounce of evidence why we are suddenly

9    limited authority peace officers; okay?

10   A.    Okay.

11   Q.    Do you stand by that claim today?

12   A.    Yes, sir.

13   Q.    Okay, please explain.  Were there any moves that

14   were made by LCB to suddenly change your classification?

15   A.    To change my classification?

16   Q.    Yeah, to recharacterize your authority.

17   A.    In 2017 I saw that they implemented in the Lexipol

18   policy, which is internal agency policy, to define the

19   LEOs as limited authority peace officers under that

20   title, the RCW 10.93.20, and that they extended our

21   authority into the RCW 10.31.100, which is a class of

22   criminal activities that we could engage in arrest.

23          And I -- as soon as I read that, I contacted my

24   defense counsel friend and asked, you know, like how is

25   this even possible, and they pretty much told me that

John Jung                                              March 5, 2021

Page 66

1    they were troubled by that language.

2         And initially I did not acknowledge that policy for

3    some time, and I ended up getting reminder notices to the

4    point where I was forced to acknowledge and so -- and I

5    believe that's that Policy 100 of the Lexipol policy.

6    Q.   We're going to get to Lexipol.  Yeah, we're going to

7    talk --

8    A.   Anyway, so basically that's what whole point is.

9    Q.   Okay.  We'll get to Lexipol in just a minute as we

10   get ready to wind down here, just a couple more areas,

11   guys.

12        Let's go to page 193; okay?  And at the bottom of

13   that page, you cite to one, two, three, four, five, six

14   -- you cite to six different bills that were offered to

15   give full authority to LCB agents, did you not?

16   A.   They weren't full authority.  There are parts where

17   full to extended authority.

18   Q.   In other words, each of these bills would have in

19   some way given criminal investigative authority to people

20   like you?

21   A.   Yes.

22   Q.   Okay.  And do you know the results of each of these

23   bills?

24   A.   They all failed.

25   Q.   Thank you.  All right.  Who is Pholeng Chue?

John Jung                                          March 5, 2021

Page 67

 1   A.   That's the agent that worked on that roll your own

 2   cigarette search warrant case.

 3   Q.   And that's Exhibit 15 on -- that's going to be the

 4   end of your exhibits.  Let's scan down to -- that, I

 5   believe starts at page 206, please.

 6   A.   Okay.

 7   Q.   Okay.  Can you identify what that document is?

 8   A.   It's an LCB search warrant.

 9   Q.   Okay, very good.

10   A.   Application, yeah.

11   Q.   Okay.  And does he make a representation in that

12   warrant as to his qualifications?

13   A.   Yeah, as I stated earlier that he listed himself as

14   a Washington State limited authority peace officer.

15   Q.   Okay.  And so similar to the unsigned Robbie

16   Satterly affidavit, is it not?

17   A.   You know, I did not know that until now.  I just

18   happened to see it that he -- it was an unsigned

19   document.

20   Q.   Right, okay.  And how did you come into possession

21   of this warrant that Pholeng Chue drafted?

22   A.   Like I said before, I was engaged in this search

23   warrant because they were targets -- the targets were

24   Korean nationals I believe, and they did not speak Korean

25   and so I was -- I was their interpreter.

John Jung                                      March 5, 2021

Page 68

1    Q.    Okay.  And what actions did you take regarding --
2    when you discovered this representation, did you take any
3    actions?
4    A.    When I started the warrant or participated in the
5    warrant, I did not take any actions other than what I was
6    told to do.
7          I think it was after the fact that I read this
8    warrant and realized that there was an issue with how he
9    identified his training records.
10   Q.    Well, that's what I'm getting at.  That's what I'm
11   getting at is what did you do at that point?
12   A.    At that point, I requested the agency to see if he
13   acquired additional training to be a peace officer, so
14   basically I did a public records request and asked for
15   his training records.
16   Q.    I see, and what was the result of that?
17   A.    Initially they tried to deviate my question and said
18   that, oh, he attended Federal Law Enforcement Academy
19   known as FLETC and were directing me, if I was seeking
20   that record.
21         And I said no.  I am not seeking that record.  I'm
22   looking for the Washington State training records.  I
23   don't care about the federal.  I know what the federal
24   system is and what that training requires.
25         I made it very clear to them back and forth with

John Jung                                          March 5, 2021

Page 69

 1    several email exchanges, and it's attached to this that I

 2    asked for Washington State.

 3          Long story short, after several weeks later they

 4    finally admitted that he did not attend Washington State

 5    Criminal Justice Training Commission.  Therefore, he is

 6    not a Washington State peace officer.

 7    Q.   Okay.  Let's move on to page 244 of that exhibit,

 8    please.  Actually, let's go to 243 or hold on.  Yeah,

 9    let's start with page 242; okay?

10          And is that a series of emails that you were having

11    with the public records officer about all of this?

12    A.   Correct.

13    Q.   Okay.  Let's move on to 244, yes.  Could you please

14    read the response at -- the whole paragraph, read the

15    whole paragraph, 244.

16    A.   We conducted a search of our public records log and

17    folders for requests regarding Officer Chue.  The only

18    request that we located regarding Pholeng Chue's

19    Washington State peace officer status was request that

20    was submitted by you on May 8, 2018.

21          We will note to you that no records were provided to

22    you under that request because Officer Pholeng Chue did

23    not complete training through the Washington State

24    Criminal Justice Training Commission.

25          He completed training through the Federal Law

John Jung                                        March 5, 2021

Page 70

1    Enforcement Training Center, and therefore does not have

2    Washington State peace officer status.

3          The WSLCB must only provide existing records and

4    does not have to create records through response to a

5    public records request, RCW 42.56.080.  Therefore, we

6    must respectfully deny your request for records.

7    Q.   Okay.  And so, sir, is it your understanding that

8    his federal training has no bearing on whether or not

9    he's a licensed -- a certified peace officer in the State

10   of Washington?

11   A.   I spoke to -- and I have a pretty good relationship

12   with the assistant commander at CJTC, the Police Academy

13   of Washington State because he was -- used to be a Fife

14   police officer.

15         And during our discussion, telephone discussion, he

16   made it very clear that federal training is not

17   recognized in Washington State.

18         Therefore, if a federal agent, any agent wants to be

19   a local or Washington State Fish and Wildlife or

20   Washington State trooper, they must attend BLEA in order

21   to be a Washington State peace officer.

22   Q.   Okay.  Yeah, and, in fact, sir, are you aware of the

23   process by which the state troopers in Washington became

24   certified peace officers because they're not -- they were

25   not certified peace officers originally either, were

John Jung                                          March 5, 2021

Page 71

1    they?

2    A.    I'm not too familiar with the process, but I know

3    that they attend Washington State Police -- I mean Patrol

4    Academy, which is separate from CJTC local police

5    academy.  Their hours are 1,200 -- I think 1,240 or 1,400

6    hour training versus the 720 training for BLEA class.

7    Q.    Never mind.  I thought there was some legislation I

8    read about to make sure that they were classified -- I

9    can't find it right now, so --

10   A.    Oh, yeah, actually for the longest time, they and

11   the Fish and Wildlife agents or officers were not deemed

12   as peace officers in the state.

13        And I'm not sure of the exact year, but there was a

14   law that enacted to make them a peace officer in the

15   State of Washington because they did not go through the

16   BLEA training.

17        But I want to say that it's somewhere in the mid

18   2000 maybe, early 2000 that law changed.  I remember

19   discussing that with the CJTC instructor about it, and

20   that's when I learned about that process.

21   Q.    Interesting.  Yeah, it was somewhere.  I think Novak

22   sent it to me somewhere.  There's a lot to keep track of,

23   so I'm sorry if I was unclear on that.

24        All right.  We're winding down.  Are you familiar

25   with, sir, the Hillard Heintze agency?

John Jung                                          March 5, 2021

Page 72

1   A.   Yes.

2   Q.   What do they do?

3   A.   Well, they provide consulting, a risk -- they're a

4   risk management consulting firm related to a lot of the

5   law enforcement agencies and government agencies is my

6   understanding.

7   Q.   And to your knowledge, did LCB ever commission them

8   to do a report?

9   A.   As a matter of fact, they came in to conduct the

10  assessment of LCB as a result of my testimony or part of

11  it that caused that consultation, so yeah.

12  Q.   And what year was the Hillard Heintze report issued?

13  A.   I think it came out in late 2019.

14  Q.   Okay.  And what is Lexipol?  You referred to it

15  before.  Could you tell us what Lexipol is?

16  A.   Lexipol is our agency, internal agency policy that

17  we utilize.  It's a third-party company that provides

18  risk management and also policy enhancement for law

19  enforcement agencies around the country.

20  Q.   Okay.  And did the Heintze report make any

21  recommendations to LCB about the use of Lexipol as a, you

22  know, policy manual?

23  A.   They recommended that we don't use Lexipol because

24  Lexipol policy is more geared towards law enforcement,

25  and LCB is not law enforcement.  They identify it as a

John Jung                                           March 5, 2021

Page 73

 1   regulatory agency.

 2   Q.   And so to be --

 3           MS. CARR:  Do you have a copy of this report

 4   as an exhibit that the witness can refer to?

 5           MR. KING:  I don't.  He's testifying from his

 6   own recollection, and I'm -- I believe I filed it with

 7   the court, so he's allowed to testify from his

 8   recollection and I'll match it up to --

 9           MS. CARR:  I would object to the extent that

10   you are using Mr. Jung's recollections as a way to prove

11   a matter of fact, that it is hearsay.

12           MR. KING:  Well, we'll let Judge Jones decide

13   that.  He's allowed to testify from his recollection.

14   It's not -- you know, and to the extent that it's

15   hearsay, I'll just produce the document.  You already

16   have it.  This is gamesmanship.

17   Q.   So please answer the question.

18   A.   What was the question?  I was interrupted.

19   Q.   I know.  I keep -- I keep spending more money.  I'll

20   tell you, just clarify your answer then.

21       To your recollection, did the Heintze report make

22   recommendations as to the use of Lexipol at LCB?

23   A.   Yeah, they recommended that Lexipol was more of a

24   law enforcement oriented policy, and that the LCB was

25   more of a regulatory, so therefore they advised that or

John Jung                                          March 5, 2021

Page 74

1    recommended that Lexipol should not be utilized for LCB

2    enforcement.

3                MR. KING:  Okay.  We'll break for about three

4    minutes, and then we'll wrap it up.

5                      (Recess taken.)

6                MR. KING:  Well, folks, I feel confident that

7    I have produced everything I need to produce from this

8    witness.  I'm going to let him go.  Do you have

9    questions, Counselor?

10               MS. CARR:  I do.  I have a couple questions

11   for Mr. Jung.

12                      EXAMINATION

13   BY MS. CARR:

14   Q.   Mr. Jung, did you -- have you recently -- have you

15   ever filed a lawsuit against the LCB?

16   A.   Yes, I have.

17               MR. KING:  Objection, relevance.

18               MS. CARR:  The relevance is -- you'll see in

19   a minute.

20               MR. KING:  Okay.  I'm just objecting for the

21   record.  I'm allowed to do that as you did all throughout

22   mine because they're two separate issues.  Anyway, go

23   ahead.

24   Q.   Mr. Jung, was your lawsuit related to the LCB's

25   designation of you as a limited authority peace officer?

John Jung                                            March 5, 2021

Page 75

```
1    A.    Yes.

2    Q.    And what was the result of that litigation?

3    A.    I lost the case.

4          MS. CARR:  Thank you.  I have no more

5    questions for Mr. Jung.

6                    FURTHER EXAMINATION

7    BY MR. KING:

8    Q.    Mr. Jung, I have -- I'll warrant to you that I have

9    read some documentation that I believe you submitted, but

10   I can't put my finger on it right now.

11         I have read some documentation where -- from one of

12   your supervisors that there was a number of attempts to

13   attack your status.  Do you recall anybody telling you

14   that?

15   A.    What do you mean?

16   Q.    That there were a number of litigation attempts to

17   attack the classification status of people in your

18   position.

19   A.    I talked to -- not with the supervisor, but with

20   co-workers, and there's one case that I know of out of

21   Eastern Washington that one of my co-workers there told

22   me about it recently and that was -- actually was -- the

23   case was dismissed, and that's what I know of --

24   Q.    Okay.  What year --

25   A.    (Continuing) -- and there were several.  Go ahead.
```

John Jung                                              March 5, 2021

Page 76

1    Q.    What year did your case wind up then?

2    A.    My case ended up in 2018.

3    Q.    Okay.  So that --

4    A.    I just want to add something to that.

5    Q.    Okay.

6    A.    I found out that the judge four months later was

7    hand selected by Inslee to the Supreme Court seat.

8    Q.    Interesting, and for the record, please note that

9    Jay Inslee is a defendant in this case.

10         Let me ask you this.  So the decision in your case

11   then came down prior to you meeting Roger Goodman;

12   correct?

13   A.    My case came down before meeting with Roger Goodman,

14   yes.

15   Q.    Okay.  And your case had come down also prior to

16   Robbie Satterly telling you he was concerned about

17   authority too; correct?

18   A.    Correct, and that's what really got me the most

19   because if the state realized that my court decision was

20   the official decision, why would Robbie or Robert be sent

21   to academy?

22         If by virtue of being a liquor enforcement officer

23   was enough to be a limited authority peace officer, why

24   would Justin, the chief of this agency, send two white

25   guys to additional training to be certified?

John Jung                                            March 5, 2021

Page 77

1       It just didn't make sense to me, and that's when I

2   actually decided to file public record requests on their

3   request for equivalency training.  I'm still getting

4   those documents.

5   Q.   Okay.  We're going to let the court decide what the

6   legislative intent was and all of that and what's going

7   on, but we appreciate your testimony and you taking the

8   time out, sir.

9   A.   Thank you.

10              MR. KING:  All right.  We're going to order

11  it, give me a cost estimate, sir, and the community will

12  take care of this.  I guarantee you that.

13

14                  (Whereupon the deposition

15                   was concluded at 12:18 p.m.)

16

17                  (Signature was waived.)

18

19

20

21

22

23

24

25

John Jung                                              March 5, 2021

Page 78

1                    C E R T I F I C A T E

2

3

4        STATE OF WASHINGTON )
                             )     ss.
5        COUNTY OF KING      )

6

7              I, the undersigned Washington Certified
         Court Reporter hereby certify that the foregoing
8        deposition upon oral examination of each witness
         named herein was taken stenographically before me
9        and transcribed under my direction;

10             that the witness was duly sworn by me
         pursuant to RCW 5.28.010 to testify truthfully; that
11       the transcript of the deposition is a full, true and
         correct transcript to the best of my ability; that I
12       am neither attorney for, nor a relative or employee
         of any of the parties to the action or any attorney
13       or counsel employed by the parties hereto, nor
         financially interested in its outcome.

14             I further certify that in accordance with
15       CR 30(e), the witness was given the opportunity to
         examine, read, and sign the deposition within 30 days
16       upon its completion and submission, unless waiver of
         signature was indicated in the record.

17

18             IN WITNESS WHEREOF, I have hereunto set my

19       hand this 12 day of March, 2021.

20

21

22                     /s/ Thad E. Byrd

23       _____

24                     Washington Certified Court Reporter
                       No. 2052
25

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110   FAX: 206.622.6236