# The Turbulent History of Cannabis Regulatory Enforcement in Washington State

*Christine Masse, Daniel J. Oates, Christopher Lynch, Andrew G. Murphy, Danielle Hunt, Vanessa L. Wheeler & Vanessa Williams-Hall*

***This manuscript is pending publication in the Winter 2022 edition of the <u>Cornell Journal of Law and Public Policy</u>***

# ABSTRACT

Washington State has one of the nation's most mature licensed cannabis industries, but nearly a decade after its voters declared the State would stop treating adult cannabis use as a crime, the Washington State Liquor and Cannabis Board (LCB) has failed to embrace the voters' lofty ambitions. Legislators, licensees, and even LCB staff have derided the LCB's preference for enforcement before education and its reliance on traditional policing systems developed during the War on Drugs to regulate the cannabis industry. The LCB's frequently hostile enforcement culture—including arguing to courts that cannabis licensees have no constitutional rights—has repeatedly converted de minimis regulatory violations into business-ending events.

The LCB's conduct prompted the legislature to pass a sweeping reform bill, and a subsequently issued independent audit requested by the LCB recognized the need for and recommended additional widespread reform, some of which the LCB implemented. Nevertheless, the LCB has not yet shown it has evolved into an agency that prioritizes achieving regulatory compliance over punishing licensees.

This article, the first of its kind to chronicle the regulatory and legislative evolution of Washington's cannabis industry, details the troubling history of the LCB's abuses of power and policy blunders in the early years of regulating Washington's cannabis industry. Washington presents a cautionary tale for other jurisdictions to heed when crafting or amending the regulatory scheme for their adult use cannabis industries. Stakeholders that are looking for a responsible and fair approach to regulating cannabis should consider the history, limitations, concerns, and resulting reforms borne from the Washington system.

# TABLE OF CONTENTS

I.   Introduction ......................................................................................................... 1

II.  Background.......................................................................................................... 2

   A.  Adult Use Cannabis Legalization ..................................................................... 2

   B.  The I-502 System ............................................................................................. 4

      1.  Licensing Division ....................................................................................... 5

      2.  Enforcement Division ................................................................................... 6

III. Historic LCB Culture and its Effect on Enforcement Practices and Policy Decisions .......... 7

   A.  The Effect of the LCB's Allegedly "Toxic Culture"—Harsh Enforcement and Disregard for Constitutional Protections ....................................................... 7

      1.  The LCB's "Gotcha" Culture Results in Overly Harsh Enforcement............................. 8

         a)  Records Inspections Are Unnecessarily Burdensome ............................... 10

         b)  Overbroad Interpretation of Rules............................................................ 12

         c)  Forced Settlements .................................................................................. 14

         d)  Licensees Often Have No Choice but to Fight.......................................... 15

         e)  Cannabis Licensees Face Far Steeper Penalties than Liquor and Tobacco Licensees 18

      2.  The LCB has a Pattern and Practice of Disregarding Licensees' Constitutional Rights 19

         a)  The LCB Disregards First Amendment Protections.................................... 19

         b)  The LCB Disregards Fourth Amendment Protections ............................... 21

         c)  The LCB Disregards Fifth and Fourteenth Amendment Protections, the Privileges and Immunities Clause, the Commerce Clause, and the Equal Protection Clause................. 26

   B.  The LCB's Culture has Resulted in Multiple Policy Blunders........................................ 28

      1.  Traceability System Failure 1.0 ..................................................................... 29

      2.  The Great Candy Debacle of 2018 ................................................................ 31

      3.  Traceability System Failure 2.0 ..................................................................... 34

      4.  Cannabis 2.0 .............................................................................................. 36

IV.  Legislative Reform ............................................................................................. 38

   A.  Testimony Regarding the Bills ......................................................................... 40

   B.  LCB gets on Board with Reform ...................................................................... 47

   C.  Final Bill Passes ............................................................................................. 48

      1.  Legislative Findings ..................................................................................... 49

      2.  The Reform of SB 5318 ............................................................................... 50

         a)  Notices of Correction.............................................................................. 50

         b)  Compliance Education Program and Technical Assistance Visits.............................. 50

         c)  Written Warnings and Prerequisites for AVN Issuance............................... 51

        d)  Settlement Agreements ..................................................................................... 52

        e)  No Amnesty and No Enforceable Cultural Reform .......................................... 53

    3.  Evading the Reform of SB 5318 ............................................................................ 53

V.  HH Report and Internal Policy Changes ................................................................... 56

  A.  HH Findings and Conclusions ................................................................................ 57

    1.  Enforcement Philosophy and Bias ........................................................................ 57

    2.  Consistency of Enforcement and Interpretation of Rules ..................................... 59

    3.  Training Officers for Law Enforcement, Not Administrative Regulation ................... 60

    4.  Accountability of Officers and Oversight ............................................................. 61

  B.  HH Recommendations ........................................................................................... 61

    1.  Reorganize Enforcement ....................................................................................... 62

    2.  Change Officer Culture ......................................................................................... 62

    3.  Improve Relationship with Regulated Community ................................................ 62

    4.  Improve Consistency of Agency Enforcement ..................................................... 63

  C.  Director Garza's Response ..................................................................................... 63

VI.  Conclusion .................................................................................................................. 64

**The Turbulent History of Cannabis Regulatory Enforcement in Washington State**

*Christine Masse, Daniel J. Oates, Christopher Lynch, Andrew G. Murphy, Danielle Hunt,*
*Vanessa L. Wheeler & Vanessa Williams-Hall*

## I.  INTRODUCTION

"The people intend to stop treating adult marijuana use as a crime and try a new approach . . ."[1] That introductory statement expressed the profound desire and intent of Washington's Initiative 502 (I-502), passed in 2012.[2] Nearly a decade into Washington's experiment into legalization of adult use cannabis, voters' lofty aspirations have not been embraced by a punishment-first regulatory system run by a police force trained to see marijuana[3] cultivation as a crime. While other states have adopted an educational or agricultural approach to marijuana regulation,[4] Washington arguably adopted the most severe regulatory scheme in the country. As one of the first states to regulate commercial cannabis activity, fear of federal intrusion pushed the Washington State Liquor and Cannabis Board (LCB) to rely on a familiar and traditional policing system, which brought with it a more conservative view of cannabis as an illegal drug.[5] This viewpoint has instilled in Washington's regulatory system a frequently hostile enforcement culture that risks the financial well-being and safety of its licensees, and has led to biased, inconsistent, and overbroad interpretation and enforcement of regulations and statutes.

While the state raked in more than a billion dollars in tax revenue from the sale of cannabis products,[6] Washington's regulatory scheme pushed its cannabis industry to a breaking point, culminating in wholesale enforcement reform by the legislature in 2019 and an independent review by a nationally recognized law enforcement consulting firm, Hillard Heintze (HH).[7] The resulting HH Report (Report)[8] revealed disparate enforcement against cannabis licensees, biased enforcement officers, and deficiencies in the LCB's systems, procedures, and structures. The Report recommended restructuring of the agency and fundamental changes to its philosophy. Now, more than a year after the Report was released, and more than a year after the legislature revised the governing statute in an attempt to reform the agency, the LCB still has not

---

[1] Initiative Measure No. 502 Part I, § 1 (Wash. 2011), https://sos.wa.gov/_assets/elections/initiatives/i502.pdf.
[2] *Id.*
[3] *Id.* Part II, § 2. This Article does not discuss or address industrial hemp or cannabidiol (CBD) derived from industrial hemp. It uses the terms "cannabis" and "marijuana" interchangeably, but, when using either, is referencing cannabis with tetrahydrocannabinol (THC) content of greater than .3% on a dry weight basis.
[4] *See* Robert T. Hoban & Raushanah A. Patterson, *Sprung from Night Into the Sun: An Examination of Colorado's Marijuana Regulatory Framework Since Legalization*, 8 KY. J. EQ. AG. & NAT'L RES. L. 225, 240–41 (2016) (describing in detail Colorado's approach to regulating adult use cannabis).
[5] *See* discussion *infra* part V(C).
[6] According to public databases, from 2014 through 2020, Washington's marijuana industry has generated more than $1.85 Billion in tax revenue for the state. *Industry Intelligence*, TOPSHELFDATA (Apr. 16, 2021, 12:32 PM), https://www.topshelfdata.com/industry/wa.
[7] *Washington State Liquor and Cannabis Board: An Independent Review of Enforcement Operations and Management*, HILLARD HEINTZE (Dec. 30, 2019) [Hereinafter Hillard Heintze Report] https://lcb.wa.gov/sites/default/files/publications/releases/Hillard-Heintze-Report-for-WSLCB-12-30-19.pdf.
[8] *Id.* at 9, 10, 48.

fully embraced the Report's findings and conclusions.[9] Rather than taking up the mandate of the Report, the LCB has instead continued to perceive the cannabis industry negatively, claiming among other things that cannabis business owners and licensees are not entitled to constitutional rights.[10]

In examining the turbulent history of cannabis enforcement in Washington State, Section II discusses the background of cannabis legalization in Washington. Section III examines the enforcement culture ingrained in the LCB, and the numerous policy stumbles arising out of the agency's oversight and management since cannabis legalization. Section IV analyzes the 2019 legislative reforms arising out of industry concerns over the agency's enforcement tactics and "toxic culture." Section V examines the results of the Report and the agency's response to the same, including its first steps toward adopting reforms. The article concludes with a cautionary tale for other jurisdictions as adult use cannabis "goes live" across the country with each new legalization regime.

## II.    BACKGROUND

### A.    *Adult Use Cannabis Legalization*

After decades of cannabis prohibition and fourteen years of medical regulation, I-502 was intended to decrease law enforcement's focus on minor drug crimes,[11] shift that focus to violent crimes, and shed light on an illicit industry by bringing it under a regulated, state-licensed system.[12] In doing so, a regulated cannabis industry would bring with it state and local tax revenue that would be earmarked for education, health care, research, and substance abuse prevention.[13] Shortly after voters approved I-502, the first draft of proposed cannabis rules was filed by the LCB on July 3, 2013.[14]

In response to evolving state policies on marijuana, the Department of Justice under President Obama issued a series of memoranda outlining federal enforcement policies.[15]

---

[9] *See* discussion *infra* part V(C).

[10] *See, e.g.*, discussion *infra* part III.A.2.

[11] And it has been successful: studies have shown that marijuana use by minors has declined since legalization. Lester Black, *New Study: Pot Use Among Washington Teens Fell Following Legalization*, THE STRANGER (Dec. 19, 2018), https://www.thestranger.com/slog/2018/12/19/37240859/new-study-pot-use-among-washington-teens-fell-following-legalization.

[12] Initiative Measure No. 502 Part I, § 1 (Wash. 2011), https://sos.wa.gov/_assets/elections/initiatives/i502.pdf.

[13] *Id.*

[14] *See, e.g.*, Wash. Reg. 13-14-124 (2013) (codified at WASH. ADMIN. CODE § 314-55 *et seq.* (2020)).

[15] Investigations and Prosecutions in States Authorizing the Medical Use of Marijuana, Memorandum from David W. Ogden, Deputy Att'y Gen. to Selected U.S. Att'ys (Oct. 19, 2009) [hereinafter Ogden Memo] https://www.justice.gov/sites/default/files/opa/legacy/2009/10/19/medical-marijuana.pdf; Guidance Regarding the Ogden Memo in Jurisdictions Seeking to Authorize Marijuana for Medical Use, Memorandum from James M. Cole, Deputy Att'y Gen. to U.S. Att'ys (June 29, 2011), http://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/dag-guidance-2011-for-medical-marijuana-use.pdf; Guidance Regarding Marijuana Enforcement, Memorandum from James M. Cole, Deputy Att'y Gen. to U.S. Att'ys, 1 (Aug. 29, 2013), https://www.justice.gov/iso/opa/resources/3052013829132756857467.pdf [hereinafter Cole Memo]; Guidance Regarding Marijuana Related Financial Crimes, Memorandum from James M. Cole, Deputy

Although medical marijuana patients and their caregivers who were in "clear and unambiguous compliance" with state law were not a priority for federal government enforcement resources in 2012, no such guidance regarding adult use or commercial cannabis activity existed when voters approved I-502.[16] In response to Washington and Colorado's legalization,[17] the Department of Justice issued the Cole Memorandum (Cole Memo) on August 29, 2013—less than two months after the LCB had issued their proposed rules.[18] The Cole Memo articulated a hands-off approach for those adult use cannabis enterprises in full compliance with state law.[19] In the Cole Memo, the Department of Justice announced that it would not attempt to challenge state laws that allowed for cannabis-based commercial enterprises, provided that a strong and effective regulatory and enforcement system controlled the cultivation, distribution, sale, and possession of marijuana and the systems did not conflict with eight federal enforcement priorities:

- Preventing distribution of marijuana to minors;[20]
- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs or cartels;[21]
- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;[22]
- Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;[23]
- Preventing violence and the use of firearms in the cultivation and distribution of marijuana;[24]
- Preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;[25]
- Preventing the grow of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and[26]
- Preventing marijuana possession or use on federal property.[27]

The Cole Memo included a disclaimer, however, noting that its guidance was never intended to shield medical marijuana activities from federal enforcement action or prosecution *even where such activity was compliant with state law.*[28] The Cole Memo cabined itself to

---

Att'y Gen. to U.S. Att'ys, (Feb. 14, 2014), https://dfi.wa.gov/documents/banks/dept-of-justice-memo.pdf [hereinafter BSA Cole Memo].

[16] Ogden Memo, *supra* note 15.

[17] *See* Legis. Council Colo. Gen. Assembly, 68-614, 1st Sess., at 7 (2012); COLO. CONST. art. XVIII, § 16(1)(a).

[18] Cole Memo, *supra* note 15.

[19] Cole Memo, *supra* note 15, at 2.

[20] Cole Memo, *supra* note 15, at 1.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Cole Memo, *supra* note 15, at 2.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Cole Memo, *supra* note 15, at 4.

prosecutorial discretion, rather than a reinterpretation or reformulation of federal marijuana law.[29]

The Cole Memo did not legalize or permit—expressly or impliedly— commercial cannabis activity. It was simply an internal Department of Justice memo that provided guidance for federal prosecutors to determine their enforcement priorities. Regardless of its effect for federal prosecutors, it had a significant effect on the LCB's rulemaking and structuring of Washington's regulatory scheme.[30] Shortly after the Cole Memo was released, the LCB issued the first set of permanent rules on October 21, 2013.[31]

The LCB contends its "tight" regulation of the market has protected Washington from drawing the ire of the federal government; but, as discussed at length in this article, many of the LCB's policies have hampered the growth and innovation of an otherwise robust industry by hamstringing its entrepreneurs.[32] And most critically, in response to the agency's fear of federal enforcement, it leaned on traditional policing structures, policies, and procedures under the guise of "strong and effective" regulation. These traditional structures are antithetical to the stated purpose of legalization—to stop treating marijuana use as a crime—and as a result, agency enforcement has not yet lived up to the lofty ideals of the voters.[33]

### B.      The I-502 System

The I-502 regulatory system is based loosely on Washington's liquor regulatory structure.[34] The LCB consists of a three-member Board (appointed by the Governor), an Agency Director (appointed by the Board), and a number of divisions thereunder, including the Licensing and Regulation Division (Licensing), and Enforcement and Education Division (Enforcement), as well as some staff under the Deputy Director.[35] The broader Licensing and Enforcement divisions deal both with alcohol and cannabis regulation, but are broken into specific "units" dealing with cannabis or liquor specifically.[36] Ultimately, these disconnected branches do not

---

[29] Cole Memo, *supra* note 15, at 3.

[30] *See, e.g.,* M. Bailey Hirschburg, *WSLCB – Board Caucus (April 23, 2019) – Summary*, CANNABIS OBSERVER (Apr. 24, 2019), https://cannabis.observer/observations/wslcb-board-caucus-april-23-2019-summary/ (statement by LCB Director Rick Garza that the LCB's "core tasks" are guided by the Cole Memo, and stating that tasks outside of that directive "honestly, should not be in our wheelhouse.").

[31] Wash. Reg. 13-21-104 (Oct. 21, 2013).

[32] Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees, ch. 394, sec. 1(1)–(5), 2019 Wash. Sess. Law 2531.

[33] Initiative Measure No. 502, § 1, https://sos.wa.gov/_assets/elections/initiatives/i502.pdf.

[34] Initiative Measure No. 502 Part I, § 1 (Wash. 2011), https://sos.wa.gov/_assets/elections/initiatives/i502.pdf (noting that the intent of I-502 was to "bring[] it under a tightly regulated, state-licensed system similar do that for controlling hard alcohol.").

[35] Annual Report Fiscal Year 2019, Wash. State Liquor & Cannabis Bd., https://lcb.wa.gov/sites/default/files/publications/annual_report/2019-annual-report-final2.pdf [hereinafter 2019 Annual Report].

[36] Hillard Heintze Report, *supra* note 7, at 9 (noting that the systems the LCB "operational units use to manage their caseloads do not interface with each other.").

communicate clearly or effectively.[37] Though the cannabis regulations and policy adopted by the Board borrow from the liquor side, they depart from it frequently, causing incongruent enforcement policies to emerge and confusion among licensees.[38]

### 1.  Licensing Division

Although not the primary subject of this article, Licensing is organized in a typical hierarchical structure, and makes up the second largest division at the LCB—only the LCB's Enforcement arm is larger.[39] In addition to liquor and cannabis licensing, Licensing houses the LCB's Customer Service, Adjudications, and Policy & Education Teams.[40] Below the team managers are a number of supervisors that oversee licensing specialists that are assigned licensing applications submitted by licenses.[41]

Licensing is primarily responsible for controlling the application and licensing process.[42] Generally, an application for a licensing change or the purchase of a cannabis business or license is submitted to either the Department of Revenue's Business Licensing Service or the LCB directly, and once the LCB receives that application, it schedules an interview with the applicant.[43] Then, a lengthy vetting process ensues.[44]

In addition to overseeing licensure, Licensing's teams often exert authority over licensees. For example, the Adjudications and Policy & Education teams often make interpretations of the Revised Code of Washington and the Washington Administrative Code or impose policy decisions on licensees based on their interpretations.[45] In addition, Licensing's Adjudication Team plays a pseudo-enforcement role by flagging applications of licensees that it

---

[37] *See, e.g.*, Hillard Heintze Report, *supra* note 7, at 40 ("As currently designed, we found inconsistency in the organizational structure regarding reporting and overall span of control . . . . We learned that officers receive assignments directly from Licensing that seemingly circumvent the chain of command. Such assignments are not known to the supervisory command structure at the district level, and therefore are tracked for completion.").

[38] *See, e.g.*, Janette Benham, Policy and Rules Coordinator Wash. State Liquor & Cannabis Bd., Petition for Rulemaking Regarding Private Label Cannabis (May 15, 2018) (rejecting requested rulemaking by industry stakeholders to bring cannabis rules in line with liquor rules and noting that "[w]hile the WSLCB endeavors to regulate cannabis similar to the principles of regulating liquor, cannabis is quite different and adopting identical approaches is not always advisable.").

[39] 2019 Annual Report, *supra* note 35, at 9.

[40] 2019 Annual Report, *supra* note 35, at 4.

[41] 2019 Annual Report, *supra* note 35, at 9; *see* Declaration of Becky Smith, Brinkmeyer v. Wash. State Liquor Control Bd., Thurston Cnty. Sup. Ct. Cause No. 20-2-01568-34 at ¶ 18 (June 18, 2021) ("As Licensing Director, I oversee and work with hundreds of Board employees, including licensing specialists, enforcement officers, and their leadership. . . .").

[42] 2019 Annual Report, *supra* note 35, at 9.

[43] *The Licensing Process*, Wash. State Liquor & Cannabis Bd., https://lcb.wa.gov/llg/licensing_process.

[44] *Id.*

[45] *See, e.g.*, *WSLCB Topics and Trends—News and Tips for the Industry We Regulate: Board Approves Jan. 1, 2020 Effective Date for All Marijuana Products, Packaging and Labeling, Wash.* State Liquor & Cannabis Bd. (Winter 2018), https://data.lcb.wa.gov/stories/s/tdtm-4fyz/ (explaining, among other things, that the LCB considers volume discounts offered by processors to retailers to constitute a violation of WASH. ADMIN CODE § 315-55-018). A complete list of the LCB's guidance newsletters for cannabis is available at https://hub.wahospitality.org/coronavirus-resource/new-complete-list-of-lcb-guidelines-for-license-holders/.

suspects have made misrepresentations to the LCB or have criminal histories, unpaid taxes, or a violation history.[46] The Adjudication Team determines whether the license will be approved, denied, or suspended, and often directs Enforcement to investigate their suspicions outside of Enforcement's chain of command, causing confusion and a lack of transparency among the LCB internally and externally with the industry.[47]

## 2.   Enforcement Division

Enforcement is structured to mimic traditional police forces.[48] Though the LCB has recently undergone some reorganization in response to the Report, until 2019, Enforcement had not separated its liquor functions from its cannabis functions, where enforcement staff were divided up into four regions across Washington.[49] Those regions each had a captain who reported to the deputy chief. During 2019, Enforcement had one Chief, a Deputy Chief, a Commander, five Captains, twenty-three Lieutenants, and 104 Officers.[50] As of the date of this Article, the LCB has created a separate cannabis-specific subdivision of Enforcement to better serve the cannabis industry.[51]

Generally speaking, when Enforcement becomes aware of an actual, perceived, or suspected violation, an officer will begin an investigation. Enforcement investigations are often prompted by anonymous complaints or impromptu inspections of premises.[52] Once an officer is sufficiently convinced a violation has occurred, the officer drafts a report and an Administrative Violation Notice (AVN). The AVN will include a cover page summarizing the allegation, the applicable rule or law that was allegedly broken, the rule that identifies the presumptive penalty, a notice regarding the licensee's hearing rights, a copy of the officer's incident report, and an evidence report identifying any evidence confiscated or reviewed.[53] These reports often demonstrate that officers conduct inspections based on pretextual reasons that can lead to the imposition of punitive violations.[54]

---

[46] 2019 Annual Report, *supra* note 35, at 11.

[47] *See* Hillard Heintze Report, *supra* note 7, at 40 ("We learned that officers receive assignments directly from Licensing that seemingly circumvent the chain of command.").

[48] According to agency records produced in response to public records requests, the switch from enforcement agents to traditional police officers took place in the year 2000. Letty Mendez, DIVISION HISTORY 2000 TO 2018 (2015).

[49] Enforcement Org. Chart (May 7, 2019).

[50] 2019 Annual Report, *supra* note 35, at 5.

[51] *Id.* at 6.

[52] *See* Hillard Heintze Report, *supra* note 7, at 40 ("Officers seem to select sites at random."). The authors are aware of several cases where former owners, fired employees, or other third parties reported licensees for baseless allegations made for personal reasons. In each case, the licensee was subject to an investigation, and in some cases received warnings or AVNs for other alleged violations unrelated to the anonymous complaint. *See* cases cited *infra* note 54.

[53] 2019 Annual Report, *supra* note 35, at 8; s*ee* cases cited *infra* note 54.

[54] *See, e.g.*, Mary Jane's Wash. State Liquor & Cannabis Bd. Uniform Incident Report #4O5365A (Dec. 31, 2015) (officer performed site inspection based on anonymous tip that the licensee was smoking cannabis on site and instead issued AVN alleging (1) true-party-in-interest violation because officer found an invoice in a file purporting to show that licensee made a partial payment to a third party vendor of $911 on a $2801 invoice; and (2) misrepresentation based on officer review of video footage showing that invoice had not been paid in the manner the licensee described in answering the officer's questions about the invoice); *see also* discussion *infra* Section III.A.

The notice of hearing rights outlines the licensee's ability to request a settlement conference or hearing for the violation—often the first opportunity to respond to Enforcement's allegations.[55] Unfortunately, even if the licensee seeks reasonable settlement with the LCB, to date, the LCB has always required as a condition of settlement that the licensee accept fault in exchange for a recommended penalty.[56] Even if the licensee accepts fault for the violations, the settlement agreement is ultimately subject to approval by the Board itself, which may approve or reject a settlement agreement in its sole discretion.[57] What's more, dismissal of the matter, regardless of any fact or mitigating circumstance the licensee can prove, has historically not been an option—based on a review of publicly available records, the LCB has almost never rescinded an AVN.[58]

If settlement discussions break down or the licensee opts instead for a hearing, the hearing is scheduled in front of an administrative law judge at the Office of Administrative Hearings—but the deck is unmistakably stacked against licensees. The issues are briefed by the licensee and the LCB's agent, but almost every matter is decided in the LCB's favor.[59] Even if it is not, the Board always gets the final say: the administrative law judge's order is sent to the LCB to approve, modify, or reverse the order in its discretion.[60] The only recourse for a licensee at that point is to appeal to superior court.[61]

## III.   HISTORIC LCB CULTURE AND ITS EFFECT ON ENFORCEMENT PRACTICES AND POLICY DECISIONS

The LCB has a well-documented history of strong enforcement, which has sometimes come at the expense of the industry and the development of a well-regulated product market. The following sections discuss the history of the agency's allegedly "toxic" culture, its penchant for disregarding licensees' constitutional rights, and some of the policy mistakes that have arisen due to the emphasis placed on enforcement over compliance.

### A.   The Effect of the LCB's Allegedly "Toxic Culture"—Harsh Enforcement and Disregard for Constitutional Protections

The LCB is recognized as a limited law enforcement agency under state law, and as such, Enforcement's authority is limited to the detection and apprehension of violators only in the

---

[55] *Understanding Your Hearing Options for Administrative Violations from the WSLCB: A Resource for Licensees and MAST Permit Holders*, Wash. State Liquor Bd., 1 (2010), https://lcb.wa.gov/publications/UnderstandingYourHearingOptions.pdf.

[56] *See* cases cited *infra* note 103.

[57] *Understanding Your Hearing Options for Administrative Violations from the WSLCB: A Resource for Licensees and MAST Permit Holders*, Wash. State Liquor Bd., 2 (2010), https://lcb.wa.gov/publications/UnderstandingYourHearingOptions.pdf.

[58] *See* discussion *infra* part III.A.1.d.

[59] *See* discussion *infra* part III.A.1.d.

[60] *Understanding Your Hearing Options for Administrative Violations from the WSLCB: A Resource for Licensees and MAST Permit Holders*, Wash. State Liquor Bd., 2 (2010), https://lcb.wa.gov/publications/UnderstandingYourHearingOptions.pdf.

[61] WASH. REV. CODE § 34.05 *et seq.*

subject areas for which the agency is responsible.[62] But in the authors' experience, Enforcement officers have a history of attempting to extend their reach and influence beyond their statutory authority as limited-authority officers, going so far as to threaten criminal penalties against licensees or their employees.

Although many licensees, fearing retaliation, are reluctant to file complaints against LCB Enforcement officers, those that do have often resulted in findings that the officer violated his or her professional obligations.[63] The LCB's 2018 Internal Affairs investigation unit marked as "substantiated" forty-two percent of all complaints filed against LCB officers.[64] A 2019 report on enforcement investigation outcomes by internal affairs recorded as "substantiated" claims against officers for insubordination, professionalism, truthfulness, ethics, and abuse of authority.[65] In short, the agency, and in particular Enforcement, has a substantiated reputation for engaging in abusive conduct toward licensees.

Actions such as these have led to an acknowledged culture problem at the LCB; a problem that has been documented in congressional testimony and the HH investigation.[66] The following sections document many of the ways the agency has overreached in its regulatory activities.

        1.       <u>The LCB's "Gotcha" Culture Results in Overly Harsh Enforcement</u>

At least one state legislator has accused the LCB of fostering a "gotcha" culture that overly penalizes licensees for violations instead of encouraging education and compliance.[67] These accusations are borne out by many accounts. For example, the LCB's traceability rules require that cannabis plants taller than eight inches be physically tagged with a unique sixteen-digit identification number.[68] For one licensee, LCB officers conducted inspections and found twelve plants out of 1,000 had not received their individual tag, and one tag in a room containing 360 flowering plants was smudged. While the licensee's entire facility was overwhelmingly compliant, the LCB nevertheless issued AVNs.[69]

Similarly, the LCB strictly limits what pesticides may be used when cultivating marijuana.[70] The allowed levels are so low that a positive test could result from pesticide drift

---

[62] WASH. REV. CODE § 10.93.020 (2020).

[63] *See* Hillard Heintze Report, *supra* note 7, at 16.

[64] Samuel J. Young, 2018 IA Report (Feb. 1, 2019).

[65] Samuel J. Young, Enforcement Investigations Outcomes (2017−19) (May 10, 2019).

[66] *See* discussion *infra* parts IV.A and VI.A.

[67] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. on Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. 2019) (Statement of Representative Drew MacEwen), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true.

[68] WASH. ADMIN. CODE § 314-55-083(4) (2020).

[69] Janice Podsada, *For Legal Cannabis Growers, There's Little Room for Error*, HERALDNET, Jan. 22, 2019, https://www.heraldnet.com/news/for-legal-cannabis-growers-theres-little-room-for-error/

[70] *Section 3 Pesticides for Use on Marijuana in Washington State* (Mar. 25, 2021), https://cms.agr.wa.gov/WSDAKentico/Documents/PM/Registration/Pesticide-AllowedUseOnMarijuana.pdf.

from a neighboring farm.[71] Nevertheless, the LCB has issued written warnings when a product has pesticides *within* the allowed limits.[72] The LCB thus sometimes takes enforcement actions even when there is no regulatory violation.

Indeed, a review of publicly available enforcement documents show inconsistency in Enforcement is prevalent—and publicly acknowledged—at LCB.[73] At an industry function, the LCB Chief of Enforcement allegedly told a crowd of attendees that cannabis licensees "should expect inconsistency [in enforcement] as enforcement officers were given significant discretion to respond to conditions in the field—and were instructed not to provide written documentation of their policy interpretations."[74] The agency has a long-standing practice of refusing to provide written guidance to licensees; instead providing instruction only orally.[75] This practice can allow the agency to penalize conduct that the agency previously authorized.

An anonymous complaint can put a licensee on the LCB's radar, which subjects that licensee to a heightened level of scrutiny it cannot escape. This anonymous complaint-based system can be abused, with competitors or other disgruntled parties weaponizing anonymized complaints to exact revenge.[76] As of 2019, "many hundreds" of licensees had one or no visits by enforcement officers, but "69 of them had over 50 visits from enforcement; one over 118 times."[77] The LCB thus identifies what it deems as a problematic licensee and then monitors them more closely than other businesses. When making these selective visits, some officers presumed, without evidence, that licensees and their employees were engaged in criminal conduct.[78] Given the plethora of rules that licensees must follow and the uncertainty of how to operate in the nascent industry, it is usually only a matter of time before an LCB officer can identify a regulatory violation with the licensee's operations.

---

[71] *See* Rule Making Order CR-103E, Wash. State Liquor & Cannabis Bd. (May 2009), https://lcb.wa.gov/publications/rules/WSR_16_12_002.pdf.

[72] Written Warning, Wash. State Liquor & Cannabis Bd., Case No. 719338A (Dec. 4, 2019).

[73] As a result of the wide discretion granted to officers, the penalties that are meted out to licensees can vary widely. For example, in some instances, licensees that refuse to allow officers to inspect their facilities were subjected to monetary penalties. *See, e.g.*, In re Squires Forest LLC, LCB No. M-26,567 (Nov. 14, 2017). Others that voluntarily self-reported violations (rather than hiding them) lost their licenses. *See In re* Green Light Baked Goods, LLC, LCB No. M-26,769 (May 1, 2018).

[74] Gregory Foster, *Hillard Heintze - Focus Group (July 30, 2019) - Summary*, CANNABIS OBSERVER (Aug. 1, 2019), https://cannabis.observer/observations/hillard-heintze-focus-group-july-30-2019-summary/.

[75] *Id.*

[76] Wash. House Bill Report on HB 1237, House Committee on Commerce & Gaming: Staff Summary of Public Testimony (Jan. 01, 2019); Wash. Senate Bill Report on SB 5318, Senate Committee on Labor & Commerce, Staff Summary of Public Testimony (Feb. 3, 2019).

[77] Gregory Foster, *WA Senate LBRC Committee Meeting (January 31, 2019) – Summary*, CANNABIS OBSERVER (Apr. 17, 2021), https://cannabis.observer/observations/wa-senate-lbrc-committee-meeting-january-31-2019-summary/ (citing statement of Vicki Christophersen from Hearing on SB 5318 Before the S. Comm. on Labor and Comm. 2019 Leg., 66th Sess.); *see also* Hillard Heintze Report, *supra* note 7, at 40 ("Absent being assigned to conduct a site visit in conjunction with a complaint, officers seem to select sites at random."); *see also* Enforcement Visits Dataset, Wash. State Liquor & Cannabis Bd., https://data.lcb.wa.gov/dataset/Enforcement-Visits-Dataset/jizx-thwg.

[78] *See* Gregory Foster, *Hillard Heintze - Focus Group (July 30, 2019) - Summary*, CANNABIS OBSERVER (Aug. 1, 2019), https://cannabis.observer/observations/hillard-heintze-focus-group-july-30-2019-summary/ ("One licensee reported experience with an officer who stated their assumption that employees only worked in the industry to steal cannabis.").

The LCB's penchant for prioritizing punishment over education is well documented and extends into other facets of the agency's regulation of the industry. This includes the policies, procedures and practices relating to records inspections, rules interpretations, settlement agreements, and the imposition of procedural obstacles in resolving disputes with licensees.

a)    *Records Inspections Are Unnecessarily Burdensome*

By rule, licensees are required to maintain records that "clearly reflect all financial transactions and the financial condition of the business."[79] Originally, this requirement imposed a three-year records retention obligation.[80] Later, the LCB revised the regulations to require licensees retain records for five years.[81]

In conducting investigations into licensees, the LCB has interpreted the language in the regulation broadly. Although the record-keeping obligation relates to the "financial condition" of the company, officers routinely make overbroad requests for documentation.[82] The standard document inspection request form demands, among other things, "records of all financial transactions . . . ."[83] As the penalty for failing to produce records that are responsive to the request was historically severe,[84] this incentivized licensees to overproduce records so as not to be accused of failing to furnish demanded records in response to an investigation. Perhaps in response to these concerns, the agency eventually began appending a list of documents to the records inspection demand that it contended encompassed the "financial transactions" described in the demand. Those included:

- Ledgers (general ledger, balance sheets);
- All bank records related to the business, including personal accounts if used for the business;
- Financial transactions, purchase invoices, and cash expenditures;
- Copies of all deposited and expenditure checks;
- All credit/debit card statements for purchases that are for the licensed business, along with statements from personal accounts, if personal accounts are used for the licensed business;
- Quickbooks in Excel format on a thumb drive, or ledgers and balance sheets on thumb drive;
- Profit and loss statements;
- Copy of bank signature cards;

---

[79] WASH. ADMIN. CODE § 314-55-087(1) (2016).

[80] *Id.*

[81] Wash. Reg. 18-22-055 (2018) *codified at* WASH. ADMIN. CODE § 314-55-087(1) (2020).

[82] WASH. ADMIN. CODE § 314-55-087(1) (2016); *see also* Authorization to Inspect Response Form, Wash. State Liquor & Cannabis Bd. (2019).

[83] WASH. ADMIN. CODE § 314-55-087(1)(d) (2016).

[84] WASH. ADMIN. CODE § 314-55-530 (2018) (providing for cancellation of license if the licensee fails to furnish records requested by the LCB), *superseded by* WASH. ADMIN. CODE § 314-55-522 (2020) (5-day suspension or $2,500 monetary fine for first violation).

10

- Stock register for corporations (from start to current, showing changes in ownership/shares);
- Articles of incorporation;
- Any and all contracts, agreements, promissory notes, and 1099s;
- Records of financial transactions involving the loaning, gifting, or infusing of funds or anything of value received to the licensed business from any/all investors, financiers, individuals, or entities which were not reported during license application phase;
- Accounting and tax records;
- Records of any financial transactions for services of accountants or bookkeepers who have assisted in preparation of any accounting and tax documents; and
- All employee records to include, but not limited to, training, payroll, and date of hire for both former and current employees.[85]

The foregoing list is onerous. In the authors' experience, obtaining all the records demanded often takes weeks or months of time. And some of these documents are outside the licensees' control. For example, in the authors' experience, obtaining copies of all checks requires assistance from financial institutions, which are often slow in responding to these requests and typically charge licensees a fee for each check. Moreover, the list's request for items like "invoices" means that literally every receipt for any purchase the business has ever made for up to five years must be retained and produced. Every box of pens, every carton of fertilizer, every bag of coffee for the breakroom; all of it must be accounted for and produced for inspection. And none of this includes time to actually review these documents before making them available. If the licensee wants counsel to review tens of thousands if not hundreds of thousands of pages before production (to ensure that only responsive, non-privileged documents are produced to the LCB) the entire production can cost hundreds of thousands of dollars. Licensees that failed to put a robust document management system in place (i.e., virtually all licensees) to make these documents readily available in easy-to-produce formats face an extremely difficult task in complying without incurring great expense. Although the LCB has expressed small-business protectionist tendencies in its regulation of the cannabis industry, [86] these record retention and production rules can bury mom-and-pop business owners in a deluge of prohibitively expensive administrative bureaucracy.[87]

---

[85] Wash. State Liquor & Cannabis Bd., Required Documents. The document notes that "[t]he following checklist may not be all inclusive but is being offered to you as a means of insuring that you have provided the investigating officer with the documents he/she needs to thoroughly and timely investigate the complaint."

[86] Gregory Foster, *WSLCB - Board Caucus (March 26, 2019) - Summary*, CANNABIS OBSERVER (Mar. 27, 2019) (Board member Hauge stating that "[W]e're facing, with Canada now, an onslaught of corporate money—it's going to happen one way or another. We're under attack, we don't know exactly how it's going to happen. Corporate money wants to find a place in here."), https://cannabis.observer/observations/wslcb-board-caucus-march-26-2019-summary/; *see also* Answer, Brinkmeyer v. Wash. State Liquor Control Bd., Thurston Cnty. Sup. Ct. Cause No. 20-2-01568-34 at ¶ 18 (June 29, 2020) (noting that the restrictions on out-of-state ownership of cannabis licenses in Washington are important for the purpose of "creating business opportunities and jobs for Washingtonians . . . ."). By law, the agency is required to do a small-business analysis under the Regulatory Fairness Act for every (non-exempt) rulemaking. *See* WASH. REV. CODE § 19.85.040.

[87] Jean Lang Jones & Rob Smith, *Tight Regulations, High Taxes May Keep Washington State's $1.4B Cannabis Industry from Really Blooming*, SEATTLE BUS. MAGAZINE (Jan. 2019), https://www.seattlebusinessmag.com/policy/tight-regulations-high-taxes-may-keep-washington-states-14b-cannabis-industry-really-blooming.

To make matters worse, the LCB historically took the position that its officers had the right to force licensees to produce the records in whatever manner the officer elected, at whatever place the officer directed, at whatever time the officer dictated.[88] But in response to complaints about officer demands for delivery of documents, including those made by the authors, the agency adopted in 2019 a new form for Requests to Inspect that allows licensees to elect between (1) delivering papers to the LCB at an agreeable time; (2) making the records available onsite for inspection in the form they are maintained in the ordinary course of business; or (3) arranging for the records to be reviewed at a third location (such as a law office).[89]

When responding to records inspections, there is typically no reasoning with Enforcement officers to reduce the burden of responding to a document request. Moreover, unlike in civil actions, where the court oversees the scope of discovery and is available to adjudicate disputes, there is no similar limiting mechanism in LCB investigations.[90] Officers typically view the failure to produce records precisely as demanded as evidence supporting the licensee's guilt, and grounds for issuance of AVNs.[91] Instead of refusing an unreasonable request and risking the (very likely) AVN that will follow, licensees' only practical alternative is to expend massive resources to cooperate with LCB demands. The alternative typically means facing an AVN for cancellation of the license.[92] And even if the AVN penalty is not for cancellation, to prove that the Enforcement officer acted outside the scope of his or her authority requires taking the matter to trial before the Office of Administrative Hearings (OAH).[93] This typically would require retaining counsel and litigating a case through to conclusion after a hearing. And even then, the matter may not be final as the Board ultimately has decision-making authority over OAH decisions.[94] In any case, the cost of the hearing is as much, if not more, than the cost of complying with agency demands to produce records. As attorneys' fees are not available to the prevailing licensee, there is no winning in disputes with the agency over inspection requests, and the only viable course of action is to cooperate with all demands.

b)      *Overbroad Interpretation of Rules*

In exercising its discretion to establish regulations, the LCB implemented rules that exceed the restrictions implemented by statute, which makes participating in the industry even more difficult. For example, the durational residency requirement for sole proprietors in I-502 has been codified in RCW 69.50.331(1)(b), which provides the following:

No license of any kind may be issued to:

---

[88] *Id.*
[89] Authorization to Inspect Response Form, Wash. State Liquor & Cannabis Bd. (2019).
[90] *See* Hillard Heintze, *supra* note 7, at 5.
[91] *I-502: An Overview of Washington's New Approach to Marijuana*, MPP, https://www.mpp.org/states/washington/washingtons-i-502/.
[92] WASH. ADMIN. CODE § 314-55-530 (2018).
[93] WASH. ADMIN. CODE § 314-55-505(c) (2020).
[94] *Understanding Your Hearing Options for Administrative Violations from the WSLCB: A Resource for Licensees and MAST Permit Holders*, Wash. State Liquor Control Bd. (2010), https://lcb.wa.gov/publications/UnderstandingYourHearingOptions.pdf.

(i) A person under the age of twenty-one years;

(ii) A person doing business as *a sole proprietor who has not lawfully resided in the state for at least six months prior to applying to receive a license*;

(iii) A partnership, employee cooperative, association, nonprofit corporation, or corporation unless formed under the laws of [the State of Washington], and unless all of the members thereof are qualified to obtain a license as provided in this section; or

(iv) A person whose place of business is conducted by a manger or agent, unless the manager or agent possesses the same qualifications required of the licensee.[95]

As shown above, the statutory residency requirement applies only to sole proprietorships and "members" of certain corporate entities, but the LCB expanded the residency requirements by administrative rule. WAC 314-55-020(10) expressly requires *all* marijuana license applicants to reside in Washington for "at least six months" before submitting their application to the LCB:

Under RCW 69.50.331 (1)(c) [sic], all *applicants applying for a marijuana license must have resided in the state of Washington for at least six months prior to application for a marijuana license. All business entities* including, but not limited to, partnerships, employee cooperatives, associations, nonprofit corporations, corporations and limited liability companies, applying for a marijuana license *must be formed in Washington. All members, governors, or agents of business entities must also meet the six month residency requirement. Managers or agents who manage a licensee's place of business must also meet the six month residency requirement.*[96]

The LCB further expanded the residency requirements in WAC 314-55-035 to include all true parties of interest (TPIs) to be applicants for a marijuana license.[97] TPIs, which include shareholders, members, managers, partners, officers, stockholders, and those who exercise control over a marijuana business, must meet the residency requirement in WAC 314-55-020(10).[98] This extension of the term "applicant" means that all of those parties, plus the entity holding the license, must meet the six-month residency requirement. Further, only approved licensees and TPIs (and thus Washington residents) are entitled to receive a share of the profits from a marijuana business operating in Washington.[99]

---

[95] WASH. REV. CODE § 69.50.331(1)(b) (2020).

[96] WASH. ADMIN. CODE § 314-55-020(11) (2020).

[97] Gregory Foster & M. Bailey Hirschburg, *WSLCB - Listen and Learn Forum - True Party of Interest (May 20, 2020) Summary*, CANNABIS OBSERVER (May 21, 2020), https://cannabis.observer/observations/wslcb-listen-and-learn-forum-true-party-of-interest-may-20-2020-summary/.

[98] The LCB amended section 314-55-035 of the Washington Administrative Code in September 2020 to remove spouses from the list of TPIs. 20-18 Wash. Reg. 69 (Sept. 2, 2020).

[99] WASH. ADMIN. CODE § 314-55-035 (2021).

Moreover, through policy and practice, the LCB requires all licensees and TPIs to remain Washington residents.[100] In other words, once a licensee obtains a license, they will forfeit their license (and their business) if they become a resident of anywhere other than Washington.

There is no statutory basis to require shareholders to meet the residency requirement. There is no statutory basis to require residency from limited liability companies. And there is no statutory basis to require licensees to forever remain Washington residents. Nevertheless, the LCB requires all of it.[101]

### c)   Forced Settlements

In order to obtain any settlement with the LCB, licensees are always required to admit all the violations alleged in the AVN in exchange for a reduction of the penalty—the agency almost never withdraws AVNs once issued; it will only agree to a reduced penalty.

For example, a review of all of the cases alleging TPI violations from 2016 through mid-2020 shows that of the thirty-nine cases that have been resolved, twenty were resolved by settlement.[102] In every single one of the settled cases, the licensee was required to admit the violations asserted in the AVN in order to resolve the case.[103] In fact, a review of hundreds of settlement agreements failed to locate a settlement agreement where the LCB did not require the licensee to admit the violations alleged in the original AVN.[104]

Having licensees always admit to the violation in order to get a reduction in the penalty (even in instances where the violation did not in fact occur) is problematic for two reasons. First, and most critical, the licensee's violation history is one factor that the agency considers at license renewal.[105] As a result, while the penalty for a first violation is often small, the penalty for future violations has the potential to increase in severity, from large monetary penalties to revocation of

---

[100] Brinkmeyer v. Wash. State Liquor Control Bd., Thurston Cty. Sup. Ct. Cause No. 20-2-01568-34 at 4 (June 20, 2020).

[101] WASH. ADMIN. CODE § 314-55-035(1) (2021).

[102] WASH. STATE LIQUOR & CANNABIS BD., ADJUDICATIVE PROCEEDINGS LOG [hereinafter ADJUDICATIVE PROCEEDINGS LOG], http://lcb.wa.gov/sites/default/files/publications/board/Final%20Orders/FinalOrders.xlsx.

[103] Good Earth LLC, LCB No. M-25,982 (June 22, 2016) (final order); Ravens Keep, LLC, LCB No. M-26,029 (Sept. 27, 2016) (final order); Dendritic Prod., LLC, LCB No. M-26,271 (Mar. 14, 2017) (final order); HL South, LLC, LCB No. M-26,248, (Apr. 25, 2017) (final order); Leaph WA, LLC, LCB No. M-26,107, (May 2, 2017) (final order); Gate Organic, LCB Nos. M-26,491, M-26,492, (Dec. 6, 2017) (final order); Garden of Weeden LLC, M-26,131 (Jan. 9, 2018) (final order); Green Light Baked Goods, LCB No. M-26,769 (May 1, 2018) (final order); Honu Enters., LCB No. M-26,628 (Aug. 14, 2018) (final order); Green Am., Inc., LCB No. M-26,694 (Oct. 30, 2018) (final order); Amerikan Weed, LP, LCB M-26,837 (Oct. 30, 2018) (final order); I.S.N. Enters., LCB No. L-26,863, (Jan. 2, 2019) (final order); Wildfire Cannabis Co., LCB No. M-26,902 (Mar. 19, 2019) (final order); Diego Pellicer, Inc., LCB No. M-26,978 (Apr. 9, 2019) (final order); EH Enters. Mgmt., LCB Nos. M-27,136, M-27,137 (May 21, 2019) (final order); RGL Indus., LCB No. M-26,971, (June 18, 2019) (final order); Anthony Bill Inv. Mgmt., LCB No. M-27,007, (Aug. 13, 2019) (final order); King Cronic Grp., LLC, LCB No. M-27,021 (Oct. 29, 2019) (final order); OG Farms, Inc., LCB No. M-27,373, (July 22, 2020) (final order).

[104] See, e.g., ADJUDICATIVE PROCEEDINGS LOG, supra note 102. As of September 11, 2020, the LCB records that 185 cannabis AVNs have been resolved by settlement between the agency and the licensee. See id.

[105] WASH. ADMIN. CODE § 314-55-045 (2021); WASH. ADMIN. CODE § 314-55-505(1)(b) (2021).

the marijuana license.[106] Thus, a licensee may feel obligated to accept a $2,500 fine for a violation (fighting over such a paltry penalty is nonsensical—that amounts to only a few hours of attorney time), without thinking that another mistake could result in a much more severe penalty. Second, it is simply unjust; even in the face of facts disproving a violation, in the authors' experience, the agency requires acceptance of the AVN in order to resolve the dispute.

Finally, as a direct consequence of the LCB's insistence on acceptance of the alleged factual basis underlying an AVN, licensees often enter into illogical or absurd settlements. For example, in one case reviewed, the LCB issued an AVN to a licensee when the licensee sold its real property, intellectual property, and equipment to a third party, then leased and licensed that property back for use in the operation of its business.[107] The LCB alleged that the transaction constituted a wrongful TPI violation.[108] The LCB sought cancellation of the license as the penalty for this purportedly wrongful conduct.[109] As part of the settlement, the LCB required the licensee to admit to the violation, then as a condition of settlement required the licensee to agree "that it will not enter into any similar agreements with any entity for a period of two (2) years from the date that the Stipulated Settlement Agreement is approved by the Board."[110] The result is nonsensical. Under the settlement agreement, the exact same acts by the licensee that originally warranted cancellation of the license were implied to be permissible within two years after the settlement.[111] This is the end result of a system that is designed to punish and impose guilt, over one designed to ensure compliance.

### d)    Licensees Often Have No Choice but to Fight

As previously discussed, if the Licensee is unwilling to accept the AVN's allegations, the only way to resolve a dispute is to litigate the matter through to conclusion.[112] A review of the LCB's violation dataset reveals that of the more than 1,679 cannabis AVNs that have been issued since 2014, only five of been resolved through dismissal or conversion to a written warning.[113] Every other AVN resulted in some sort of penalty.[114] In other words, more than 99.7% of LCB AVNs result in the imposition of some penalty by the Board.[115] This leaves licensees little practical choice but to fight.

Moreover, most licensees never have a meaningful opportunity to appeal decisions in court. Under the Administrative Procedures Act (APA), AVNs may only be appealed to the

---

[106] WASH. ADMIN. CODE § 314-55-509 (2021).
[107] BMF Washington, LLC, LCB No. M-26,730, M-26,894 at 3 (Feb. 27, 2019) (settlement agreement).
[108] Id.
[109] Id.
[110] Id.
[111] Id.
[112] WASH. REV. CODE § 34.05.534 (2021).
[113] See, e.g., ADJUDICATIVE PROCEEDINGS LOG, supra note 102; see also Greenstone Garden, LCB No. M-27,301 (May 26, 2020); Jus Liquor, LCB No. M-26,986 (Nov. 12, 2019); I-502 Invs., LCB No. M-26,847 (Feb. 19, 2019); Alternative Medicine Collective LLC, LCB No. M-26,827 (Oct. 16, 2018); Lower Valley Commodities, LCB No. M-25, 723 (July 5, 2016).
[114] See, e.g., ADJUDICATIVE PROCEEDINGS LOG, supra note 102.
[115] See id.

superior court after the proceedings before the administrative law judge and the Board have run their course.[116] The review is generally not *de novo*; it is based on the factual record developed before the agency.[117]And the agency's decision is not typically stayed pending judicial review.[118] Instead, it is incumbent upon the licensee to seek a stay of agency enforcement pending judicial review.[119]

According to the agency, the standard rules for enjoining a party from acting do not apply, and the only avenue for staying enforcement of an agency order on review is for a licensee to establish the following factors:

> (1) The applicant is likely to prevail when the court finally disposes of the matter;
> (2) Without relief the applicant will suffer irreparable injury;
> (3) The grant of relief to the applicant will not substantially harm other parties to the proceeding; and
> (4) The threat to the public health, safety, or welfare is not sufficiently serious to justify the agency action in the circumstances.[120]

The LCB takes the position that virtually all violations of its rules constitute a threat to public safety and interfere with its ability to regulate the industry.[121] For instance, under the LCB's reasoning, the agency's inability to inspect whether a licensee has maintained an employee date-of-hire record poses a direct threat to the public.[122] And the need to stay enforcement of agency action is often paramount, as the LCB's imposition of its penalties can have the practical effect of crippling the licensee's businesses and making successful litigation pointless and often financially impossible to pursue. For example, in matters involving cancellation of licenses, one component of the cancellation process is the state's seizure and destruction of the licensees' cannabis products.[123] The LCB regularly seeks to exact this penalty the moment an administrative law judge has pronounced the judgment.

This practice is problematic because administrative law judges are prohibited from considering many arguments. For example, administrative law judges frequently refuse to

---

[116] WASH. REV. CODE § 34.05.542(3) (2021).

[117] WASH. REV. CODE § 34.05.562 (2021).

[118] WASH. REV. CODE § 34.05.550(2) (2021).

[119] *Id.*

[120] WASH. REV. CODE § 34.05.550(3) (2021).

[121] *See, e.g.*, The Board's Response to Petitioner's Request for Reconsideration at 7, *In re* The Clone Zone, LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00035-34 (Jan. 29, 2019) ("[R]epeated violations of the traceability regulations threaten the Board's ability to regulate a legal marijuana industry, and its pattern of disregard of marijuana rules and regulations threatens the public safety and welfare of Washingtonians.").

[122] *See, e.g.,* The Board's Response to Petitioner's Motion for Preliminary Injunction at 16, *In re* The Clone Zone, LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00035-34 (Feb. 12, 2019) (citing WASH. REV. CODE § 34.05.550(3)) (noting that the right to conduct inspections of licensee premises is necessary to protect public health and welfare); *see also* Petitioner's Reply in Support of Motion for Preliminary Injunction at 2, *In re* The Clone Zone, LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00035-34 (Feb. 13, 2019) ("[U]nder the Board's interpretation, any 'inspection' is an 'agency action based on public health safety or welfare,' including mundane inspections of employee date of hire records, and purchase invoices for office supplies.").

[123] WASH. ADMIN. CODE § 314-55-220(1) (2021).

adjudicate constitutional questions.[124] Consequently, if a licensee's defense to an AVN is that the agency has violated the licensee's constitutional rights, the ALJ typically is reluctant to, and therefore does not, address that concern.

In one case, the agency obtained an order from the ALJ directing cancellation of the licensee's license, and destruction of its products, including proprietary plant lines and all of the licensee's inventory.[125] Accordingly, even if the licensee prevailed on appeal of the ALJ's ruling (which could not address constitutional issues), the victory would be pyrrhic; with all of its product destroyed, it could not do any further business. In that case, the licensee filed suit, arguing that the agency issued an AVN following an unconstitutional search of its premises in violation of the Fourth Amendment and Article 1, Section 7 of the Washington State Constitution.[126] At every turn, the agency fought the imposition of a stay of destruction of property pending the adjudication of the constitutional claims.[127] If the LCB can seize the cannabis product at a licensee's facility and destroy it, no constitutional arguments will matter, and further litigation in the courts will for all practical purposes be moot because the agency cannot restore the product it destroys and does not pay damages to licensees for enacting wrongful penalties.[128]

Similarly, in another case the LCB entered into a settlement agreement with a licensee (RGL), pursuant to which the licensee, under a settlement agreement with the LCB, had a set

---

[124] *See* Nor-Pac Enters. v. Dep't of Licensing, 129 Wash. App. 556, 562 n.9 ("The ALJ noted that she did not have authority to decide the constitutional issue.") (2005); *but see* Fields v. Dep't of Early Learning, 193 Wash.2d 36 (2019) (reversing and remanding lower court's decision that determining constitutional question was out of the scope of its review).

[125] Petitioner's Motion for Preliminary Injunction, *In re* The Clone Zone LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00810-34 (Feb. 7, 2019).

[126] *Id.*

[127] Response to Motion for Preliminary Injunction, *In re* The Clone Zone LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00810-34 (Feb. 12, 2019); *see also* Resp. to Request for Stay, *In re* Clone Zone, LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00035-34 (Jan. 15, 2019); Response to Motion for Reconsideration, In re The Clone Zone, LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00035-34 (Jan. 29, 2019). Indeed, the agency also sought to exclude the testimony of a Washington State legislator who submitted a declaration attesting to the importance of the issues in the case and the need to place matters on hold while the legislature worked on a regulatory enforcement reform bill that would have prevented the agency from acting harshly. *See* Declaration of Ann Rivers, *In re* The Clone Zone, LLC, Thurston Cty. Sup. Ct. Cause No. 19-2-00035-34 (Jan. 17, 2019) ("The issues presented by this proposed license cancellation are very important to me. I had planned to testify in person in this matter in support of petitioner's motion for a preliminary injunction . . . but I was informed that the Washington State Liquor and Cannabis Board . . . would seek to exclude my oral testimony . . . . Unfortunately, it appears that the LCB has become more aggressive in pursuing terminations for administrative violations, not less . . . .").

[128] Unlike a typical civil action, where a party can post a supersedeas bond to stay enforcement during an appeal, there is no automatic right to a stay of an administrative adjudication. Instead, the licensee must satisfy the onerous requirements of Washington Revised Code § 34.05.550(2)−(3). This is particularly difficult because the agency takes the position that *any* violation of its rules, once found by an ALJ, affects "public safety," requiring a much more stringent evidentiary showing by the licensee in order to obtain a stay. WASH. REV. CODE § 34.05.550(3). While reform bills were being contemplated by the legislature, four state legislators wrote a bipartisan appeal to the director of the agency noting that traceability violations did not affect public safety. Letter from Senator Ann Rivers, Senator Guy Palumbo, Representative Derek Stanford, and Representative Brandon Vick to LCB Executive Director Rick Garza (Jan. 2, 2019). Of course, the agency is permitted by law to voluntarily grant a stay, but the authors are not aware of any instance where the LCB has done this. *See* WASH. REV. CODE § 34.05.550(1).

period of time to sell its business to a third party, or otherwise the license would be cancelled.[129] The licensee submitted all of the requested documentation to the LCB to obtain approval to transfer its license, and after the approval deadline passed, the LCB denied the transfer and moved to cancel the license and destroy all of RGL's products.[130] RGL's creditors filed for the creation of a receivership to halt the property destruction (citing the statute's automatic stay provisions),[131] but the agency ignored the filing and sent officers to the licensee's facility to destroy its products.[132] RGL's creditors then had no choice but to seek a temporary restraining order halting the destruction while the courts could adjudicate the agency's refusal to consider RGL's application to transfer its license.[133] Although opposed by the agency, the court granted the TRO, and the court prohibited the agency from destroying RGL's products.[134]

These cases are only a few examples of the agency taking actions that undercut licensees' ability to obtain meaningful judicial review.

> ### e)    Cannabis Licensees Face Far Steeper Penalties than Liquor and Tobacco Licensees

In addition to the foregoing obstacles to settlement and litigation with the agency, the LCB consistently penalizes cannabis licensees far more severely than the liquor and tobacco licensees it also regulates. Since 2014, the agency has imposed fines of $34,500,[135] $38,000,[136] $45,000,[137] $50,000,[138] $55,000,[139] and $75,000[140] on cannabis licensees. The Board regularly imposed fines on cannabis licensees in excess of $10,000.[141] At the same time, the single largest

---

[129] *In re* RGL Indus. Inc., LCB No. M-26,971 (June 10, 2019) (settlement agreement).

[130] *See* Motion for Temporary Restraining Order, *In re* RGL Indus., Inc., Cowlitz Cty. Sup. Ct. Cause No. 19-2-01057-08 at 4 (Oct. 29, 2019) ("Although all of the documents that were necessary for the LCB's consideration and approval of the application to transfer the License were timely submitted to the LCB, the LCB failed and refused to consider them.").

[131] Petition for Appointment of General Receiver, *In re* RGL Indus., Inc., Cowlitz Cty. Sup. Ct. Cause No. 19-2-01057-08 (Oct. 28, 2019). The authors represented one of RGL's creditors in this litigation.

[132] *See* Motion for Temporary Restraining Order, *In re* RGL Indus., Inc., Cowlitz Cty. Sup. Ct. Cause No. 19-2-01057-08 at 4 (Oct. 29, 2019) ("The LCB notified [the appointed receiver] that it intends to proceed with its enforcement action, which includes destruction of the Estate's property.").

[133] *Id.* at 5 ("[V]irtually all of the value of the Estate is tied up in marijuana inventory that the LCB is hell-bent on destroying if the court fails to restrain the LCB from its enforcement actions.").

[134] Order, *In re* RGL Indus., Inc., Cowlitz Cty. Sup. Ct. Cause No. 19-2-01057-08 at 4 (Oct. 29, 2019).

[135] *In re* Dendritic Prods., LLC, LCB No. M-26,271 (Mar. 14, 2017).

[136] *In re* Good Earth, LLC, LCB No. M-25,982 (June 22, 2016).

[137] *In re* Anthony Bill Invs. Mgmt., LCB No. M-27,007 (Aug. 1, 2019).

[138] *In re* Diego Pellicer, Inc., LCB No. M-26,978 (Apr. 9, 2019); *In re* Wildfire Cannabis Co., LCB No. M-26,902 (Mar. 19, 2019); *In re* HL South, LLC, LCB No. M-26,248 (Apr. 25, 2017).

[139] *In re* RGL Indus., Inc., LCB No. M-26,971 (June 18, 2019).

[140] *In re* EH Enters. Mgmt., Inc., LCB No. M-27,136, M-27,137 (May 21, 2019).

[141] *See, e.g.*, ADJUDICATIVE PROCEEDINGS LOG, *supra* note 102. This of course does not include license suspensions, which can have far greater financial consequences for retail locations that are forced to close their doors for days or weeks. In many instances, license suspensions are a nonsensical way of dealing with violations. While the owner does suffer the consequence of lost sales, employees also bear a substantial burden of going without wages during the period of the closure.

penalty the Board imposed on a liquor licensee during the same period was $10,000.[142] All of the remaining penalties for liquor license violations were $5,000[143] or less.[144] Tobacco licensees were punished even less, with the highest penalty being $2,000.[145] These disparate penalties tend to demonstrate that the Board disproportionately punishes cannabis licensees by requiring fines closer to a criminal sanction than a regulatory compliance penalty.

2.     The LCB has a Pattern and Practice of Disregarding Licensees' Constitutional Rights

Perhaps as a result of harsh enforcement practices, the LCB has garnered a reputation for taking actions that exceed its legal mandate. The following sections describe accounts of actions by the agency that raise questions about the LCB's respect for legal or constitutional bounds.

a)     *The LCB Disregards First Amendment Protections*

In 2017, the state legislature passed Senate Bill 5131, a law relating to cannabis advertising and signage.[146] Although Senate Bill 5131 was originally proposed as a "clean-up" bill to address issues that had been missed or that were not anticipated in earlier cannabis legislation, an amendment to the bill added new restrictions to advertising and signage regulations by limiting the number and size of the signs, as well as the information that could be displayed.[147] The bill also prohibited certain images that could be displayed on signs—licensees could not depict marijuana plants, marijuana products, or anything that appealed to children.[148]

In enforcing the statute, the LCB took the position that licensees deserved little-to-no-leeway for signs that were previously compliant but were rendered noncompliant nearly overnight, often resulting in thousands of dollars of costs to the licensee to alter and replace their signs (in addition to any costs expended fighting resulting AVNs).[149] Many licensees came up with cost-effective ways to remedy their non-compliant signs, such as covering them with tarp until they could afford to replace them or using plastic decals that were compliant with the new rules.[150] But not all licensees were given sufficient flexibility by their assigned enforcement officer.[151] Instead, the agency took the hardline position that the new statute superseded licensee's First Amendment rights.[152]

---

[142] *In re* One Longview Inc., LCB No. L-24,747 (Dec. 3, 2014). The cannabis licensees referenced *supra* notes 135–141 were all facing their first offenses. The liquor licensee was facing a third public safety offense of supplying liquor to an intoxicated person, and second public safety offense of selling alcohol to a minor. *Id.* at 3.

[143] *In re* Tulalip Tribes of Washington, LCB Nos. L-24,951, L-24,859 (Feb. 10, 2015).

[144] *See, e.g.*, ADJUDICATIVE PROCEEDINGS LOG, *supra* note 102.

[145] *In re* Pasco Smoke Shop, Inc., LCB No. T-27,246 (Jan. 7, 2020).

[146] E.S.S.B. 5131, 65th Leg., Reg. Sess. (Wash. 2017).

[147] *Id.* at 26.

[148] *Id.*

[149] *Id.* at 11.

[150] *Id.* at 8.

[151] *Id.* at 9.

[152] *Id.*

Beginning in January 2018, one licensee received an AVN imposing a $1,000 fine for a "Black Lives Matter" sign and an "All Races Welcome" sign in the window of its retail store.[153] Reportedly, the Enforcement officer that issued the violation concluded these signs violated the LCB's advertising rules and told the licensee, "Those signs have to go."[154] Although it does not appear as though the licensee challenged the AVN, there can be no doubt that a statute that chills political speech like the signs at issue would run afoul of First Amendment protections. The agency took matters further which culminated in *Plausible Products, LLC d/b/a Hashtag Cannabis v. Washington State Liquor & Cannabis Board*.[155]

Plausible Products, LLC (Hashtag) came up with a way to comply with the new advertising regulations by stringing outdoor lights together to spell "POT" in their window (the Sign). After Hashtag's landlord complained to the LCB about the Sign, Enforcement came out to issue an AVN.[156] Struggling to identify any reason that the lights were actually a violation, Enforcement tried out four different theories: first, that the Sign contained wording other than Hashtag's business or trade name; second, that the Sign exceeded the number of signs Hashtag was permitted to display; third, that the Sign exceeded the 1,600 square inch limit; and fourth, that the Sign was not permanently affixed to the building.[157] To substantiate its AVN, Enforcement simply quoted the entirety of RCW 69.50.369(2) (which contained all of the advertising and signage limitations) in a catch-all strategy.[158] The administrative law judge that oversaw the hearing on the AVN determined it had no authority to evaluate Hashtag's claim that the statute and the LCB's enforcement of it was unconstitutional, and settled for the conclusion that the Sign had simply violated the statute and the regulations.[159]

On appeal, Hashtag asked the superior court to determine if the applicable statutes and regulations unconstitutionally burdened commercial speech.[160] In defense of its actions, the LCB asked the court to find that the Sign was not protected by the First Amendment because it was commercial speech regarding a federally illegal activity.[161]

Unsurprisingly, the court disagreed. In evaluating the constitutionality of the commercial speech, the court relied on *Central Hudson Gas & Electric Corporation v. Public Service*

---

[153] Wash. State Liquor & Cannabis Control Bd., 11 Notice of Permanent Rules for Marijuana Advertising Rules, https://lcb.wa.gov/sites/default/files/publications/rules/2017%20Proposed%20Rules/CES_MJ_Advertising_Rules.pdf/; *see also* Steven M. Telstad, Field Contact Notes (Jan. 11, 2018) ("I observed other signage on the building. I advised the manager that per the law the only signs they may have on the building are the two tradename signs. Everything else must be removed, moved inside, or somewhere else. I also advised that we do allow signage such as OPEN signs, hours signs, and the required signs by law, but no other signs.").

[154] Wash. State Liquor & Cannabis Control Bd., 9 Notice of Permanent Rules for Marijuana Advertising Rules.

[155] Order, Plausible Prods., LLC v. Wash. State Liquor & Cannabis Bd., King County Sup. Ct. Cause No. 19-2-03292-6 SEA (Nov. 18, 2019).

[156] *Id*. at 2.

[157] *Id*. at 3 ("The [LCB] Narrative/Evidence Report simply quotes the whole of RCW 69.50.369(2)").

[158] *Id*.

[159] *Id*.

[160] *Id*. at 4.

[161] *Id*. at 7 ("The State argues that 'for purposes of the first *Central Hudson* test, marijuana activity cannot be considered to be 'lawful activity' where its use, possession, manufacture, and distribution remains illegal under federal criminal law.").

*Commission of New York*[162] to determine that, not only did the Federal and Washington Constitutions apply, the Sign survived *Central Hudson's* illegality test.[163] The court went on to find that though the LCB had a substantial interest in preventing underage consumption of marijuana, its stated interest in avoiding federal enforcement was too vague to qualify as a substantial interest for the purposes of the *Central Hudson* analysis.[164]

The court's analysis regarding the size and affixing requirements relied heavily on how the LCB has permitted billboard advertisements, ruling that the on-premises sign size restrictions were untenable because the LCB also permitted billboard advertising.[165] Billboards are much larger than on-premises signs, and the court acknowledged that youths were much more likely to be exposed to marijuana advertisements on billboards than at stores where they are not permitted entry.[166] The court determined that the content restrictions were invalid because the business could just register a word like "POT" as a business or trade name, which would permit the sign under the RCW and WAC.[167]

Ultimately, the court determined that the content, size, and affixing restrictions did not directly and materially advance the state's interest in preventing underage consumption, and the restrictions were not sufficiently tailored to advance the state's interest, ruling that the on-premises content, size, and affixing restrictions were unconstitutional.[168]

*Hashtag* was certainly a victory for the constitutional rights of Washington's cannabis industry, but it was also a herald for issues to come. It showed that the agency was willing to litigate its position that licensees do not have constitutional rights. Though the LCB failed to convince the court in *Hashtag*, it would continue to argue in the coming years that the industry did not enjoy other constitutional protections.[169]

### b)      The LCB Disregards Fourth Amendment Protections

The Fourth Amendment of the U.S. Constitution guarantees basic protections against unreasonable searches and seizures.[170] The federal Constitution serves as the "minimum level of protection against warrantless searches and seizures . . . ."[171] States, conversely, tend to offer additional protections, as does Article I, section 7 of the Washington Constitution.[172] These protections, at base, are about the fundamental right to freedom from unreasonable government

---

[162] Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n. of New York, 447 U.S. 557 (1980).
[163] *See* Order, *supra* note 155, at 6–7.
[164] *Id.* at 9.
[165] *Id.* at 16.
[166] *Id.* at 17.
[167] *Id.* at 16.
[168] *Id.* at 20. The court also found that the enforcement of the statute violated Article I, Section 5 of the Washington State Constitution.
[169] *Id.* at 22.
[170] U.S. CONST. amend. IV.
[171] State v. Walker, 157 Wash.2d 307, 313, 138 P.3d 113 (2006).
[172] *Id.*

intrusion.[173] The rights codified in federal and state law are usually examined in the context of criminal law. However, it is well-established doctrine that the prohibition against unreasonable searches and seizures "applies to administrative inspections of private commercial property" as well.[174] From a policy perspective, this is only logical; the general public would likely balk at the idea of significantly greater protections being afforded to those suspected of criminal activity than those engaged in lawful commercial enterprise.

Yet, this is exactly how cannabis law is enforced in Washington state. In the criminal context, state and federal law prohibit warrantless searches and seizures unless the State can show that one of a narrow set of exceptions applies.[175] Where an individual might be subject to criminal charges related to a controlled substance, a warrantless search is presumed to be invalid unless the officer shows that he or she had probable cause to believe a crime was being committed.[176] The presumption of legality of searches related to the licensed cannabis industry is not so clear-cut.

After the people of Washington voted to legalize the adult use and sale of cannabis in 2012, the State enacted and revised hundreds of rules to regulate the manufacture, transport, sale, use and disposal of cannabis products.[177] The authority for these rules stems largely from the Uniform Controlled Substances Act, ch. 69.50 RCW (the Act).[178] The Act's enforcement provisions arguably comply with constitutional restraints and prohibit warrantless searches and seizures in the context of cannabis businesses. Specifically, the Act allows administrative inspections of premises controlled by cannabis licensees when they are "authorized by an administrative inspection warrant issued pursuant to RCW 69.50.502."[179] The warrant itself must:

1.   be issued by a judge,[180]
2.   identify "the area, premises, building, or conveyance to be inspected, the purpose of the inspection, and if appropriate the type of property to be inspected, if any;"[181]
3.   state the grounds of issuance;
4.   be presented to the owner, operator, or agent in charge of the premises, with appropriate credentials, at the time of inspection or seizure;
5.   be "served during normal business hours;"[182] and
6.   be conducted "within reasonable limits and in a reasonable manner."[183]

---

[173] Donovan v. Dewey, 452 U.S. 594, 599 (1981).
[174] Seymour v. Wash. State Dep't of Health, Dental Quality Assur. Comm'n, 152 Wash. App. 156, 164, 216 P.3d 1039 (2009).
[175] State v. Grande, 164 Wash.2d 135, 141, 187 P.3d 248 (2008).
[176] Id.
[177] See generally WASH. REV. CODE ANN. § 69.50 et seq.; WASH. ADMIN. CODE § 314-55 et seq.
[178] See WASH. REV. CODE ANN. § 69.50.
[179] WASH. REV. CODE ANN. § 69.50.501(1).
[180] Id. at § 69.50.501(1).
[181] Id. at § 69.50.501(2).
[182] Id.
[183] Id. at § 69.50.501(3).

The Act does allow warrantless searches and seizures, but only in limited circumstances, such as where an owner or agent gives consent, there is an imminent threat to health or safety, or there are exigent or exceptional circumstances.[184] In short, the Act appears to closely follow the requirements for searches and seizures laid out by federal and state law.[185]

The regulations derived from the Act, however, are not crafted with the same restraint or respect for constitutional rights. Purportedly under the authority of the Act, the LCB created WAC 314-55-185 (the Search Regulation) to govern the inspection of all premises and vehicles "used or in any way connected, physically or otherwise," with cannabis production, processing, sale, research, or transport.[186] The Search Regulation requires licensees to make all such premises "available for inspection *at all times*" to LCB officers.[187] The Search Regulation includes no warrant or reasonable cause requirements. In fact, it seeks to eliminate a licensee's right to deny consent to an unreasonable inspection, as it mandates that *any* person on a licensed premises or within a transport vehicle "must admit [any LCB officer] demanding to enter therein . . . and must not obstruct or attempt to obstruct the entry of such officer, or refuse to allow an officer to examine the premises, vehicles, records and products" of the licensee.[188] The Search Regulation is without limits; it imposes no real duties or restrictions on those who conduct searches.[189] Instead, it balances the entire system of enforcement on caprice of the LCB officers themselves.[190]

On its face, the Search Regulation does not comport with the constitutional protections afforded to commercial enterprises. Though most federal and state case law deals with criminal searches, the expectation of privacy unquestionably extends to "administrative inspections designed to enforce regulatory statutes."[191] To be sure, that expectation is more limited when applied to an industry as "closely regulated" as cannabis.[192] But the right to privacy and the protection against unreasonable searches and seizures does not simply disappear in such circumstances. Even in enforcing regulatory schemes for closely regulated industries, a warrantless inspection or search is permissible only where the regulation or rules authorizing the search are so comprehensive and well-defined as to put the commercial property owner on notice that "his property will be subject to periodic inspections undertaken for specific purposes[.]"[193] More importantly, to create a "constitutionally adequate substitute for a warrant," the regulation

---

[184] *Id.* at § 69.50.501(4).
[185] The LCB further acknowledges, in its Policy manual, that the U.S. Constitution requires a valid warrant in order to conduct a search, subject to very limited exceptions. *See* Wash. State Liquor & Cannabis Bd., Policy Manual, § 311.3.
[186] WASH. ADMIN. CODE § 314-55-185(1)(a) (2020).
[187] *Id.* at § 314-55-185(1) (emphasis added).
[188] *Id.* at § 314-55-185(2).
[189] *See infra* note 204, at 10–12.
[190] *Id.*
[191] Seymour v. Wash. State Dep't of Health, Dental Quality Assur. Comm'n, 152 Wash. App. 156, 164, 216 P.3d 1039 (2009).
[192] *See, e.g.,* New York v. Burger, 482 U.S. 691, 702 (1987).
[193] *Id.* at 703.

must be "carefully limited in time, place, and scope."[194] The point is to ensure that inspections are not so "random, infrequent, or unpredictable," that an owner cannot meaningfully ascertain that he or she will be inspected from time to time for specific purposes.[195] To allow otherwise would be to subject a commercial business owner to the "unbridled discretion [of] executive and administrative officers."[196]

Unfortunately, that is the exact situation in which cannabis licensees find themselves. The Search Regulation does not limit LCB inspections in time, place, or scope. Contrary to the Act, which requires that inspections be done pursuant to a warrant and during business hours, the Search Regulation allows LCB officers to conduct warrantless searches "at all times."[197] As a result, licensees are technically subject to search any time, day or night, that an officer chooses to inspect their premises.

Furthermore, the premises subject to inspection "at all times" are not limited to a licensee's actual business location.[198] The Search Regulation explicitly permits inspections of "any premises . . . used or *in any way* connected, *physically or otherwise*, with the licensed business[.]"[199] The implications of the Search Regulation's broad language are staggering. Many other businesses, including those that are not in closely-regulated industries—and therefore entitled to even stronger constitutional protections—are connected in some way to cannabis businesses. This includes banks, law firms, software developers, office supply companies, security system companies, and marketing specialists, just to name a few, that would all purportedly be subject to inspections at any time. Not only does the Search Regulation purport to run rough-shod over the rights of innocent third parties not directly engaged in the cannabis business, but it also eliminates any meaningful geographic limitations on LCB inspections.

Finally, the Search Regulation provides no actual limitation on the scope of warrantless inspections. The scope element requires that regulations state the purpose of warrantless searches with some specificity.[200] The Search Regulation does not require any purpose for a warrantless search; it simply dictates that LCB officers may conduct them at any time, at any location remotely connected to the cannabis licensee's business, at their sole discretion.[201] And regardless

---

[194] *Id.*; Wash. Massage Found. v. Nelson, 87 Wash.2d 948, 558 P.2d 231, 235 (1976). In Washington Massage, the Court struck down as unconstitutional a regulation that permitted the inspection of a massage business "at any time" in order to "ascertain whether it is conducted in compliance with the law" because it found that the statute was not limited in time or scope. Specifically, it determined that the language of the statute, which is not all that different from the language of the Regulation, "would leave the inspectee subject to the unfettered discretion of the inspecting agency and individual inspector."
[195] *See* Donovan v. Dewey, 452 U.S. 594, 599 (1981).
[196] Marshall v. Barlow's, Inc., 436 U.S. 307, 323 (1978).
[197] *See* WASH. ADMIN. CODE § 314-55-185(1) (2020).
[198] *Id.*
[199] *See* WASH. ADMIN. CODE § 314-55-185(1) (2020).
[200] *See* Wash. Massage Found. v. Nelson, 87 Wash.2d 948, 953, 558 P.2d 231, 235 (1976) (striking down a statute that authorized warrantless searches to determine whether a business was being "conducted in compliance with the law. . .").
[201] *See* WASH. ADMIN. CODE § 314-55-185 (2020).

of why an LCB officer chooses to inspect a location, the owner, operator, or agent is prohibited from refusing entry.[202]

This analysis of the Search Regulation is not a theoretical exercise. LCB officers have been engaging in warrantless, and at times harassing, searches and seizures of licensee facilities and vehicles for years.[203] In one case, a single licensee was the victim of approximately twenty warrantless inspections in a three-year period.[204] Having been arguably unfairly targeted by the LCB, it had received three AVNs during that time.[205] The third violation was problematic, because a fourth violation in that same three-year period would result in license cancellation and the loss of the licensee's entire business.[206] The very next business day after the licensee challenged the third AVN, the LCB conducted a warrantless, armed raid of the licensee's business, presumably in the hopes of identifying a fourth violation that would allow it to cancel the license.[207] The LCB officers overrode the objections of the manager at the licensee's facility, refused to wear sterile coverings to avoid contaminating the facility, and were caught on video intentionally wiping their hands and buttocks on various surfaces.[208] They identified a few instance of minor regulatory non-compliance, issued a fourth administrative violation, and obtained an order from an ALJ directing cancellation of the license, and destruction of the licensee's proprietary plant lines and all of its inventory.[209] And the licensee could not challenge the constitutionality of these actions until after these orders issued.[210]

Over thirteen hundred administrative violations have been issued to licensees since 2014, many resulting in penalties that ranged from monetary fines to cancellation of the license.[211] It is unclear how many of these resulted from unconstitutional searches and seizures, and how many additional warrantless searches may have been conducted while turning up no violations at all. What is clear is that the current regulatory scheme is nonsensical, having created a system where a criminal selling illicit drugs has greater protections from search and seizure than a legally authorized commercial business.

Moreover, the LCB uses its limitless search and seizure authority to do more than conduct warrantless "inspections" of licensees' business operations. For example, in one case, LCB officers authorized the surveillance of attorneys defending a cannabis business against an administrative violation issued by the LCB.[212] Despite the seriousness of surveilling opposing counsel in an active dispute, the officer authorizing the surveillance encouraged the surveilling

---

[202] *See id.* at § 314-55-185(1).
[203] *See, e.g.,* Second Decl. of Daniel J. Oates in Supp. of Pet'r's Mot. for Prelim. Inj. *In re* The Clone Zone LLC, Thurston Cnty. Sup. Ct. Cause No. 19-2-00810-34 (Feb. 13, 2019) ¶ 3 (showing LCB officers encouraging each other to surveil a licensee's attorney and neighbor in February 2018 with "[h]appy hunting.").
[204] Mtn. for Preliminary Injunction, *In re* The Clone Zone LLC, Thurston Cnty. Sup. Ct. Cause No. 19-2-00810-34 (Feb. 7, 2019).
[205] *Id.*
[206] *See* WASH. ADMIN. CODE § 314-55-185 (2020).
[207] *See supra* note 204.
[208] *Id.*
[209] *Id.*
[210] *Id.*
[211] *See, e.g.,* ADJUDICATIVE PROCEEDINGS LOG, *supra* note 102.
[212] E-mail from Michael Jennings, LCB Officer, to Joseph R. Bussman, LCB Officer (Feb. 2, 2018 9:49 PST).

officer with "Happy hunting."[213] In addition to the licensee's attorney, the LCB officer also authorized surveillance of a person with no connection to the cannabis industry except they lived next door to a cannabis company employee.[214]

The Fourth Amendment is designed to protect the public from intrusive government overreach, through searches, seizures, and surveillance.[215] Unfortunately, no court has yet resolved questions over the LCB's enforcement authority, and the agency continues to conduct inspections, searches, and surveillance without acknowledging the constitutional guardrails that prevent overreach.

> c)  *The LCB Disregards Fifth and Fourteenth Amendment Protections, the Privileges and Immunities Clause, the Commerce Clause, and the Equal Protection Clause*

The agency's disregard for constitutional protections is not limited to speech, searches, and surveillance. In fact, in a recent case, *Brinkmeyer v. Washington State Liquor & Cannabis Board,* the agency took the much broader position that no federal or state constitutional protections exist for the marijuana industry.[216] *Brinkmeyer* involved a challenge brought by an Idaho businessman challenging the constitutionality of Washington's residency requirement for cannabis business owners.[217] The complaint alleged that the state's durational residency requirement violated the Commerce Clause of the Federal Constitution, the Privileges and Immunities Clause of the Federal Constitution, the Privileges or Immunities Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Privileges or Immunities Clause of the Washington Constitution.[218] Courts have consistently found that the federal Constitution prohibits durational residency requirements like Washington's, including a federal court ruling that specifically applied to the cannabis

---

[213] *Id*.
[214] *Id*.
[215] Michael W. Price, *Rethinking Privacy: Fourth Amendment "Papers" and the Third-Party Doctrine*, 8 J. NAT'L SEC. L. & POL'Y 246, 257–58 (2016).
[216] Brinkmeyer v. Wash. State Liquor & Cannabis Bd., No. C20-5661 BHS, 2020 U.S. Dist. LEXIS 164682 (W.D. Wash. Sep. 8, 2020).  The authors represent the plaintiff in this litigation.
[217] *Id*. at 1.
[218] Pet. for Declaratory Relief at 6–10, *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, Thurston Cnty. Sup. Ct. Cause No. 20-2-01568-34.

industry.[219] The case law on this issue is so clear that the State of Maine would not defend the residency requirement for its cannabis industry.[220]

Nevertheless, the LCB chose to defend the residency requirement.[221] In response to an order to show cause why the court had jurisdiction, the LCB asserted no less than six times that "no constitutional protections exist" for licensed cannabis businesses.[222] Further, without filing a dispositive motion, the LCB asked for the petitioner's state constitutional claim to be dismissed with prejudice, implying (consistent with its position in the *Hashtag* case) that the cannabis industry also lacks protection under the Washington constitution.[223]

In support of this argument, the LCB cited to cases that held there was no due process property right to cannabis as the basis to argue "that activity involving marijuana commerce is not a protected right under the federal Constitution."[224] But the issue before the court in *Brinkmeyer* did not relate to any due process property right in cannabis. Rather, the petitioner in *Brinkmeyer* raised completely different claims under a wide variety of constitutional provisions—including asserting his due process *liberty* rights under the Fourteenth Amendment.[225] Lacking a due process *property* interest (i.e., claiming the right to own an illegal substance) does not equate to lacking all constitutional rights, but the LCB still stretched that

---

[219] NPG, LLC v. City of Portland, Maine, No. 2:20-CV-00208-NT, 2020 WL 4741913 (D. Me. Aug. 14, 2020); Lowe v. City of Detroit, Civil Action No. 21-CV-10709, -- F.Supp.3d -- , 2021 WL 2471476 at *7 (E.D. Mich. June 17, 2021) ("[P]laintiff has demonstrated a substantial likelihood that the challenged provisions of the Detroit Ordinance unconstitutionally discriminate against all applicants who have not lived in Detroit for at least 10-15 of the past 30 years, violate the fundamental right to inter- and intrastate travel, and impede interstate commerce."); Toigo v. Dep't of Health & Senior Servs., Case No. 2:20-cv-0423-NKL (W.D. Mo. June 21, 2021) ("[T]he states has not demonstrated that the durational residency requirement is narrowly tailored to advance its legitimate interest);*see also* Original Inv., LLC v. Oklahoma, Case No. CIV-20-820-F, 2021 WL 2295514 at *6 (W.D. Okla. June 4, 2021) (noting that challenge to residency requirement on constitutional grounds was not frivolous, but refusing to address the case in light of federal illegality of marijuana); Gregory S. Toma, *License to Sell: The Constitutionality of Durational Residency Requirements for Retail Marijuana Licenses,* 47 FORDHAM URBAN L.J. 1439, 1468 (2020) ("Durational residency requirements for retail marijuana licenses are unconstitutional. . . ."); Robert A. Mikos, *Interstate Commerce in Cannabis*, 101 BOSTON UNIV. L. REV. 857 (2021) ("[T]o the extent that states allow any commerce in cannabis, they likely must put outside firms and investors on an equal footing with locals.").

[220] Maine Office of Marijuana Policy, *State of Maine Will Not Enforce Marijuana Residency Requirement*, May 11, 2020.

[221] *Id*. at 2.

[222] Board's Resp. to Order to Show Cause, *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. 3:20-cv-05661 (W.D. Wash. Sept. 14, 2020), ECF No. 18 at 1; *see also id*. at 3 ("activity involving marijuana commerce is not a protected right under the constitution"); *id*. at 5 ("there is no federal constitutional right to do something illegal, even if such an activity is state sanctioned"); *id*. at 6 ("the resolution of this case dictates the obvious answer that no federal constitutional protections exist to protect the illegal activity"); *id*. at 8 ("no federal constitutional protections exist for a federally illegal marijuana activity"); *id.* ("ownership in a marijuana business is not protected under the federal Constitution.").

[223] *Id*. at 8 n.2.

[224] *Id*. at 3–4.

[225] The petitioner raised federal constitutional claims under the Privileges and Immunities clause under Article IV, the Dormant Commerce Clause, the Equal Protection Clause of the Fourteenth Amendment, the Privilege or Immunities of the Fourteenth Amendment, and liberty rights under the Due Process Clause of the Fourteenth Amendment. Motion for Preliminary Injunction, *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. 3:20-cv-05661 (W.D. Wash. Aug. 6, 2020), ECF No. 6.

precedent in seeking to deprive the cannabis industry from any constitutional protection whatsoever. [226]

After the LCB took the position that licensees lack federal and state constitutional rights in its court pleadings, several industry associations sent letters to the Washington Attorney General's office to demand clarification.[227] In response to a letter from the Washington CannaBusiness Association (WACA)[228] criticizing the LCB's efforts to eliminate constitutional protections for the cannabis industry,[229] Attorney General Bob Ferguson scaled back that position, arguing that cannabis businesses only lack the constitutional rights raised in the lawsuit.[230] Although the clarification assuaged some concerns, it still means that the LCB believes that cannabis businesses have no Fourteenth Amendment due process liberty rights, no Fourteenth Amendment equal protection rights, and no commercial rights under Article I and Article IV of the federal Constitution.[231] Those are the precise constitutional rights that most protect businesses from government overreach. And that is in addition to the LCB's disregard for First and Fourth Amendment protections raised in previous cases.[232] By arguing to limit these rights, the LCB has sought to deprive cannabis businesses from recourse if the State abuses them.[233]

### B.      The LCB's Culture has Resulted in Multiple Policy Blunders

In addition to its ongoing interactions with licensees in the enforcement of cannabis regulatory policy, the LCB Enforcement and Licensing divisions also interact with industry stakeholders through policy initiatives.[234] Unfortunately, the same cultural concerns that have

---

[226] *Id.*

[227] Letter from Vicki Christopherson, Executive Director, Washington CannaBusiness Association to Bob Ferguson, Attorney General for the State of Washington (Sept. 23, 2020); Letter from Eric Gaston & Joanna Bonroe, Craft Cannabis Coalition to Bob Ferguson, Attorney General for the State of Washington (Nov. 9, 2020).

[228] WACA is an association of licensed and regulated cannabis and hemp businesses in Washington that lobbies on behalf of the industry at both the state and federal level. *See Who We Are*, WASHINGTON CANNABUSINESS ASSOCIATION, https://www.wacannabusiness.org/about-us-.

[229] Letter from Vicki Christopherson, Executive Director, Washington CannaBusiness Association to Bob Ferguson, Attorney General for the State of Washington (Sept. 23, 2020).

[230] Letter from Bob Ferguson, Attorney General for the State of Washington, to Vicki Christopherson, Executive Director, Washington CannaBusiness Association (Oct. 2, 2020) [hereinafter Letter from Bob Ferguson].

[231] Attorney General Ferguson accused WACA of quoting "one sentence from the voluminous briefing" to mischaracterize the LCB's position. Letter from Bob Ferguson, *supra* note 230. The LCB actually filed only two briefs in the case, totaling thirty-two pages. Resp. to Motion for Preliminary Injunction, *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. 3:20-cv-05661 (W.D. Wash. Aug. 24, 2020), ECF No. 11; Resp. to Order to Show Cause, *Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. 3:20-cv-05661 (W.D. Wash. Sept. 14, 2020), ECF No. 18. The brief in which the LCB asserted the cannabis industry lacks constitutional rights was only eight pages, during which the LCB repeatedly asserted no constitutional rights existed for cannabis businesses. *See* Board's Resp. to Order to Show Cause, *supra* note 222.

[232] *See supra* parts III.A.2.a–b.

[233] The agency has also toyed with dispensing with Eighth Amendment prohibitions on excessive fines by advocating for the seizure and destruction of licensee property when the state merely suspects, but cannot prove, a violation. *See* discussion *infra* note 374.

[234] Hillard Heintze Report, *supra* note 7.

influenced enforcement activities have created multiple policy disasters that have harmed industry participants. The following sections outline some of the most significant examples.

### 1.   Traceability System Failure 1.0

Washington law directs the LCB to promulgate rules regulating the "the manner, methods, and means by which, licensees shall transport and deliver marijuana" products.[235] In exercising that discretion, the LCB promulgated a traceability regulation for cannabis: "To prevent diversion and to promote public safety, marijuana licensees must track marijuana from seed to sale. Licensees must provide the required information on a system specified by the [LCB]."[236] Although the regulation does not require use of a single traceability system, the LCB determined that it would utilize only one system, and then sought a vendor to provide traceability services.[237]

The LCB first contracted with BioTrack, which was experienced in tracking the movements of pharmaceutical products across the United States.[238] BioTrack announced in early 2017 that it was unwilling to extend its contract with the LCB, which expired on October 31, 2017.[239] As a result, the LCB accepted bids for new traceability system vendors through April 2017, meaning the LCB had six months to identify a new vendor and implement the new traceability system before BioTrack's contract expired.[240] Ultimately, the LCB decided to contract with Marijuana Freeway (MJF) to provide traceability services in Washington via MJF's Leaf Data System (Leaf).[241]

Before the LCB hired MJF, MJF had two significant cybersecurity breaches within six months. In January 2017, a hacking incident resulted in a major crash of MJF's point-of-sale system, which was used by hundreds of cannabis retailers across the country.[242] Then, in June 2017, MJF's source code was posted illegally online.[243] The LCB was aware of the breaches but was "satisfied with the security measures" MJF had in place.[244]

---

[235] WASH. REV. CODE § 69.50.342(1)(k) (2020); *Id.* at § 69.50.345(10).

[236] WASH. ADMIN. CODE § 314-55-083(4) (2020).

[237] Washington State Liquor and Cannabis Board, Press Release, https://lcb.wa.gov/pressreleases/liquor-control-board-announces-biotrackthc-provide-traceability-software (2020).

[238] *Id.*; *BioTrackTHC – Simplified Solutions In A Complex Industry*, BIOTRACK, https://www.biotrack.com/cannabistech-biotrackthc (last visited Jan. 1, 2021).

[239] Bart Schaneman, *Washington state's marijuana tracking contract up for bid*, MARIJUANA BUS. DAILY, https://mjbizdaily.com/washington-states-cannabis-tracking-contract-bid/ (Apr. 11, 2017).

[240] *Id.*

[241] WASH. STATE LIQUOR & CANNABIS BD., *MJ Freeway selected as apparent successful vendor for marijuana traceability replacement*, https://lcb.wa.gov/pressreleases/mj_freeway_selected_as_vendor_for_mj_traceability_replacement (last visited Jan. 1, 2021).

[242] Chris Walsh, *Alleged 'attack' takes down MJ Freeway's software, causing chaos for marijuana retailers*, MARIJUANA BUS. DAILY (Jan. 8, 2017), https://mjbizdaily.com/alleged-attack-takes-down-mj-freeways-software-causing-chaos-for-marijuana-retailers/.

[243] John Schroyer, *MJ Freeway experiences second security breach in 2017, calls it 'a theft'*, MARIJUANA BUS. DAILY (June 20, 2017), https://mjbizdaily.com/another-security-breach-mj-freeway/.

[244] *Id.*

But problems with MJF's products continued. In September 2017, a major system issue caused an outage for all of MJF's clients in Spain, which resulted in lost data that could not be retrieved.[245] Then, in October 2017, MJF's point-of-sale system again failed multiple times. In Arizona and California, prices for some of the products listed in the point-of-sale system decreased dramatically from as much as $80 to $3.[246] MJF took the system down, which again resulted in its customers losing data.[247] One licensee in Arizona reported that the rebooted system caused it to lose $15,000 in revenue because MJF's system failed to track transactions.[248] And a California licensee reported spending extra labor costs to have employees record transactions by hand instead of using the electronic system.[249]

Perhaps unsurprisingly, MJF's rollout of Leaf in Washington was also fraught with problems. MJF was supposed to have Leaf ready to launch immediately after BioTrack's contract ended, but it was not ready.[250] Without MJF ready to take over for BioTrack, the LCB was forced to announce a contingency plan, which included the manual tracing of cannabis inventory.[251]

MJF and the LCB then both indicated that Leaf would be ready to launch in February 2018.[252] While Leaf did launch this time, the system immediately crashed, resulting in months of glitches and system failures.[253] Some licensees struggled to log into the system at all.[254] Some growers reported the system scrambled shipping orders and sometimes automatically changed which stores were supposed to receive cannabis.[255] Some could not transfer wholesale cannabis.[256] One producer estimated the outage cost him $10,000 in lost sales.[257] Another producer reported laying off six employees because of the disruption to his business.[258] Meanwhile, some store managers reported they were not able to receive shipping manifests.[259]

---

[245] Bart Schaneman, *MJ Freeway's issues mount with more outages, delayed seed-to-sale program*, MARIJUANA BUS. DAILY (Oct. 24, 2017), https://mjbizdaily.com/mj-freeways-issues-mount-with-more-outages-delayed-seed-to-sale-program/.

[246] *Id.*

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] Lester Black, *State's Pot Tracking Software Causes Headaches for the Legal Weed Industry*, THE STRANGER (Oct. 24, 2017), https://www.thestranger.com/slog/2017/10/24/25490384/states-pot-tracking-software-causes-headaches-for-the-legal-weed-industry.

[251] *Id.*; Bart Schaneman, *Hiccups with traceability system rollout costing Washington state cannabis producers thousands*, MARIJUANA BUS. DAILY (Feb. 8, 2018), https://mjbizdaily.com/hiccups-traceability-system-rollout-costing-washington-state-cannabis-producers-thousands/.

[252] Bart Schaneman, *Delay in Washington State's Marijuana Seed-to-Sale System Causes Diversion Concerns*, MARIJUANA BUS. DAILY (Jan. 3, 2018), https://mjbizdaily.com/washington-states-delayed-marijuana-traceability-system-causes-diversion-concerns/.

[253] *Id.*

[254] *Id.*

[255] Evan Bush, *Washington State's New Marijuana Tracking System Hits Big Problems, Causing Issue for Businesses*, GOV'T TECH. (Feb. 7, 2018), https://www.govtech.com/data/Washington-States-New-Marijuana-Tracking-System-Hits-Big-Problems-Causing-Issue-for-Businesses.html.

[256] Schaneman, *supra* note 252.

[257] *Id.*

[258] *Id.*

[259] Bush, *supra* note 255.

Some said the disruption halted business altogether, while others reported that it slowed business down or made simple tasks cumbersome.[260] One retailer said he went a full week without receiving a shipment from a producer, when he typically received fifteen orders in a week.[261] Both MJF and the LCB acknowledged the outage, but downplayed the severity when questioned by reporters.[262]

Subsequently, the LCB hired Gartner Consulting to perform an eight-week study assessing the launch of Leaf.[263] Gartner ultimately issued a 177-page report that blamed the LCB and MJF for the failure.[264] Among other things, Gartner identified the following causes of the outage:

- The LCB went live with a system that would have failed typical tests and halted deployment;
- Testing did not provide metrics required to make informed decisions;
- The LCB's team did not have the proper data points from the testing phases to make the decision to deploy the software;
- Security design did not follow best practices; and
- The intent for Leaf to be a compliance system was not fully understood by all stakeholders.[265]

Nearly ten months after the system failed during the leaf rollout in February 2018, the State still had not implemented a fix to the software.[266]

2.    The Great Candy Debacle of 2018

Washington regulations have consistently permitted the sale of certain types of cannabis-infused food and beverages.[267] The rules have always prohibited the sale of any product that was deemed "especially appealing to children."[268] In 2018, infused edibles made up approximately nine percent of the marijuana sold in Washington.[269]

---

[260] *Id.*

[261] Schaneman, *supra* note 252.

[262] *Id.*

[263] MJ Freeway, *Washington: Report Reveals That Cannabis Tracking System Was A Failure Overlaid On A Failure*, https://cannabislaw.report/washington-report-reveals-that-cannabis-tracking-system-was-a-failure-overlaid-on-a-failure/ (last visited Apr. 5, 2021).

[264] Lester Black, *One Year Later, and the State's Pot Tracking System is Still Fucked*, THE STRANGER (Nov. 12, 2018), https://www.thestranger.com/slog/2018/11/12/35463669/one-year-later-and-the-states-pot-tracking-system-is-still-fucked; Gartner Consulting, Leaf Implementation IV&V Report (Aug. 24, 2018), https://drive.google.com/file/d/1WlQOdXzHyg99Qvn2ML6d0RBcAAlCdrl1/view [hereinafter Gartner Consulting Report].

[265] Gartner Consulting Report, *supra* note 264, at 14−16.

[266] Black, *supra* note 264.

[267] WASH. ADMIN. CODE § 314-55-077(7) (2016).

[268] *Id.*

[269] *Wash. Liquor & Cannabis Bd., Marijuana Infused Candy*, WASH. STATE LIQUOR & CANNABIS BD., Oct. 3, 2018, at 11, https://lcb.wa.gov/sites/default/files/publications/Marijuana/infused_products/Marijuana-Infused-Edible-Presentation-10-3-2018.pdf.

On October 3, 2018, at an industry meeting, the LCB abruptly announced that in response to unspecified "concerns" raised by the Board and complaints from the public,[270] the LCB had reevaluated the right of retail licensees to sell cannabis-infused candy products.[271] Without explanation, the LCB informed industry members that the agency had previously and erroneously "approved some products that would meet the definition of especially appealing to children."[272] The LCB went on to explain that it would be adopting criteria for evaluating whether products were "especially appealing to children," including appearance, similarity to commercially available products marketed to children, and color.[273]

Having already acknowledged that the agency had previously approved products that it now deemed "especially appealing to children," the LCB ordered manufacturers to cease production of any product that violated the new, not yet articulated, guidelines and to sell off any remaining product within six months.[274] The Board made clear, however, that products such as hard candy, tarts, fruit chews, colorful chocolates, jellies, and gummies were no longer permitted, regardless of the packaging or marketing.[275]

Industry reaction was predictably swift and harsh.[276] The day after the agency's presentation, three industry associations signed and submitted a joint letter noting that they "were surprised and disappointed by the LCB's abrupt, unilateral decision to ban previously LCB-approved cannabis-infused sweetened products."[277] Industry representatives speculated that the agency's decision was a clumsy effort to cover its failure to properly evaluate product applications.[278] Similarly, a bipartisan group of four state legislators also sent a letter to the agency, noting that "[w]e are concerned about the [LCB] announcement, without warning, that a significant segment of legal cannabis-infused products were to be immediately banned from

---

[270] The agency is constantly lobbied by drug prevention organizations that disapprove of cannabis use. *See, e.g.,* Gregory Foster, *WSLCB – Executive Management Team (November 28, 2018) – MIE Update – Prevention Community,* CANNABIS OBSERVER (Dec. 19, 2018) (describing a meeting to discuss the Washington Association for Substance Abuse and Violence Prevention's concerns relating to cannabis product, packaging and labeling rules), https://cannabis.observer/observations/wslcb-executive-management-team-november-28-2018-mie-update-prevention-community/. Many LCB meetings are devoted to addressing these concerns, and stakeholders are rarely present. *See* M. Bailey Hirschburg, *WSLCB – Board Meeting (October 28, 2020) – Summary,* CANNABIS OBSERVER (Oct. 29, 2020) (noting multiple prevention advocates commenting to the board on ways to "impede better access to marijuana."), https://cannabis.observer/observations/wslcb-board-meeting-october-28-2020-summary/.
[271] Wash. Liquor & Cannabis Bd., *supra* note 269, at 2.
[272] *Id.* at 3.
[273] *Id.* at 7.
[274] *Id.* at 12–15.
[275] *Id.* at 3, 6, 9–10.
[276] Lester Black, *Pot Industry Asks for Transparent Candy Rules*, THE STRANGER (Oct. 30, 2018) ("When the state's Liquor and Cannabis Board (LCB) announced earlier this month that they were suddenly banning pot companies from making pot-infused candies, the pushback was intense and immediate."), https://www.thestranger.com/slog/2018/10/30/34760721/pot-industry-asks-for-transparent-candy-rules.
[277] Lester Black, *Washington Pot Businesses Unite to Oppose Candy Ban*, THE STRANGER (Oct. 10, 2018), https://www.thestranger.com/slog/2018/10/10/33622593/washington-pot-businesses-unite-to-oppose-candy-ban
[278] *Id.* ("'I have yet to see any data showing there is even a problem that needs solving,' Eisenberg said. 'I think the LCB screwed up by approving some edibles that totally look like kids candy. Instead of firing whoever approved them, the LCB is punishing the whole industry.'").

production."[279] The group continued, "[n]o regulated industry can survive when rulemaking is unpredictable."[280] The LCB's abrupt reversal was devastating to businesses.[281] Many producers had invested millions of dollars in kitchen equipment and manufacturing facilities to produce infused edible candy products, many of which were banned outright by the LCB without notice or opportunity to comment.[282]

Having failed to consult with anyone in the industry before moving forward with the ban,[283] the agency quickly started to walk back its position.[284] The Board subsequently amended the rule to remove ambiguity as to whether a product was "especially appealing to children," and the rule is now based on similarity to existing products marketed to children.[285] The final change was a ban on bright colors.[286]

The Great Candy Debacle of 2018 revealed a number of things about the LCB. First, the agency decided to implement widespread changes to previous practices without consulting with the industry, and without taking feedback.[287] Second, it showed that the agency is often unaware of, or unsympathetic to, the business consequences its decisions have on the industry.[288] Many industry members had invested massive sums of money in developing businesses around cannabis-infused candy.[289] The LCB did not consider these investments when it unilaterally imposed a ban on these products. Third, it revealed that the agency has a penchant for relying on anonymous complaints and comments to drive policy.[290] At no time did the agency reveal the source of the purported complaints, let alone provide data supporting concerns about sales of

---

[279] Lester Black, *Bipartisan Group of Legislators Ask LCB to Keep Pot Candy Legal*, THE STRANGER (Oct. 22, 2018), https://www.thestranger.com/slog/2018/10/22/34318299/bipartisan-group-of-legislators-ask-lcb-to-keep-pot-candy-legal.

[280] *Id.*

[281] Heidi Groover, *Washington to 'Reevaluate' Marijuana Edibles, Crack Down on Products That Might Appeal to Kids,* SEATTLE TIMES (Oct. 5, 2016, 6:00 AM), https://www.seattletimes.com/seattle-news/state-liquor-and-cannabis-board-to-reevaluate-marijuana-edibles-will-crack-down-on-products-that-might-appeal-to-kids/.

[282] *Id.*

[283] The agency took the position that no notice or comment period was required because "our rules haven't changed." Nathalie Graham, *Buy Your Favorite Weed Gummies and Candies Now—They're About to be Prohibited*, STRANGER (Oct. 4, 2018, 2:59 PM), https://www.thestranger.com/slog/2018/10/04/33361367/buy-your-favorite-weed-gummies-and-candies-now-theyre-about-to-be-prohibited.

[284] Lester Black, *Washington State Might Be Reversing Their Pot Candy Ban, Baby!*, STRANGER (Nov. 30, 2018, 1:54 PM), https://www.thestranger.com/slog/2018/11/30/36491731/washington-state-might-be-reversing-their-pot-candy-ban-baby ("I asked LCB Spokesperson Brian Smith if the state was still going to ban certain types of candies. He said 'I don't think it's going to be written that way, we are bringing a new process to it.").

[285] *See* Wash. Reg. 20-01-172 (Dec. 18, 2019) (A marijuana processor may infuse food or drinks with marijuana provided that. . . the product and package design is not similar to commercially available products marketed for consumption by persons under twenty-one years of age . . . ."), *codified at* WASH. ADMIN. CODE § 314-55-077(9) (2020).

[286] Lester Black, *No Bright Colors, but Pot Candy Still Legal in Washington State*, THE STRANGER (Dec. 6, 2018, 8:40 AM), https://www.thestranger.com/slog/2018/12/06/36771358/long-live-weed-candy-pot-infused-candies-still-legal-in-washington-state-but-no-bright-colors.

[287] *Washington State Enforces Ban on Candy-like Cannabis Edibles* (Nov. 8, 2018), https://www.analyticalcannabis.com/articles/washington-state-enforces-ban-on-candy-like-cannabis-edibles-311343.

[288] *Id.*

[289] *Id.*

[290] *See* discussion *supra* notes 52 & 270.

cannabis-infused products to minors. Finally, the incident revealed that the agency can be moved by strong public input.

### 3.   Traceability System Failure 2.0

Despite the failed Leaf launch in February 2018 and Gartner's study and recommendations to improve Leaf, the system's traceability issues continued. Businesses continued to complain about the lack of reliable sales transaction data, such as price per gram,[291] and the data that Leaf did record was often inaccurate. For example, one retailer who typically averaged $70,000-$100,000 in monthly sales was shown to have made $8.6 million in a month when he had not.[292] In another case, one producer had been reporting little to no sales, but then was suddenly shown to have recorded more than $200 million in one month, exceeding the average total monthly sales for all Washington cannabis companies by over $100 million.[293] Another retailer noted that he did not know "a single retailer that has correct information in Leaf."[294]

Then, in 2019, in an apparent effort to address Leaf's continuing problems, the LCB publicly reported that Leaf upgrades were coming that would bring the software *closer* to baseline functionality.[295] Thus, after two years, Leaf still had not accomplished the minimal baseline functions upon which licensees depended, and the upgrades would not achieve that minimal baseline. The release of the upgrades was postponed and delayed.[296] The LCB initially warned licensees that the entire traceability system would be taken down over the weekend of July 12, 2019 to allow for the upgrade.[297] The LCB later had to extend the outage time into the work week.[298] Despite that extra time, the site crashed again when it went live again on Tuesday, July 16.[299] The LCB then announced to licensees on the morning of Wednesday, July 17 that the software release had been completed and the system was back up.[300] However, on Thursday, July

[291] Bart Schaneman, *Lack of Cannabis Tracking Data in WA Sparks Confusion, Missed Business Opportunities*, MARIJUANA BUS. DAILY (Jan. 31, 2019), https://mjbizdaily.com/lack-cannabis-tracking-data-washington-state/.
[292] *Id.*
[293] *Id.*
[294] Bart Schaneman, *MJ Freeway cannabis software system hits new glitch in Washington state; contract up for renewal*, MARIJUANA BUS. DAILY (June 21, 2018), https://mjbizdaily.com/mj-freeway-cannabis-software-system-hits-new-glitch-in-washington-state-contract-up-for-renewal/.
[295] E-mail Bulletin from The Wash. State Liquor & Cannabis Bd. to Marijuana Licensees, Commercial Integrators and Certified Labs (June 17, 2019, 5:23 PM PDT), available at https://content.govdelivery.com/accounts/WALCB/bulletins/24be815.
[296] Schaneman, *supra* note 294.
[297] *Id.*; Bart Schaneman, *Washington State Offers Up Cannabis Traceability 'Workaround' in Wake of Software Release Problems*, MARIJUANA BUS. DAILY (July 18, 2019), https://mjbizdaily.com/washington-state-offers-up-traceability-workaround-in-wake-of-software-release-problems/.
[298] E-mail Bulletin from The Wash. State Liquor & Cannabis Bd. to Marijuana Licensees, Commercial Integrators and Certified Labs (July 12, 2019, 5:29 PM), https://content.govdelivery.com/accounts/WALCB/bulletins/2512ab5.
[299] E-mail Bulletin from The Wash. State Liquor & Cannabis Bd. to Marijuana Licensees, Commercial Integrators and Certified Labs (July 16, 2019, 1:57 PM), https://content.govdelivery.com/accounts/WALCB/bulletins/251fab2.
[300] E-mail Bulletin from The Wash. State Liquor & Cannabis Bd. to Marijuana Licensees, Commercial Integrators and Certified Labs (July 17, 2019, 6:04 AM), https://content.govdelivery.com/accounts/WALCB/bulletins/2521ab1.

18, the LCB asked cannabis companies to use a webform manifest "to alleviate flow blocks."[301] In other words, the LCB directed licensees to not use Leaf when attempting to comply with LCB's traceability requirements.

The upgrade and resulting crash significantly damaged Washington cannabis businesses.[302] A survey conducted by The Cannabis Alliance (a non-profit industry association) asked cannabis business owners to estimate what the Leaf outage cost them by way of employee pay, lost revenue, and other factors.[303] Respondents' answers ranged from $1,000 to as much as $80,000.[304] Eight businesses reported that they lost more than $25,000 in sales.[305] A retailer reported that he had enough inventory to not feel negative effects for about a week, but that he had not yet received any orders and would normally have received ten to twelve by that time.[306] The broader impact that the retailer identified was to smaller producers and processors who could not fill orders, and would lose market share and shelf space to bigger players in the market.[307]

Then, to address the problems caused by the upgrade, the LCB issued an interim policy, permitting Leaf users to develop and implement workarounds, even if those workarounds varied from standards established by regulations.[308] In other words, instead of providing licensees with a solution to the Leaf outage, the LCB tasked licensees with fixing the problem themselves, subject to potential administrative penalty (including license cancellation) should they fail to track all cannabis in their possession in accordance with the LCB's standards.

This latest traceability debacle led to many calls in the industry for the LCB to cancel its contract with MJF and develop an alternative approach to traceability.[309] But the LCB took the opposite approach, extending its contract with MJF.[310] As of writing, MJF continues to provide traceability services in Washington, but the LCB is moving to an in-house system called the Cannabis Central Reporting System.[311]

---

[301] E-mail Bulletin from The Wash. State Liquor & Cannabis Bd. to Marijuana Licensees, Commercial Integrators and Certified Labs (July 18, 2019, 1:04 PM), https://content.govdelivery.com/accounts/WALCB/bulletins/25273af.
[302] Schaneman, *supra* note 252.
[303] Bart Schaneman, *'Breakdown' in Washington state traceability system update costs cannabis businesses thousands*, MARIJUANA BUS. DAILY (July 17, 2019), https://mjbizdaily.com/breakdown-washington-state-cannabis-commerce-traceability-system-update-costs-businesses-thousands/.
[304] *Id.*
[305] *Id.*
[306] *Id.*
[307] *Id.*
[308] WASH. STATE LIQUOR & CANNABIS BD., BOARD INTERIM POLICY 13-2019, ISSUES WITH RELEASE 1.37.5 OF LEAF TRACEABILITY SYSTEM SOFTWARE (July 23, 2019), https://lcb.wa.gov/sites/default/files/publications/rules/2019%20Proposed%20Rules/BIP-13-2019-Issues-with-Releas-1_37_5-of-Leaf-Traceability-System-Software.pdf.
[309] *Open Letter Re: Traceability*, CANNABIS ALLIANCE (July 25, 2019), https://thecannabisalliance.us/open-letter-re-traceability/.
[310] *Washington State Extends Leaf Data Systems Cannabis Contract*, MARIJUANA BUS. DAILY (Aug. 6, 2019), https://mjbizdaily.com/washington-state-extends-leaf-data-systems-contract-to-work-on-software-release/; Lukas Barfield, *Washington Cannabis Regulators Extend MJ Freeway Contract*, GANJAPRENEUR (Oct. 7, 2019), https://www.ganjapreneur.com/washington-cannabis-regulators-extend-mj-freeway-contract/.
[311] Wash. State Liquor and Cannabis Board, Traceability, https://lcb.wa.gov/mjtrace/leaftraining-for-licensees; Wash. State Liquor and Cannabis Board, Cannabis Central Reporting System (CCRS), https://lcb.wa.gov/ccrs/ccrs.

4.      Cannabis 2.0

At a meeting of the Board on November 27, 2018, Board Chair Jane Rushford introduced a new policy project she titled "Cannabis 2.0."[312] The purpose of Cannabis 2.0 was purportedly to give the Board greater flexibility in rulemaking to address issues such as the corporate identity of financiers and on-site sales and tastings.[313] Over the course of several Board meetings, the new initiative repeatedly came up in the context of discussions about allowing on-site consumption of cannabis at retail locations.[314] Later discussions expanded the scope of the initiative to include the Board's "new story to tell" to the legislature about its work, and commitment to small growers.[315] In the official announcement, the initiative evolved further into a purported partnership between various agencies that would discuss the future of cannabis policy-making in the state in a broad, consensus driven fashion.[316]

The initial kickoff meeting of the Cannabis 2.0 project took place on April 17, 2019.[317] Participants (comprised largely of LCB executive management) opined that I-502 "assigned too many responsibilities to" the LCB, that the agency had too little help in crafting its rules, that the agency was "scared, because [I-502] violates federal law," and that other agencies, such as the Washington Department of Agriculture had "resisted taking over regulation of processor kitchens."[318] Director Rick Garza also complained that news organizations had been unfairly "demeaning" to the agency for years.[319] Participants and Board members also pointed to interagency work done by other states (notably New York and Colorado) that did not happen in Washington.[320] Without the participation of other state agencies, the session was largely a discussion of LCB management complaints about the rollout of cannabis legalization.[321] It also likely did little to foster inter-agency interaction, as participants went out of their way to deflect blame on other agencies for the LCB's oversight.[322]

---

[312] *See* Gregory Foster, *WSLCB – Board Caucus (November 27, 2018 – Summary)*, CANNABIS OBSERVER (Nov. 28, 2018), https://cannabis.observer/observations/wslcb-board-caucus-november-27-2018-summary/#takeaway_3.
[313] *Id.* (quoting board member Russel Hauge).
[314] *See, e.g.,* Gregory Foster, *WSLCB – Board Caucus (February 5, 2019 – Summary)*, CANNABIS OBSERVER (Feb. 14, 2019), https://cannabis.observer/observations/wslcb-board-caucus-february-5-2019-summary/#takeaway_3; Gregory Foster, *WSLCB – Board Caucus (March 19, 2019 – Summary)*, CANNABIS OBSERVER (Mar. 20, 2019), https://cannabis.observer/observations/wslcb-board-caucus-march-19-2019-summary/; Gregory Foster, *WSLCB – Board Caucus (March 20, 2019 – Summary)*, CANNABIS OBSERVER (Mar. 26, 2019), https://cannabis.observer/observations/wslcb-executive-management-team-march-20-2019-summary/.
[315] Gregory Foster, *WSLCB – Board Caucus (March 26, 2019 – Summary)*, CANNABIS OBSERVER (Mar. 27, 2019), https://cannabis.observer/observations/wslcb-board-caucus-march-26-2019-summary/.
[316] *Id.*
[317] Gregory Foster, *WSLCB – Board Meeting (April 17, 2019)*, CANNABIS OBSERVER (Apr. 17, 2019), https://cannabis.observer/events/wslcb-board-meeting-april-17-2019/.
[318] Gregory Foster, *WSLCB – Board Caucus (April 23, 2019 – Summary)*, CANNABIS OBSERVER (Apr. 24, 2019), https://cannabis.observer/observations/wslcb-board-caucus-april-23-2019-summary/.
[319] *Id.*
[320] *Id.*
[321] *See id.*
[322] *Id.* ("Hauge said WSLCB had attempted [to bring together state agencies to craft the state's cannabis program], but 'there was nobody there' from other agencies during the crucial early stages of the system. Garza called it 'the

The Board's repeated focus on Chair Rushford's Cannabis 2.0 initiative in early 2019 was questionable in the context of the agency's other pending concerns. Beginning in November 2018, at the time that the initiative was originally announced, the agency was anticipating release of its new Leaf traceability software.[323] As previously discussed, release of the traceability software issue was an ongoing problem during this time, and yet the agency was focusing on Cannabis 2.0 while the software was crashing and industry members' businesses suffered.[324]

Moreover, the agency was already besieged by demands for legislative reform of its enforcement practices.[325] Beginning in January of 2019, the legislature was considering several bills that would reign in the agency and substantially reform its enforcement practices.[326] That ultimately culminated in the passage of a sweeping reform bill in June 2019.[327]

Despite these extreme challenges, the agency continued with its focus on Cannabis 2.0, and moved forward with a grand unveiling of the initiative in a September 2019 interview of Director Garza by the Associated Press.[328] After months of purported interagency meetings, the LCB announced that it would be proposing two bills in the next legislative session.[329] The first bill would create a social equity program that would encourage greater ownership of marijuana businesses by minorities, women, and military veterans.[330] This would allow the agency to redistribute eleven licenses state-wide to minorities, women, and veterans that had been surrendered to the agency in enforcement actions.[331]

The second proposal would allow struggling tier one producers (the smallest sized producer, limited to 2,000 square feet of plants) to expand their footprint to 5,000 square feet, and deliver product to medical users.[332] As of October 2019, there were only 190 Tier 1 producers in the state (as compared with 488 Tier 2 producers, and 426 Tier 3 producers).[333] Consequently, this proposal, like the social equity proposal, was small in scale.

Perhaps in light of the extremely limited impact and negative response received to its proposals, and the multiple daunting issues facing the industry, by November 2019, the Board

---

biggest lesson learned from our experience' that after five years other agencies were reluctant to engage in 'holistic' cannabis policy making.").

[323] Gregory Foster, *WSLCB – Board Caucus (March 26, 2019 – Summary)*, CANNABIS OBSERVER (Mar. 27, 2019), https://cannabis.observer/observations/wslcb-board-caucus-march-26-2019-summary/.

[324] *See* discussion *supra* Part III.B.4.

[325] *See* Foster, *supra* note 318.

[326] *See, e.g.,* discussion *infra* Part IV.

[327] *See, e.g.,* discussion *infra* Part IV.

[328] Gene Johnson, *5 Years In, Washington Considers Overhaul of Pot Regulation*, ASSOC. PRESS (Aug. 27, 2019), https://apnews.com/article/afb408dcadf54aafbe75a68d577d555e.

[329] *Id.*

[330] *Id.*

[331] *Id.*

[332] *Id.*

[333] Kay James, *Smaller Farms Hope to Benefit from LCB Proposals*, SPOKESMAN-REVIEW (Dec. 2, 2019), https://www.spokesman.com/stories/2019/dec/02/smaller-farms-hope-benefit-lcb-proposals/.

stopped promoting Cannabis 2.0.[334] In August 2020, after nearly a year without any action, the concept was resurrected with new branding as the "Cannabis 2021" initiative, although the Board has done little to articulate the change or direction of the initiative.[335] In December 2020, it appeared the project was effectively dead, with Board Chair Rushford noting that she would not seek another term on the Board.[336]

To many, Cannabis 2.0 was an example of the agency's misunderstanding of the industry and critical issues facing its participants. While multiple disasters were unfolding, many of which were actively harming market participants, the agency was focusing its efforts on its negative news coverage, questioning participation (or non-participation) of other agencies, and conducting talking sessions about future policy goals that effected only small segments of the industry.[337] While many of these goals, especially social equity, were laudable attempts at reform, it is hard for the agency to take on new projects while the state's traceability system was offline for months, and in the midst of legislative demands for comprehensive enforcement reform.

## IV.   LEGISLATIVE REFORM

After surviving years of harsh enforcement practices and a string of policy missteps, by the end of 2018, licensees had had enough. On January 2, 2019, four legislators drafted a letter to LCB Director Garza on behalf of the industry.[338] The letter noted that the next legislative session (scheduled to begin on January 14, 2019)[339] would consider reform legislation that would attempt to model the LCB after other state agencies, such as the Department of Labor and Industries, with the express intention of focusing on "compliance before enforcement."[340] In anticipation of these new changes, the legislators asked the LCB to "suspend any cancellation proceedings for licensees that have received four administrative violations in a three-year period for the duration of the 2019 legislative session" so that the legislature could "deliberate and adopt a fair approach to this issue."[341] Among other things, the letter expressed that the agency's decision to prosecute these violations and seek license cancellations failed to recognize that

---

[334] Gregory Foster, *WSLCB – Board Caucus (November 19, 2019 – Summary)*, CANNABIS OBSERVER (Nov. 20, 2019), https://cannabis.observer/observations/wslcb-board-caucus-november-19-2019-summary/#takeaway_3 (noting that further meetings would be curtailed in favor of one-on-one meetings between Board Chair Rushford and other agency heads).

[335] Gregory Foster, *WSLCB – Board Caucus (September 29, 2020 – Summary)*, CANNABIS OBSERVER (Sept. 30, 2020), https://cannabis.observer/observations/wslcb-board-caucus-september-29-2020-summary/#takeaway_3 (board chair Rushford promising a more thorough update "soon.").

[336] M. Bailey Hirschburg, *WSLCB – Executive Management Team (December 9, 2020) – Summary*, CANNABIS OBSERVER (Dec. 11, 2020), https://cannabis.observer/observations/wslcb-executive-management-team-december-9-2020-summary/.

[337] *Id.*

[338] Letter from Senator Ann Rivers, Senator Guy Palumbo, Representative Derek Stanford, and Representative Brandon Vick to Rick Garza, LCB Executive Director (Jan. 2, 2019), https://drive.google.com/file/d/1m-t6-9-m_frToFQIoItmQkM9PUzVCsr4/view [hereinafter Letter to Rick Garza].

[339] 2019 Session Cutoff Calendar, https://leg.wa.gov/History/Legislative/Documents/2019Cutoff.pdf.

[340] Letter to Rick Garza, *supra* note 338, at 1.

[341] *Id.* at 2.

"[t]he pioneers of this regulated industry took great financial and personal risk and should be given the opportunity rectify mistakes and move forward."[342]

The January 2, 2019 letter was the precursor to two bills in the following legislative session, House Bill 1237 (HB 1237) and Senate Bill 5318 (SB 5318).[343] HB 1237 was first introduced by a bipartisan group of representatives including Representatives Stanford (D), Vick (R) (signatories to the January 2, 2019 letter), Kirby (D), MacEwen (R), Blake (D), Eslick (R) and Appleton (D) on January 17, 2019 and referred to the House Committee on Commerce and Gaming.[344] At the same time, SB 5318 was also introduced by bipartisan group of senators including Senators Rivers (R), Palumbo (D) (signatories to the January 2, 2019 letter), and Wagoner (R) and referred to the Senate Labor and Commerce Committee.[345]

The initial drafts of the bills were identical.[346] Among other things, notable provisions of the original bills included:

- Direction to the LCB to draft new rules and procedures for issuing written warnings and creating a compliance program that allowed licensees to request guidance and assistance without fear of reprisals;[347]
- Waiving fines and penalties for most violations that are corrected within seven days;[348]
- Eliminating one-and-done license cancelation penalties in most instances and requiring the occurrence of four violations in a two-year period for most cancellations;[349]
- Limiting escalating penalties to a two-year period (instead of the existing three-year look-back for penalties);[350]
- Requiring the LCB to look at mitigating factors, and using those to deviate from prescribed penalties;[351]
- Prohibiting the issuance of violations caused by employee misconduct where the licensee implemented procedures and training to prevent violations from occurring;[352]
- Granting amnesty for any violation occurring before June 30, 2018 in most instances;[353]
- Imposing a higher burden of proof (clear, cogent and convincing) on the LCB in proving violations in administrative hearings (above the existing preponderance standard);[354]

---

[342] *Id.* at 1.
[343] Gregory Foster, *WSLCB – Board Caucus (January 22, 2019) – Summary*, CANNABIS OBSERVER (Jan. 23, 2019), https://cannabis.observer/observations/wslcb-board-caucus-january-22-2019-summary/.
[344] H.B. 1237, 66th Leg., Reg. Sess. (Wash. 2019), http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/House%20Bills/1237.pdf#page=1.
[345] S.B. 5318, 66th Leg., Reg. Sess. (Wash. 2019), http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/Senate%20Bills/5318.pdf#page=1.
[346] *Id.*
[347] *See, e.g.,* H.B. 1237, 66th Leg., Reg. Sess. § 2(1)(a) (Wash. 2019), http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/House%20Bills/1237.pdf#page=1.
[348] *Id.* at § 2(1)(b)−(c).
[349] *Id.* at § 2(2)(b)−(c).
[350] *Id.* at § 2(2)(a).
[351] *Id.* at § 2(2)(d)
[352] *Id.* at § 2(2)(e).
[353] *Id.* at § 2(3).
[354] *Id.*

- Prohibiting the Board from considering violation history arising prior to June 30, 2018 in making license renewal determinations absent proof, by clear and convincing evidence, that the violation involved sales to minors, diversion to the illicit market, or other criminal or drug trafficking activity;[355] and
- Prohibiting the Board from rejecting settlement agreements between licensees and enforcement.[356]

Taken as a whole, these changes would address stakeholder concerns that the LCB was too heavily focused on punitive enforcement over education and compliance.[357] The changes would provide certainty that mistakes made during the initial I-502 ramp-up period would not be used against licensees as a basis for revoking and canceling their license, and would prevent the Board from rejecting settlement agreements that sought to mitigate harsh penalties (a relatively common occurrence that regularly led to extremely high monetary penalties).

Unfortunately, the LCB saw many of these provisions as non-starters. LCB opposition to the bills was swift, in particular the portions relating to amnesty and changing the burden of proof at administrative hearings.[358] The Board also was not interested in allowing the legislature to tie its hands in approving settlement agreements,[359] and wanted the entire bill scrapped in favor of rulemaking that the agency could control. With the stage set, the bills proceeded to public hearings.[360]

### A.    *Testimony Regarding the Bills*

HB 1237 had its first Committee hearing on January 28, 2019.[361] The hearing commenced with a statement by the Bill's primary sponsor, Representative Kirby, who recounted stories he had received from constituents about overbearing, nit-picking enforcement practices by the LCB.[362] Kirby's comments set the tone for the hearing, which revealed evidence suggestive of a toxic enforcement culture at the LCB.

---

[355] *Id.* at § 3(1)(b).

[356] *Id.* at § 4(2).

[357] *See* Hillard Heintze Report *supra* note 7, at 14.

[358] Foster, *supra* note 343.

[359] *See* Gregory Foster, *WSLCB – Executive Management Team (February 27, 2019),* CANNABIS OBSERVER (Feb. 27, 2019) ("[T]he legislature can't tell the executive branch how to adjudicate disputes."), https://cannabis.observer/events/wslcb-executive-management-team-february-27-2019/.

[360] *Id.*

[361] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019), https://app.leg.wa.gov/billsummary?BillNumber=1237&Year=2019&Initiative=false.

[362] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Representative Kirby) ("I was approached by more than a few retailers with complaints . . . about how the . . . department went about doing their enforcement activities . . . The problem we are trying to solve is it was like, it's been described to me as they would come in and look for any little picky petty thing, what we call de minimis violations . . . and do some piling on . . . and it was almost as if it was done deliberately . . . to cause them problems in the future."), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true [hereinafter Statement of Representative Kirby].

Vicki Christopherson of WACA testified that although dozens of her organization's members had raised complaints about the LCB's enforcement practices, they refused to testify at the hearing because they were afraid of retribution from the LCB.[363] Some licensees testified that LCB officers applied rules inconsistently, giving different advice on compliance, and instead of educating licensees, acted to issue AVNs first.[364] As a result, the system disincentivized self-reporting of violations, thereby interfering with the stated goals of education and compliance with regulations.[365] Other licensees noted that simple things like a cash-strapped business's decision to pay its employees' wages out of its owner's pocket were license-canceling events according to the LCB; something that is unheard of in any other industry.[366]

After the litany of testimony (and legislators' own comments about their concerning conversations with constituents), LCB Board member Russell Hauge and LCB legislative liaison Chris Thompson stepped forward to testify about the bill.[367]

Both Thompson and Hauge downplayed the seriousness of the allegations, claiming, without providing any evidence, that many of the stories the committee was hearing were not "fully accurate."[368] Although not technically opposed to the legislation, they both suggested that

---

[363] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Vicki Christopherson), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true.

[364] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Wendy Hull), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true. The consequences go far beyond the issuance of the AVN and the associated penalty. One licensee testified that accumulated violations interfere with licensees' ability to maintain bank accounts, and that a sufficient number of violations could destroy a business by eliminating its access to banks. *Id.*

[365] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Christine Masse), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true.

[366] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Tammi Hill), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true.

[367] Hauge signed into the hearing twice, once in opposition to the proceeding, and once as "other," i.e., without taking a position. *See* Statement of Representative Kirby, *supra* note 362.

[368] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Chris Thompson), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true [hereinafter Statement of Chris Thompson]. Board member Hauge similarly agreed, suggesting that the accounts of license cancellations were overblown and that he viewed it as his obligation to give legislators "the other side" of the story. *Id.; see, e.g., An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and*

the proper avenue for addressing the concerns was through rulemaking, which Hauge testified was already in process before the legislature took up the bill.[369] Confronted with the committee's concerns about harsh enforcement practices, Hauge responded that the LCB "regulates tightly compared to other states."[370] With respect to the bill's proposal to create a voluntary compliance program that encouraged licensees to seek guidance and education from enforcement without fear of reprisals, Thompson testified that the agency "already does that" which was inconsistent with the testimony from industry members who testified that they never self-report violations and feared reprisals from the agency.[371]

Hauge and Thompson also testified about serious concerns that the LCB had over the bill. Thompson testified that the bill would provide for a general amnesty for violations, and that it failed to adequately define the phrase "public safety."[372] Hauge also testified that the bill's proposal to change the burden of proof in evidentiary hearings related to AVNs from the preponderance standard to a "clear and convincing standard" would hamstring the organization:

> If we go to something like clear and convincing evidence rather than the standards that are used regularly and clearly in all administrative proceedings, we will lose that bright crisp and very, very effective enforcement. It will slow down to a halt.[373]

In response to Hauge and Thompson's testimony, which appeared to discount the accounts of the various licensees about the agency's practices, Representative MacEwen noted that the evidence provided to the committee reflected:

> There's a culture of "gotcha" from the Liquor Control Board . . . The mentality and the treatment that this Board has done to legitimate businesses in the state is just unacceptable. And if we're going to treat legitimate businesses like that, how do you expect to combat the illicit market?[374]

---

*Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Russell Hauge), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true ("I can tell you that since I've been involved in the board, which is essentially since we started doing this business, we have not canceled a license solely for clerical errors.") [hereinafter Statement of Russell Hauge].

[369] Statement of Russell Hauge, *supra* note 368.

[370] *Id.*

[371] *See* Statement of Chris Thompson, *supra* note 368.

[372] *Id.*

[373] Statement of Russell Hauge, *supra* note 368. As the agency's own records reflect, it already has a 99.7% conviction rate on AVNs. *See* discussion *supra* Part I.A.1.d) (citing ADJUDICATIVE PROCEEDINGS LOG, *supra* note 102). From the surface it seems like nothing short of 100% conviction rate is sufficient to satisfy Hauge's demands for efficient enforcement. This is likely the reason why legislators were so upset by Hauge's testimony, and win-at-all-costs attitude, that they petitioned the Governor for his removal. *See* Letter to Rick Garza, *infra* note 379.

[374] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Representative Drew MacEwen), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true. Representative MacEwen's comments apparently had no impact on Board member Hauge. At a meeting of the LCB that took place after the House Labor and Commerce Committee hearing, Hauge

Board member Hauge flatly responded to this concern that "we expect everybody to follow the rules, and we will enforce the rules."[375] His response prompted the following exchange:

> Rep. Young: In your mind, is there any validity to the testimony that preceded you today?
>
> Mr. Hauge: Yes
>
> Rep. Young: Ok, [be]cause I couldn't tell it necessarily from your answers to the questions that we've been asking you . . . If there is validity to those questions, are you prepared to give us an alternative to [the provisions contained in this bill]?
>
> Mr. Hauge: We have a rulemaking open right now, a rulemaking that was open before these complaints were turned into this bill, and we're addressing these concerns.[376]

Hauge and the LCB's repeated attempts to deter the committee from crafting legislation pending the administrative rulemaking were not successful, as committee members raised concerns that the "toxic" agency culture could drag the process out without any meaningful change for years.[377]

---

commented about his concerns that the bill would prevent the LCB from seizing cannabis from licensees in instances where the LCB was unable to prove a traceability violation, but suspected some wrongdoing. "We have to have that. If we don't pin the violation on them, it stings. And we know that product's not in the black market." *See* Gregory Foster, *WSLCB – Executive Management Team (February 27, 2019),* CANNABIS OBSERVER (Feb. 27, 2019), https://cannabis.observer/events/wslcb-executive-management-team-february-27-2019/. In other words, Hauge wanted the agency to have the ability to punish licensees in ways that "sting" even in those cases where the LCB is unable to meet its burden of proof alleging a violation (which, according to a review of agency records, it already does 99.7% of the time due to the unfair playing field of administrative hearings). *Id.* This is precisely the type of "toxic culture" that the legislation was intended to curb. It is also likely unconstitutional. *See, e.g.,* Timbs v. Indiana, 139 S. Ct. 682 (2019) (holding that the Eighth Amendment's excessive fines clause is incorporated by reference into the Fourteenth Amendment, and thereby applicable to the states, precluding states from seizing property in civil forfeiture proceedings).

[375] *See* Statement of Russell Hauge, *supra* note 368.

[376] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Comm. On Commerce and Gaming*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statements of Representative Young and Russell Hauge), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019011276&startStreamAt=2188&stopStreamAt=3347&autoStartStream=true.

[377] *See e.g.,* Statement of Representative Kirby, *supra* note 362; Lester Black, *Ten Washington Lawmakers Claim Liquor and Cannabis Board Has a "Toxic Culture,"* THE STRANGER (Feb. 26, 2019), https://www.thestranger.com/slog/2019/02/26/39305040/ten-washington-lawmakers-claim-liquor-and-cannabis-board-has-a-toxic-culture.

After the hearings, legislators were so dissatisfied with the LCB testimony[378] that a bipartisan group of ten legislators sent a letter to Washington Governor Jay Inslee.[379] The letter was a scathing rebuke of Hauge and his testimony:

> It has become clear that the approach to regulating under the authority of the Liquor [sic] Cannabis Board (LCB) is not fitting of an administrative agency that lists its values as, 'Respect and courtesy, Professionalism, Open communication, Accountability and integrity, Continuous improvement, meaningful results and Customer focus.' *This Board has consistently modeled the opposite.*[380]

The letter went on to note that Hauge and Thompson "appeared on behalf of the LCB and on specific points, either were ignorant of facts, or purposely did not tell the truth."[381] As lying at a legislative hearing might constitute perjury in some cases,[382] these accusations are remarkable in their severity. Based on the letter, it appears as though legislators viewed the LCB's Enforcement division as more concerned with proving guilt than regulating a legitimate marketplace.[383] The letter demanded that Governor Inslee withdraw his appointment of Hauge to the Board.[384]

In response to the letter, Governor Inslee declined to rescind his appointment of Hauge, but stated that the LCB would "retain an independent consultant to review its enforcement

---

[378] Based on the comments of the committee members at the hearing, it appeared that Board member Hauge's demeanor and responses were not acceptable. *Id.* ("Keep in mind [Mr. Hauge], we are not the defense counsel at one of your criminal trials.").

[379] Letter from Senator Ann Rivers, Senator John Braun, Senator Guy Palumbo, Senator Mark Schoesler, Senator Steve Hobbs, Representative Drew MacEwen, Representative Brian Blake, Representative Brandon Vick, Representative Kristine Reeves, and Representative Steve Kirby to Jay Inslee, Governor of Washington (Feb. 13, 2019), https://www.gleamlaw.com/wp-content/uploads/2019/03/WSLCB-Russ-Hauge-Appointment.pdf.

[380] *Id.* at 1 (emphasis in original).

[381] *Id.*

[382] WASH. REV. CODE § 9A.72.010(4) (2020) (defining "official proceeding" as a "proceeding heard before any legislative . . . government agency or official authorized to hear evidence under oath . . . ."); WASH. REV. CODE § 9A.72.020 (2020) ("A person is guilty of perjury in the first degree if in any official proceeding he or she makes a materially false statement which he or she knows to be false under an oath required or authorized by law.")

[383] *Id.* at 2 ("The role of the LCB should not be to 'catch' everyone with the assumption they're trying to get away with something. *The LCB is not the 'anti' Liquor [sic] Cannabis Board*, despite its prevailing attitude toward these industries.") (emphasis in original). In particular, the letter takes issue with Hauge personally and his win-at-all-costs mentality, which the legislators viewed as inconsistent with the LCB's purpose and objectives. *Id.* ("Mr. Hauge, in his former role as a prosecutor, is an expert on identifying and making a case against someone who he believes has broken the law – *proving guilt was his job*.") (emphasis in original).

[384] *Id.* at 1−2 ("The ethos at the LCB does not yet effectively separate taxpaying license-holders who have thrown open the doors to their businesses, their personal finances and more, from criminals skulking in dark alleys who sell to kids from the back of a van. Washington needs LCB leaders who embrace the distinction . . . Rejection of this toxic culture at LCB should start with not reappointing Mr. Hauge."). Hauge's reappointment, along with the two other board members, was under consideration by the Senate at the time the letter was sent. *See, e.g.,* Lester Black, *State Senate Moves to Privately Confirm Embattled Liquor and Cannabis Board*, THE STRANGER (Jan. 23, 2019). The hearings were held in private, without public comment. *Id.* ("If the hearing was open to the public the three board members up for confirmation would likely get an earful after a year of almost relentless missteps by the state's pot regulator . . . .").

practices."[385] HH was ultimately hired as that consultant, its review of the LCB is discussed in Section V below.

Shortly after the House Commerce and Gaming Committee hearing, on January 31, 2019, the Senate Labor and Commerce Committee held a hearing on the companion bill, SB 5318.[386] Unlike the House committee hearing, the Senate committee was much less dramatic. The only witnesses to testify were a bipartisan pair of state senators that had sponsored the bill, who noted that the bill was needed based on feedback they had received from their constituents about questionable enforcement practices and lack of uniformity in agency reaction to violations.[387]

The witnesses advocated in favor of moving the agency from an enforcement-first mindset to an education-first mindset, similar to other regulatory agencies such as the Department of Labor and Industries.[388] And critically, the agency needed to move away from taking licenses away for *de minimis* violations.[389] The committee was receptive to the testimony.[390]

Following their initial hearings, both bills passed out of committee. Following a "do pass" vote on February 20, 2019, SB 5318 was referred to the Senate Ways and Means Committee. The following day HB 1237 was passed out of the Commerce and Gaming Committee. Following its passage, Committee member Brandon Vick noted that "we've seen the

---

[385] Letter from Governor Jay Inslee to Senator Ann Rivers, Senator John Braun, Senator Guy Palumbo, Senator Mark Schoesler, Senator Steve Hobbs, Representative Drew MacEwen, Representative Brian Blake, Representative Brandon Vick, Representative Kristine Reeves, and Representative Steve Kirby (Feb. 26, 2019) ("I know the Board supports enforcement reforms both through its current rulemaking process and by working with many of you this session to craft legislative modifications. In addition, the Board will retain an independent consultant to review its enforcement practices.").

[386] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the S. Committee on Labor and Commerce*, 2019 Leg., 66th Sess. (Wash. Jan. 31, 2019), https://www.tvw.org/watch/?eventID=2019011334.

[387] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the S. Committee on Labor and Commerce*, 2019 Leg., 66th Sess. (Wash. Jan. 31, 2019) (statement of Sen. Ann Rivers) ("Part of what I have heard from numerous tours that I have done from the very beginning now four years ago is that there seems to be a lack of uniformity in the enforcement of rules and systems . . . . [T]here are some very subjective citations occurring."), https://www.tvw.org/watch/?eventID=2019011334.

[388] *Id.*

[389] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the S. Committee on Labor and Commerce*, 2019 Leg., 66th Sess. (Wash. Jan. 31, 2019) (statement of Sen. Guy Palumbo) ("There are people that are losing their livelihood and their investment because of de minimus violations . . . . We have to move to a compliance mindset, not a law enforcement mindset, in this industry."), https://www.tvw.org/watch/?eventID=2019011334. Senator Palumbo referenced a licensee that had its license canceled by the LCB because a handful of plants, in a room containing thousands of plants, had grown a few inches too tall and should have been moved to a different room before enforcement inspected the premises. *Id.*

[390] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the S. Committee on Labor and Commerce*, 2019 Leg., 66th Sess. (Wash. Jan. 31, 2019) (Statement of Sen. Maureen Walsh) ("I've heard the same complaint."), https://www.tvw.org/watch/?eventID=2019011334.

reasons why the bill is needed . . . to help the Washington State Liquor and Cannabis Board get the house in order while not being, I guess, overly punitive.[391]

After leaving committees, the Senate bill began to gain traction as the vehicle, and following several amendments, it was passed by the Senate on March 11, 2019.[392] SB 5318 then returned to the house, where another hearing with explosive testimony awaited.[393]

On March 19, 2019, the House Gaming and Commerce Committee held a hearing on SB 5318 and received testimony from LCB Enforcement Agent John Jung.[394] Officer Jung's insider testimony about the LCB was scathing. Jung testified that over the past ten years as an officer for the LCB he had witnessed and been directed to participate in "unfair and inconsistent application of policies, procedures, and laws to the public."[395] Although he stated he had raised these concerns about agency practices with his superiors since at least 2014, his pleas fell on deaf ears.[396] He appeared on his own behalf in the hopes that his testimony might help hold the agency "accountable."[397]

Jung recounted that many licensees had complained about unfair enforcement practices, including some that prompted Jung to refer them to the Federal Bureau of Investigation, but that none had taken any action out of fear of retaliation by the LCB.[398] According to Jung, the disproportionate share of enforcement action had fallen on minorities and immigrants.[399] He further testified that the agency violated state law by, among other things, submitting false sworn statements in efforts to obtain warrants.[400] He also claimed that many LCB officers illegally carry concealed firearms.[401] Ultimately, he noted that "LCB has a toxic culture; that is very true."[402]

---

[391] M. Bailey Hirschburg, *Washington State Legislature – Executive Sessions (February 20-21, 2019)*, CANNABIS OBSERVER (Feb. 22, 2019), https://mailchi.mp/5cca404c5fb3/washington-state-legislature-executive-sessions-february-20-21-2019?e=e34a6e5dc5.

[392] SB 5318 Bill Information, https://app.leg.wa.gov/billsummary?BillNumber=5318&Initiative=false&Year=2019.

[393] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the H. Commerce & Gaming Comm.*, 2019 Leg., 66th Sess. (Wash. Mar. 19, 2019), https://www.tvw.org/watch/?eventID=2019031223.

[394] *Id.*

[395] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the H. Commerce & Gaming Comm.*, 2019 Leg., 66th Sess. (Wash. Mar. 19, 2019) (statement of Officer John Jung), https://www.tvw.org/watch/?eventID=2019031223.

[396] *Id.*

[397] *Id.*

[398] *Id.*

[399] *Id.*

[400] *Id.* (noting that the LCB had falsely stated in submissions to obtain warrants that LCB officers were sworn peace officers when in fact they were not).

[401] *Id.*

[402] *Id.* Jung went on to give examples of the agency's toxic culture, including that as an LCB enforcement agent he is forced to "carry a gun, pretend that I'm a cop" despite receiving no peace officer training. Testifying was another licensee that piled on to past testimony about the agency's harsh practices. *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the H. Commerce & Gaming Comm.*, 2019 Leg., 66th Sess. (Wash. Mar. 19, 2019) (statement of Laurent Bentitou)

The LCB again appeared at the committee, but this time Hauge was noticeably absent.[403] Again, the LCB signed in as "other" on the bill, not in favor of the reforms.[404] The agency professed an interest in working with the committee on some of the reforms.[405]

### B.      LCB gets on Board with Reform

In mid-February 2019, the Senate passed a substitute for SB 5318 that among other things eliminated the amnesty provisions of the bill, added a new process for issuing notices to correct violations without the need for issuing AVNs, added a program for providing technical assistance visits, and directed the Board to give "substantial weight" to settlement agreements reached with licensees.[406] The amendments were proposed by Senator Karen Keiser, chair of the Senate Labor and Commerce Committee.[407] While there was no substantive public discussion about why certain matters were removed from the original bill (such as the amnesty provision), the committee generally approved of the idea of making education and compliance a cornerstone of regulation.[408] Some of the proposed changes were presumably included to appease agency concerns.[409]

Following the disastrous first hearing on HB 1237, and the Senate's adoption of changes that lessened the scope of the proposed reform package, in early March 2019, the LCB began to change tact and decided to cautiously engage with cannabis trade associations, the Governor's office, legislators, and industry stakeholders on bill language. First, the LCB provided written feedback to the proposed substitute bill acknowledging, among other things, its approval of the removal of the amnesty provision, its reduction in the standard of proof in evidentiary hearings

---

("The way that we interpret the laws here is draconian . . . we are repeatedly told that the upper levels of the organization would love to see every infraction prosecuted at the highest level available. There is no room for mistakes."), https://www.tvw.org/watch/?eventID=2019031223.

[403] Hauge later said that he intentionally retreated from participation in future legislative hearings, considering himself "blackballed" as a result of his behavior in the January 28, 2019 House Commerce and Gaming Committee hearing. *See* Gregory Foster, *WSLCB – Executive Management Team (February 27, 2019),* CANNABIS OBSERVER (Feb. 27, 2019), https://cannabis.observer/events/wslcb-executive-management-team-february-27-2019/.

[404] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the H. Comm. on Commerce & Gaming,* 2019 Leg., 66th Sess. (Wash. Mar. 19, 2019) (statement of Chris Thompson), https://www.tvw.org/watch/?eventID=2019031223.

[405] *Id.*

[406] S.S.B. 5318, 66th Leg., Reg. Sess. (Wash. 2019), http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/Senate%20Bills/5318-S.pdf?q=20201124100913.

[407] S.S.B. 5318, 66th Leg., Reg. Sess. (Wash. 2019), https://app.leg.wa.gov/committeeschedules/Home/Document/196137#toolbar=0&navpanes=0.

[408] *An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318 Before the S. Committee on Labor and Commerce,* 2019 Leg., 66th Sess. (Wash. Feb. 20, 2019) (statement of Sen. Steve Conway) (noting that although the LCB needed to improve its record on emphasizing compliance and education, the legislature also needed to reaffirm "a firm regulation of this industry as well."), https://www.tvw.org/watch/?clientID=9375922947&eventID=2019021352&startStreamAt=486&autoStartStream=true.

[409] M. Bailey Hirschburg, *WSLCB – Board Caucus (February 26, 2019),* CANNABIS OBSERVER (Feb. 26, 2019) (noting that while amendments to the house bill added to agency concerns, the substitute senate bill addressed them), https://cannabis.observer/events/wslcb-board-caucus-february-26-2019/.

from the "clear and convincing" standard to the "preponderance" standard, and a host of minor technical wording changes.[410] The LCB continued to object to any provision that imposed an obligation on the Board to give deference to agency personnel entering into settlement agreements with licensees to resolve AVNs.[411]

Second, in meetings with stakeholders, LCB representatives stood by their previously articulated position that reform would best be achieved through rulemaking, and through Governor Inslee's proposed independent review of enforcement practices.[412] But ultimately, the tides of change began to pull too strongly, and conversations changed to include ways in which the bills could be altered to mitigate some of the agency's concerns. In early March, agency representatives met on several occasions with legislative aides and industry advocates to hammer out a consensus approach.[413] There remained considerable dispute over the excision from the Senate bill of the burden of proof language, and the agency's demand to remove the language requiring that the Board give deference to settlement agreements with licensees.[414] But the parties continued to meet to try to reach a compromise position.

### C.    Final Bill Passes

With the agency on board, passage became inevitable. On March 11, 2019, the Senate approved the bill in its substituted form.[415] On March 15, 2019, the informal meetings continued with LCB representatives meeting with stakeholders and legislators at the Capitol to discuss the burden of proof issue, and proposed future rules distinguishing between public safety violations and less serious regulatory violations.[416] Although the House considered some drastic changes to the bill to bring it into line with the more reform-heavy HB 1237,[417] on April 16, 2020, the

---

[410] Rick Garza, 5318 Enforcement Bill LCB Feedback on Keiser Sub, Feb. 27, 2019.

[411] *Id.* ("The board isn't required to delegate this task of negotiating a proposed settlement with a licensee currently. This provision is in our view problematic, and we would request removing that section.").

[412] M. Bailey Hirschburg, *Washington State Legislature – House of Origin Cutoff (March 13, 2019)*, CANNABIS OBSERVER (Mar. 13, 2019), https://cannabis.observer/observations/washington-state-legislature-house-of-origin-cutoff-march-13-2019-summary/.

[413] Co-author Chris Masse participated in several of these meetings to discuss alternative approaches to modifying the legislation for consensus. The agency also met with other stakeholder groups during this time period to address concerns. M. Bailey Hirschburg, *WSLCB - Executive Management Team (March 6, 2019) - Summary)*, CANNABIS OBSERVER (Mar. 12, 2019), https://cannabis.observer/observations/wslcb-executive-management-team-march-6-2019-summary/ (noting that the agency reached a compromise with some advocacy groups following informal meetings).

[414] E-mail from Vicki Christopherson, Executive Director of the Washington Cannabusiness Association to Chris Thompson, Legislative Liaison for the Wash. State Liquor & Cannabis Bd. (Mar. 6, 2019, 1:11 PDT) ("To confirm the issues I recall that we agreed to continue to work on were figuring out the burden of proof language and the settlement conference issue.").

[415] Reforming the Compliance and Enforcement Provisions for Marijuana Licensees, S.B. 5318, 66th Leg., Reg. Sess. (Wash. 2019), https://app.leg.wa.gov/billsummary?BillNumber=5318&Initiative=false&Year=2019.

[416] E-mail from Chris Thompson, Legislative Liaison for the Wash. State Liquor & Cannabis Bd. to large group of stakeholders (Mar. 15, 2019, 1:41 PM) ("Thanks to all of you for a meeting and conversation today that seemed to me to be very productive. As we discussed, this message is to confirm our intention to meet again Monday.").

[417] For example, one proposed amendment would have turned all LCB officers into inspectors that would be prohibited from carrying firearms and holding themselves out as peace officers. E-mail from Peter Clodfelter,

House passed a lightly modified version of SB 5318 by an overwhelming margin of 88-8.[418] Upon return to the Senate, the bill passed with the House amendments by a similarly wide 43-4 margin.[419] The governor signed the bill into law on May 13, 2019, and it officially went into effect on July 28, 2019.[420]

### 1.   Legislative Findings

The final bill was explicit in announcing the legislature's intentions when implementing the LCB reforms:

> As the regulated marketplace has been developing, Washington residents with a strong entrepreneurial spirit have taken great financial and personal risks to become licensed and part of this nascent industry. It should not be surprising that mistakes have been made both by licensees and regulators, and that both have learned from these mistakes leading to a stronger, safer industry . . . [A] strong focus on compliance and education is . . . critically necessary to assist licensees who strive for compliance and in order for the Board to focus its enforcement priorities on those violations that directly harm public health and safety.
>
> . . .
>
> The risk-taking entrepreneurs who are trying to comply with Board regulations should not face punitive consequences for mistakes made during this initial phase of the industry that did not pose a threat to public health and safety.[421]

In other words, at the outset, the legislature's reform package directed the agency to refocus its energy on compliance and education in lieu of the single-minded pursuit of strict enforcement of regulations. The explicit nature of the proclamation was necessary, because, as one witness testified to the legislature, the agency consistently expressed surprise that its effort to "punish and punish and punish some more" did not improve compliance.[422] The legislature's shot across the bow was clearly intended as a warning to the agency that its culture needed to change,[423] and that the old ways of doing business were no longer acceptable.

---

Counsel Office of Program Research Wash. State House of Representatives to Representative Steve Kirby (Feb. 13, 2019).

[418] *See* H.B. 1237, 66th Leg., Reg. Sess. (Wash. 2019), http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/House%20Bills/1237.pdf#page=1.

[419] *Id.*

[420] *Id.*

[421] Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees, ch. 394, 2019 Wash. Sess. Laws 2531, § 1(1)−(5).

[422] *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on HB 1237 Before the H. Commerce & Gaming Comm*, 2019 Leg., 66th Sess. (Wash. Jan. 28, 2019) (Statement of Christine Masse), https://www.tvw.org/watch/?eventID=2019031223.

[423] At least one representative noted that many of the provisions that were stripped from the bill to accommodate agency concerns could easily be reinstated in a future bill if the agency did not embrace real change. *See An Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees: Hearing on SB 5318*

2.      The Reform of SB 5318

The changes wrought by the adoption of SB 5318 were expansive.

a)  *Notices of Correction*

The legislature constrained the LCB's discretion to issue AVNs for observed regulatory violations by requiring the agency to first issue a notice of correction (NOC) in most circumstances.[424] The NOC should (1) identify the regulatory violation; (2) explain in detail how the licensee can resolve the violation and come into compliance; and (3) impose a deadline for making the correction.[425] If the agency issues a NOC, it cannot impose a punishment unless the licensee fails to correct the deficiency by the deadline set forth in the notice.[426] NOC is not a formal enforcement action,[427] so it does not count towards a licensee's AVN history, and cannot be used against licensees during license renewal or to increase punishment for other violations. And under SB 5318, the agency is prohibited from issuing an AVN or any other punishment in virtually all cases except those involving criminal activities if it has not yet issued a NOC.[428]

b)  *Compliance Education Program and Technical Assistance Visits*

In addition to the NOC procedure, SB 5318 imposed an obligation on the LCB to develop rules to "perfect and expand existing programs for compliance education . . . ."[429] The agency was directed to develop the rules "in consultation with licensed marijuana businesses and their employees."[430] The new regime also must include "recommendations for abating violations" by licensees.[431]

Washington regulatory agencies already have a statutory mechanism for investigating and correcting licensee compliance under Washington's technical assistance programs.[432] Agencies

---

*Before the H. Comm. on Gaming and Commerce*, 2019 Leg., 66th Sess. (Wash. Mar. 19, 2019) (Statement of Representative Kirby), https://www.tvw.org/watch/?eventID=2019031223.
[424] WASH. REV. CODE § 43.05.160 (2019).
[425] *Id.* at § 43.05.160(1)(a)−(c).
[426] *Id.* at § 43.05.160(3).
[427] *Id.* at § 43.05.160(2).
[428] *Id.* at § 69.50.563(1)(a)−(c). Specifically, the LCB is prohibited from issuing an AVN without first issuing a NOC unless (1) the licensee has been subject to an enforcement action for the same or similar type of violation of the same statute or rule; (2) the licensee has been given a previous NOC for the same or similar type of violations; or (3) the LCB prove by a preponderance of the evidence that the violation constitutes a substantial public safety violation, i.e., diversion of cannabis products or revenue to the illicit market/across state lines, or furnishing products to minors. *Id.* Thus, except where the licensee is a serial offender or is selling cannabis on the black market, the agency is statutorily required to always issue a NOC first; consistent with the intent of SB 5318 to emphasize education and compliance over punishment.
[429] WASH. REV. CODE § 69.50.342(3) (2019).
[430] *Id.*
[431] *Id.*
[432] *Id.* at § 43.05 et seq.

such as the Department of Ecology,[433] Department of Labor and Industries,[434] Department of Agriculture,[435] Department of Fish and Wildlife,[436] Department of Health,[437] Department of Licensing,[438] and Department of Natural Resources,[439] have used Washington's technical assistance programs for more than twenty years to help educate licensees and achieve compliance without punishment. SB 5318 added the LCB to the vetted-and-approved technical assistance program as a way of emphasizing compliance over punishment,[440] and directed the agency to develop rules to implement the program.[441]

Thus, to foster better trust between the agency and licensees, and to dispel concerns about retaliation and retribution by the agency, the legislature directed the agency to begin conducting technical assistance visits, pursuant to which licensees could request agency inspections and guidance to improve regulatory compliance.[442] The LCB will then make recommendations to the licensee on ways to improve compliance.[443] The statute prohibited the LCB from issuing NOCs or AVNs for noncompliance observed during a technical assistance visit,[444] but did not grant immunity from inspections or future investigations.[445] Instead, the LCB is authorized to pursue further investigations of the licensee if the on-site visit discloses a violation "with a direct or immediate relationship to public safety"[446] and the violation is not corrected pursuant to an issued NOC within a specified time after the visit.[447]

### c)  Written Warnings and Prerequisites for AVN Issuance

The statute also directed the agency to develop procedures to issue written warnings or notices to correct for regulatory violations that do not have a direct or immediate impact to

---

[433] WASH. REV. CODE § 43.05.060 (1995).

[434] Id. at § 43.05.090.

[435] Id. at § 43.05.100.

[436] Id.

[437] Id.

[438] Id.

[439] Id.

[440] Id. at § 43.05.160.

[441] WASH. REV. CODE § 69.50.562(1)(c) (2019).

[442] Id. at § 69.50.561.

[443] Id.

[444] Id. at § 69.50.561(2).

[445] Id. at § 69.50.561(3). In other words, a licensee that knows it is not in compliance cannot request a technical assistance visit with the express intent of gaining immunity when the LCB arrives and realizes the noncompliance. Nonetheless, the purpose of the provision is to improve education and compliance without fear of reprisals.

[446] The agency subsequently defined violations "with a direct or immediate relationship to public safety" as: (1) sales to minors; (2) criminal conduct or disorderly conduct on premises by a licensee or employee; (3) operation of an unapproved $CO_2$ or hydrocarbon extraction system; (3) adulterated products (including pesticides); (4) transports without manifests; (5) obstruction, misrepresentation of fact, or not allowing agents on site; (6) traceability failures; and (7) pickups or deliveries at an unauthorized location. WASH. ADMIN. CODE § 314-55-521.

[447] WASH. REV. CODE § 69.50.561(5) (2020). LCB has shown some progress on the technical assistance front. On January 15, 2021, it introduced its Cannabis Compliance Consultant Team to the industry, stating that "[t]he goal of the Compliance Consultants is to help licensees understand and comply with state cannabis requirements, laws, and rules (RCWs and WACS) and to help licensees achieve and maintain compliance." E-mail from Washington State Liquor & Cannabis Bd. to subscribers (Jan. 15, 2021, 15:25 PM) (on file with author).

public safety.[448] The Board was also required to adopt procedures to waive fines, penalties, or sanctions for violations that are corrected within a reasonable time and do not have a direct or immediate impact on public safety.[449]

SB 5318 also substantially changed the penalty structure for violations of agency rules. It requires that the LCB (1) limit penalty escalation to a two-year time period;[450] (2) prohibit cancellation for multiple infractions unless the licensee receives four violations within the preceding two years;[451] (3) limit the bases for "one and done" license cancellation to violations involving substantial public safety violations;[452] (4) give substantial consideration to aggravating and mitigating circumstances and deviate from prescribed penalties accordingly;[453] and (5) give substantial consideration to mitigating penalties imposed on a licensee as a result of employee misconduct that led to the violation, where the licensee had adequate training and compliance programs in place.[454]

### d)  Settlement Agreements

Lastly, the bill obligated the Board to thoughtfully consider settlement agreements entered into between the Enforcement Division and licensees.[455] Of the many complaints leveled against the agency, one particularly grating one was the fact that the Enforcement Division would often enter into settlement agreements with licensees to resolve outstanding AVNs, and those agreements would be rejected by the Board without explanation. In the authors' experience, particularly frustrating was the fact that the Board had little direct knowledge of what happened in individual cases, yet sought to impose its will over the Enforcement Division to prevent settlements that reduced penalties in exchange for mitigating circumstances. Thus, many licensees faced license cancellation not only because of strenuous enforcement by the Enforcement Division, but also because any lesser punishment was ultimately rejected by the Board in the circumstances where Enforcement agreed to a lesser penalty (usually in exchange for an exorbitant fine and admission of guilt by the licensee).

The statute changes this by requiring that the Board give "substantial weight" to the settlement agreement.[456] Presumably this should make the prospects of settlement in AVN disputes improve, although in the authors' experience, the agency continues to reject many settlement agreements as insufficiently punitive, and the authors have been told that the agency views the statute very narrowly as only applying to settlement agreements reached between

---

[448] WASH. REV. CODE § 69.50.562(1)(a) (2020).

[449] Id. at § 69.50.562(1)(b).

[450] Id. at § 69.50.562(2)(a).

[451] Id. at § 69.50.562(2)(c).

[452] Id. at § 69.50.562(2)(b).

[453] Id. at § 69.50.562(2)(d). The agency was also required to authorize its officers to consider mitigating and aggravating circumstances. This provision was added to the bill as a result of complaints about the agency's toxic culture that included concerns that officers had no discretion to consider any factors other than the highest possible penalty in enforcing agency regulations.

[454] Id. at § 69.50.562(2)(e).

[455] Id.

[456] Id. at § 69.50.564.

Board representatives and licensees; not those negotiated through counsel. This is consistent with the agency's record of proceedings, which continues to show a massive discrepancy between penalties meted out to cannabis licensees and those issued to liquor and tobacco licensees.[457] Moreover, this position seems at odds with the spirit and intent of SB 5318.

### e) No Amnesty and No Enforceable Cultural Reform

As a result of legislative wrangling in the Senate and negotiations with the LCB, the final statute left out a few other big-ticket reforms. For starters, the amnesty provision was stripped from the legislation.[458] This stemmed from concern that unspecified "bad actors" would gain a windfall benefit from the revision.[459] In addition, some of the amendments that would have forced the agency to embrace a cultural reform were rejected.[460] For example, amendments adopted for the companion House bill proposed eliminating the LCB's law enforcement authority and instead designating LCB officers as inspectors.[461] This would have eliminated their ability to carry firearms and wear SWAT-style uniforms. Instead, the legislature largely left it to the agency to address the public's cultural concerns in its pending rulemaking, and through the independent consulting audit initiated by the governor's office.[462]

### 3. Evading the Reform of SB 5318

Although the agency's full regulatory response to SB 5318 is beyond the scope of this article, the authors feel it necessary to acknowledge three cases that have addressed the agency's attempts to undermine the legislature's reforms. These cases relate to how the LCB complied with the mandate of SB 5318 to adopt new, more lenient penalties for regulatory violations, which resulted in the LCB abandoning its former penalty tables and adopting new ones.[463] At the same time, however, the agency created a loophole for itself by promulgating WASH. ADMIN. CODE § 314-55-509(4), which provides in relevant part as follows:

> For violations that occurred before the effective date of these rules, enforcement action will be based on the rules that were in effect on the date the violation occurred.

---

[457] See, e.g., sources cited and discussion supra, section III.A.1.(e).
[458] WASH. REV. CODE § 69.50.562 (2020).
[459] See Statement of Russell Hauge, supra note 368. There were also some licensees that testified to this concern as well.
[460] S.H.B. 1237, 66th Leg., Reg. Sess., § 5(1)(a) (Wash. 2019).
[461] See id. ("The board's officers and employees, while enforcing any provision of this chapter. . . or any rule adopted under authority of these chapters, are designated as inspectors or employees and do not have law enforcement authority . . . ."), http://lawfilesext.leg.wa.gov/biennium/2019-20/Pdf/Bills/House%20Bills/1237-S.pdf?q=20201124103458.
[462] Statement of Russell Hauge, supra note 368.
[463] See Rule Making Order CR-103E, Wash. State Liquor & Cannabis Bd. (Jan. 2020), https://lcb.wa.gov/sites/default/files/publications/rules/2019%20Proposed%20Rules/MJ_Penalties_WSR_20-03-177.pdf

(the Rule). The LCB relied on the Rule to continue applying the older, harsher penalties to licensees for violations that predate the adoption of SB 5318 and the amended, less punitive, penalty table. The Rule is, however, directly contrary to the express language of SB 5318, and the legislature's finding that:

> The risk-taking entrepreneurs who are trying to comply with Board regulations should not face punitive consequences for mistakes made during this initial phase of the industry that did not pose a threat to public health and safety.[464]

The language in the act is backward looking. It contemplates granting relief from punitive punishment for "mistakes made during" the "initial phase" of the industry, a phase that necessarily predated the bill's adoption. While the legislature stated its intent to protect licensees from mistakes they had already made, the LCB disregarded that intent and adopted the Rule so it could continue to impose the outdated, harsher, more punitive consequences on licensees for mistakes made during the initial phase of the industry. Predictably, this conflict between the Rule and SB 5318 lead to litigation.

The first case to address the issue was *Sunshine Farming, LLC v. Washington State Liquor & Cannabis Board*.[465] The *Sunshine* case came before the court on appeal from an administrative decision to cancel Sunshine's license for alleged violations of the TPI regulations.[466] Under the post-SB 5318 penalty table, the alleged violations would result in a $1,250 fine.[467] But relying on the Rule, the agency applied the old table and obtained an order of cancellation for Sunshine's license.[468] Sunshine challenged the Rule on appeal to the superior court, arguing that the reforms of SB 5318 were retroactive, and that as a result, the Rule was in conflict with the statute and therefore invalid.[469]  The superior court agreed, and invalidated the Rule as applied to Sunshine noting:

> [Sunshine] has demonstrated that the Legislature enacted ESSB 5318 as a remedial measure intended to impose reduced penalties on violations that do not pose a direct threat to public safety committed during the initial phase of the marijuana industry. . . To the extent WAC 314-55-509(4) is inconsistent with ESSB 5318's intent to impose reduced penalties, it is invalid as to this petitioner.[470]

---

[464] Act Relating to Reforming the Compliance and Enforcement Provisions for Marijuana Licensees, ch. 394, 2019 Wash. Sess. Laws 2531, § 1(1)−(5).
[465] Wash. State Sup. Ct., Thurston Cnty., Cause No. 20-2-01587-34.
[466] Order, Sunshine Farming, LLC v. Wash. State Liquor & Cannabis Bd., Thurston Cnty. Sup. Ct. Cause No. 20-2-01587-34 at 1 (Mar. 19, 2021).
[467] WASH. ADMIN. CODE § 314-55-524 (2020).
[468] Order, *Sunshine Farming, LLC*, Thurston Cnty. Sup. Ct. Cause No. 20-2-01587-34 at 2.
[469] Pet'r's Am. Br. Sunshine Farming, LLC v. Wash. State Liquor & Cannabis Bd., Thurston Cnty. Sup. Ct. Cause No. 20-2-01587-34 at 14–23 (Jan. 18, 2021).
[470] Order, *Sunshine Farming, LLC*, Thurston Cnty. Sup. Ct. Cause No. 20-2-01587-34 at 2.

The court then remanded the case to the office of administrative hearings for further proceedings.[471] The LCB did not appeal the decision.

The second case challenging the Rule had a different result. In *Seattle 420, LLC v. Washington State Liquor & Cannabis Board*, the LCB sought license cancellation after the petitioner received a third sale to minor violation in a two-year period.[472] After administrative hearings, the agency ordered the license to be canceled, and that decision was affirmed by the superior court on appeal.[473] At the court of appeals level, the licensee argued, among other things, that cancellation was not the proper penalty for a third sale-to-minor violation because SB 5318 was retroactive, and lesser penalties should be applied.[474] The court of appeals disagreed for two reasons. First, the bulk of its decision on retroactivity was devoted to language in 5318 that permits the agency to cancel licenses for a single violation of furnishing marijuana to minors.[475] The court found the reforms of SB 5318 did not apply to Sunshine because the LCB retained discretion to cancel licenses after a single sale to minor violation.[476] Second, the court noted, in cursory fashion, that SB 5318 was not expressly retroactive, and that it was not a remedial statute because it effected a "substantive change" in the law.[477] On this point, the court erred. A substantive change in the law is one that grants "the right to proceed against persons previously outside the scope of [the law]."[478] But SB 5318 created no such new rights. The court of appeals did not identify what it believed constituted a new "substantive change" to the law; it merely stated in conclusory fashion that the statute substantively changed the law.[479] The court also mistakenly held that substantive changes in the law cannot be remedial by citing to a case that addressed curative laws.[480] Curative and remedial legislation are different. Curative legislation "clarifies or technically corrects an ambiguous statute,"[481] and remedial legislation "relates to practice, procedure or remedies, and does not affect a substantive or vested right."[482] Contrary to the court of appeals decision, the Washington State Supreme Court has found many times that substantive changes in the law were remedial.[483] The *Seattle 420* opinion is unpublished and of

---

[471] *Id.* ("This matter is REMANDED TO THE BOARD with directions to apply ESSB 5318 retroactively in determining the appropriate penalties for Petitioner's conduct according to the current penalty schedules. . .").

[472] Seattle 420, LLC v. Washington State Liquor & Cannabis Board, Wash. Ct. App. Cause No. 80904-1-I at 1 (July 12, 2021).

[473] *Id.*

[474] *Id.* at 1–2.

[475] *Id.* at 12 (July 12, 2021) ("The language of the statute indicates that the WSLCB could have penalties resulting in the loss of a license . . . after one violation of furnishing marijuana to a minor. . . .").

[476] *Id.*

[477] *Id.* at 10−11.

[478] Kittilson v. Ford, 595 P.2d 944, 949 (Wash. Ct. App. 1979), *aff'd*, 608 P.2d 264 (Wash. 1980); *see* Dep't of Ret. Sys. v. Kralman, 867 P.2d 643 (Wash. Ct. App. 1994) (same*); Hammack v. Monroe St. Lumber Co.*, 339 P.2d 684 (Wash. 1959) ("To supply a remedy where previously there was none of any kind, is to create a right of action.").

[479] *Seattle 420, LLC*, Wash. Ct. App. Cause No. 80904-1-I at 12 (July 12, 2021) ("[T]his is a substantive change in the law. . .").

[480] *Id*. at 11 (citing Magula v. Benton Franklin Title Co., 930 P.2d 307, 313 (Wash. 1997)).

[481] McGee Guest Home, Inc. v. Dep't of Soc. & Health Servs. of State of Wash., 12 P.3d 144, 149 (Wash. 2000)

[482] State v. Humphrey, 983 P.2d 1118 (Wash. 1999)

[483] *See, e.g.,* Snow's Mobile Homes, Inc. v. Morgan, 494 P.2d 216, 221–22 (Wash. 1972) (amendment reducing certain tax burdens was retroactive); Macumber v. Shafer, 637 P.2d 645, 646 (Wash. 1981) (substantive change in homestead exemption was remedial); State v. Heath, 532 P.2d 621, 622–23 (Wash. 1975) (substantive change in law providing alcoholics treatment rather than punishment was remedial).

questionable persuasive authority; it appears that the court was heavily influenced by the fact that the underlying violation was a sale to minor.

While there has yet to be a final determination as to the retroactive effect of SB 5318, the ruling in *Sunshine Farming* is consistent with the plain language of SB 5318, which was specifically adopted to grant relief to licensees for "mistakes made" during the initial phase of the state's novel legalized adult use cannabis industry. The unpublished *Seattle 420* case was likely wrongly decided based on the violation at issue (sale to minor), which appears to have influenced the court's decision, and a misapplication of binding precedent.[484] Accordingly, courts are likely to follow the lead of the earlier trial court decision, and hold that although SB 5318 was not an amnesty for licensees, it was intended to grant relief to licensees in the form of reduced punishments for violations.

## V.    HH REPORT AND INTERNAL POLICY CHANGES

At the same time the LCB was undergoing rulemaking to implement SB 5318, it also undertook a review of its operations by an outside consultant.[485] As discussed earlier, following Board member Hauge's testimony before the House Gaming and Commerce Committee, Governor Inslee ordered an independent third-party to conduct an evaluation of the LCB and its operations and practices.[486] The State retained HH, a Chicago-based global consultancy firm specializing in independent ethics, integrity, and oversight services, with a special focus in law enforcement.[487] HH was tasked with completing a systematic review of the LCB, including policy and procedure, complaint intake and investigation, training, and accountability in order to make recommendations to address areas of concern and areas in need of improvement.[488] HH interviewed Board members, command staff, internal and external stakeholders, and legislators.[489] HH also utilized industry member focus groups, reviewed Enforcement policies, procedures, and corresponding documents, participated in site visits and observed Enforcement staff, surveys, and independent site visits to review the LCB's enforcement practices and complete its analysis.[490] In preparing the Report, HH relied heavily on interviews conducted on an anonymous basis of industry members (for fear of retaliation for speaking out against the LCB), and LCB staff.[491]

---

[484] This also likely explains why the court of appeals panel decided that the decision should remain unpublished and not binding on future cases even though it addressed an issue of first impression. *See* WASH. GEN. R. 14.1(a) ("Unpublished opinions of the Court of Appeals have no precedential value and are not binding on any court."). Citation to Unpublished Opinions, 2 WASH. PRAC., RULES PRACTICE GR 14.1 (9th ed.) ("An opinion is unpublished because a panel of the Court of Appeals has decided that the opinion does not have value as precedent.").
[485] Rick Garza, Director Washington State Liquor & Cannabis Bd., Follow Up to Regulated Communities and Stakeholders (Jan. 9, 2020), https://content.govdelivery.com/accounts/WALCB/bulletins/2755fd3.
[486] *Id.*
[487] Hillard Heintze Report, *supra* note 7, at 6.
[488] *Id.* at 5.
[489] *Id.* at 6.
[490] *Id.*
[491] *Id.* at 17.

### A.    HH Findings and Conclusions

What HH found was not surprising: "As cannabis regulations and the [LCB] evolved, licensees often expressed concerns that the [LCB]'s approach to enforcement created a culture of finding licensees doing something wrong, rather than assisting them in complying with the law."[492] In short, the Report details the LCB's culture of punishment and the inconsistency of its interpretation and enforcement of rules, recommending a "significant change in the focus of its operations," to emphasize education and assisting licensees in complying with law, rather than punishing them.[493] HH went as far as to suggest that the LCB's punishment culture had diminished Washington's cannabis industry, citing San Jose's Police Department's Division of Cannabis Regulation's focus on building relationships with and educating licensees, leading to "a safer, more vibrant marketplace," noting that jurisdictions where licensees had positive relationships with regulators created a safe environment that allowed businesses to flourish.[494] Ultimately, the Report suggests that these deficiencies are, at least in part, because the LCB may have a poor understanding of how regulatory bodies function and what the best practices of an administrative agency are.[495]

### 1.    Enforcement Philosophy and Bias

HH's findings on the LCB's enforcement philosophy confirmed what the industry already knew. Although some licensees spoke favorably of their enforcement officers, others thought their officers were "anti-cannabis," and treated them with "suspicion and as criminals," either because the officers had not adjusted to marijuana legalization or because the licensees were previously involved with the illicit cannabis industry, despite now being approved licensees.[496] In fact, the perception of bias by licensees was so pervasive that HH recommended training that targets subconscious bias.[497]

HH's findings of a perception of bias within the LCB seems to be supported by the policies, training practices, and evaluation metrics of the agency, which reflect law enforcement strategies and not a regulatory agency.[498] For one, the policy manual recently adopted by the LCB, Lexipol, is created for and designed for use by police departments, which leaves the

---

[492] *Id.* at 5.

[493] *Id.* at 49.

[494] *Id.*

[495] *Id.* at 47.

[496] *Id.* at 14.

[497] *Id.* at 48.

[498] *See, e.g.,* WASH. STATE LIQUOR & CANNABIS BD., ANNUAL REPORT – FISCAL YEAR 2018 at 5 ("Retail Enforcement strives to protect and serve the public . . . . Officers have arrest powers and carry out enforcement operations such as compliance checks, undercover operations, premises checks, complaint investigations, and technical assistance visits . . . ."); *see also* WASH. STATE LIQUOR & CANNABIS BD., FIELD TRAINING OFFICER'S MANUAL (calling for basic law enforcement academy training as a prerequisite for all officers); *see also* Edmon G. Lee, Enforcement Employee Training & Development (July 26, 2016) (noting the number of officers in 2016 that had met required firearms, surveillance, and defensive tactics training).

agency to develop a policy manual for its regulatory functions and policies.[499] Unsurprisingly, because it is easier to copy policies than it is to create new ones, those regulatory functions and policies mimicked those used by police departments.[500] Even then, the boiler plate Lexipol policies are generally not applicable to regulatory agencies and need to be revised.[501] To make it even more confusing, to determine which rule interpretation the agency is applying, the LCB has left many old policies and procedures in place, making it nearly impossible for staff to figure out which policy applies.[502]

Perhaps the most blatant example of hostility by Enforcement cited by licensees—as highlighted by HH—is Enforcement's choice of uniform—full tactical-style dress, including a vest and sidearm.[503] Some licensees reported that the aggressive clothing and armament causes trauma to their employees.[504] The authors are aware of several cases where Enforcement has appeared at a licensee's premises, without warning and in full tactical gear, prepared to "investigate" the facility, directly contrary to agency policy.[505] After the Report recommended that Enforcement change uniform standards to de-escalate confrontations and project a "softer approach" to licensees,[506] the officers' union pushed back and refused to allow the agency to take away their firearms.[507]

As the Report notes, there is nothing inherently wrong with using law enforcement policies as a starting point for creating policies for a regulatory agency—the issue is with culture

---

[499] Hillard Heintze Report, *supra* note 7, at 41–42 (showing that Enforcement and Education Division Policy 290 refers to the law enforcement officer code of ethics, and reminds staff not to be contentious or abusive, "even in the face of extreme provocation . . . .").

[500] Hillard Heintze Report, *supra* note 7, at 8.

[501] *Id.* at 48.

[502] *Id.*

[503] This is contrary to the official LCB policy, which calls for enforcement officers to wear (1) business suit with a dress shirt and tie; (2) sport coat and slacks with a dress shirt and tie; or (3) collared sport or polo shirt. WASH. STATE LIQUOR & CANNABIS BD., ENFORCEMENT DIVISION POLICY #360 – Clothing and Appearance Standards 1 (Sept. 15, 2006). When working in the field, the policy encourages officers to "generally reflect the attire worn by customers." *Id.* at 2. They should not wear their tactical gear for routine premises checks. WASH. STATE LIQUOR & CANNABIS BD., ENFORCEMENT DIVISION POLICY #365 – USE OF UNIFORM APPAREL 2 (Apr. 12, 2010). Nonetheless, the Report found that officers frequently wear the tactical-style apparel during standard site visits. Hillard Heintze Report, *supra* note 7, at 14.

[504] *Id.* ("[L]icensees, legislators, and external stakeholders expressed concerns that in addition to the enforcement stance of many officers, the uniform was discomforting to most. The tactical-style uniform, complete with vest and sidearm, was offensive and frightening to some licensees who related that they felt Special Weapons and Tactics (SWAT) officers were raiding their business.").

[505] WASH. STATE LIQUOR & CANNABIS BD., ENFORCEMENT DIVISION POLICY #365 – Use of Uniform Apparel 2 (Apr. 12, 2010).

[506] Hillard Heintze Report, *supra* note 7, at 50 ("The Division should also consider assigning officers with the sole duty of educating and assisting licensees in compliance with the law. These officers, whether sworn or non-sworn, should not wear a traditional police uniform but should work in plainclothes, such as khakis and a polo shirt, which is attire that many municipal police officers wear when focusing on compliance activities.").

[507] *See* Gregory Foster, *WSLCB – Executive Management Team Meeting (September 16, 2020) – Enforcement Review,* CANNABIS OBSERVER (Sept. 22, 2020), https://cannabis.observer/observations/wslcb-executive-management-team-meeting-september-16-2020-enforcement-review/ ("Union representatives had been concerned about whether Enforcement would maintain the "same level of safety equipment . . . ."). Instead, the agency ultimately decided to purchase equipment that allowed "for firearms to be carried in a less 'visible fashion.'" *Id.*

and problems with accountability, internally and externally, which trickles down from leadership through the agency's ranks.[508] In no small part, this is because agency leadership "has failed to stress the importance of education as a tool for gaining industry compliance, leaving officers to believe that supervisors and LCB leaders only value enforcement or coercive activity."[509] This is apparent in the quantitative metrics used by Enforcement to measure productivity: the agency counts the activity of the officers, including the number of compliance checks, premises checks, education activities and violations issued (though HH observed that, although education activities are an option in the electronic notebook used by officers, it is seldom used).[510] In effect, this means that some officers "take a strong enforcement approach and write up even the smallest violations" either in an effort to appease their superiors, show how productive they are, or simply because the LCB's culture or officers' bias mandates that they do so.[511]

## 2.    Consistency of Enforcement and Interpretation of Rules

One of the chief concerns expressed by licensees and a running theme throughout the Report was the industry's concerns related to miscommunication and a lack of transparency in the enforcement and interpretation of rules.[512] In the interviews conducted by HH, licensees noted that Enforcement applied inconsistent interpretations of rules depending on the officer, the region, or even the unit of the LCB giving the answer.[513] This inconsistency is in part due to the LCB's internal communication and diffused lines of communication with agency staff, in part because the LCB's technological systems do not interface across the Enforcement and Licensing divisions, as well as an absence of any central decision making or rule-interpretation authority within the agency.[514] Because of the inconsistency of answers from different sources throughout the agency, it benefitted licensees to continue asking the same compliance question with different officers, supervisors, or branches of the LCB until they received the answer they wanted, and licensees interviewed by HH confessed as much.[515] Despite being willing to offer verbal advice, the agency will very rarely commit to any rule interpretation in writing which often harms licensees more than it helps them—the agency is literally playing the game of telephone with regulations that affect licensees' life savings—due to a policy that written guidance may only come from the Director.[516] Because of this prohibition on offering written

---

[508] Hillard Heintze Report, *supra* note 7, at 48.

[509] *Id.* at 45.

[510] *Id.*

[511] *Id.* at 14.

[512] *Id.* at 9.

[513] *Id.*; *id.* at 15. The lack of an emphasis on consistency also flows from the very top echelons of the organization. Board member Russell Hauge and Chief of Enforcement Justin Nordhorn have taken the position at public meetings that consistency in enforcement and interpretation of rules should take a back seat to the "greater objective" of public safety. M. Bailey Hirschburg, *WSLCB – Executive Management Team (March 20, 2019)*, CANNABIS OBSERVER (Mar. 26, 2019) ("Hauge and Nordhorn agreed 'individual internal consistency' from officers was less important than the 'greater objectives' around public safety and compliance."), https://cannabis.observer/events/wslcb-executive-management-team-march-20-2019/. It is no wonder that lower level officers feel free to apply inconsistent and unfair standards when the heads of the organization take this position.

[514] Hillard Heintze Report, *supra* note 7, at 15.

[515] *Id.*

[516] *Id.*

guidance and the hesitance of any agency staff to offer concrete written guidance, Enforcement rarely makes or communicates decisions in a timely manner.[517]

This perfect storm of reluctance, technological limitation, and structural delay is inherently problematic because "a licensee relies on an interpretation of the rules by one division and then may receive a violation notice from an enforcement officer who interprets the rules differently."[518] Even if a licensee received guidance, licensees consistently report that the LCB's rules are often overly complicated, unnecessary, or misguided, which demonstrates an inability or unwillingness to understand the troubles faced by cannabis businesses, or even small businesses generally.[519] Internal and external stakeholders of the industry have "expressed the desire and need for more training on cannabis, the cannabis industry, small business needs, regulatory issues for both alcohol and cannabis, and how to develop relationships between licensees and regulators." [520] But attempts by the agency to try and support small businesses has ultimately resulted in protectionists stances, such as unconstitutional residency requirements that have hindered more than helped Washington's entrepreneurs.[521]

### 3.    Training Officers for Law Enforcement, Not Administrative Regulation

Because so much of LCB policy is modeled on traditional law enforcement, it is not surprising that officer training is the same. Most officers "receive basic law enforcement training but receive little training on how to fulfill their role as regulators, especially regarding the cannabis industry."[522] As a policy, Enforcement prefers hiring officers laterally that have law enforcement experience, or, if they do not, Enforcement sends new officers with no prior law enforcement training to the Washington State Criminal Justice Commission for the Basic Law Enforcement Academy, despite the officer's limited authority.[523] In either case, after becoming certified at the Basic Law Enforcement Academy or relying on previous law enforcement experience and training, all officers attend a fourteen-week field training program modeled on the San Jose Field Training Officer program.[524] Though the Report notes that academy training is excellent for law enforcement, "sending officers to it with other local officer trainees reinforces the notion that they are regular law enforcement officers, rather than those who primarily have a regulatory role."[525] Even then, supplementary training conducted annually by the agency has a "strong focus on traditional law enforcement measurements and little focus on the officer's duties and responsibilities as they related to regulations," focusing on skills or situations "that will rarely occur, such as physical arrests or use of force," as well as defensive tactics and use of firearms, but does not mention anything about procedural justice or problem solving, skills that the Report notes are necessary to voluntary compliance.[526] Enforcement's practice, training, and

---

[517] *Id.*
[518] *Id.*
[519] *Id.* at 35.
[520] *Id.* at 48.
[521] *See* discussion *supra* part III.A.2.(c)
[522] *Id.* at 8.
[523] *Id.* at 8–9.
[524] *Id.*
[525] *Id.*
[526] *Id.*; *id.* at 48.

culture has resulted in a "lack of empathy, concern and common sense to balance the enforcement and education to assist small business owners with achieving compliance and potential success."[527]

<h4 align="center">4.    Accountability of Officers and Oversight</h4>

The best crafted policies can become ineffectual if those that are tasked with administering them do not ultimately comply with them. HH found that the LCB lacked transparency for officer investigations and failed to impose consistent discipline against officers, if it disciplined them at all.[528] This is particularly problematic given that in 2019, more than forty percent of allegations that the agency investigated were substantiated.[529] Nonetheless, the agency rarely investigates misconduct because licensees are unwilling to submit complaints about officer conduct for fear of retaliation.[530] And in any event, the LCB has not promulgated effective policy for the investigation of complaints against employees.[531] Not only is it practically difficult to file a report, the agency often fails to address such reports.[532] What's more, inconsistent internal classification of complaints has led some agency staff to doubt fair treatment of staff across the agency and has led industry members to believe complaints are resolved arbitrarily.[533] This may very well be the case considering what the Report found—no system exists, such a disciplinary matrix or chart, to ensure that corrective action is taken by the agency for misconduct, whether corrective action is consistent for similar misconduct, or even that corrective action is fair and transparent.[534] Nor is there an early warning system established that monitors officer behavior and is intended to identify and address early warning signs before concerning conduct becomes misconduct.[535]

This lack of accountability may be a symptom of poor oversight. Despite prohibiting the exercise of discretion in some areas, the LCB permits officers to exercise total discretion and autonomy in conducting themselves in the field, which leaves officers to seemingly conduct investigations "at random."[536] Autonomy is not necessarily bad in administrative agents and inspectors, but when combined with a leadership culture that some have suggested promotes and actively encourages enforcement over education, as well an implicit and toxic bias against cannabis licensees, autonomy manifests as targeted and disparate enforcement, and retaliation for legal conduct that officers think is wrong.[537]

### B.    HH Recommendations

---

[527] *Id.* at 15.
[528] *Id.* at 9.
[529] Young, *supra* note 65.
[530] Hillard Heintze Report, *supra* note 7, at 9.
[531] *Id.* at 43.
[532] *Id.* at 44.
[533] *Id.*
[534] *Id.*
[535] *Id.*
[536] *Id.* at 40.
[537] *Id.* at 8.

The Report recommends "significant change" in the LCB's focus—despite an emphasis on reforming itself in the image of law enforcement agencies, the LCB fails to meet the best practices and policies of successful policing agencies.[538] To address that failing, HH made eighteen recommendations to make the significant change necessary to bring the LCB in line with other modern administrative agencies, which can be synthesized into four categories.[539]

### 1.    Reorganize Enforcement

The Report suggests that reorganizing the agency to clarify the chain of command will help to ensure better education and training of officers, and increase oversight and accountability of staff, internally and externally.[540] In addition, HH recommended creating a dedicated unit to focus on cannabis, so officers are not confused by variances in cannabis and liquor laws. This unit would likely better demonstrate a clear understanding on the issues and challenges faced by cannabis businesses and owners.[541]

### 2.    Change Officer Culture

The Report also calls for correcting officer culture to prioritize education over punishment.[542] Per the Report, this should include revising mission statements and agency goals to reflect the emphasis on education and increasing compliance, as well as supplementing and revising policy and procedure manuals to better reflect the agency's administrative nature.[543] In addition, the Report recommends that LCB dismiss its preference for lateral hiring of police officers and update hiring policies and job descriptions to hire candidates with the skills necessary to make them better suited for administrative agency investigations.[544]

Critically, HH recommends that training of officers must also be revamped to reflect an appropriate change of culture, including removing use of force, defensive tactics, and firearm training, and replacing it with training on education and compliance, and the associated skills.[545] This should include changes to in-service training and education, skills such as problem solving, procedural justice, and training on recognizing and addressing implicit bias.[546]

### 3.    Improve Relationship with Regulated Community

The agency must improve its relationship with the regulated community by increasing outreach efforts to develop trust and improve the timeliness and transparency of communication and oversight mechanisms.[547] Per the Report, this should include committing to a system to

---

[538] *Id.* at 49.
[539] *Id.* at 50−53.
[540] *Id.* at 50.
[541] *Id.*
[542] *Id.*
[543] *Id.*
[544] *Id.* at 50−51.
[545] *Id.* at 51.
[546] *Id.* at 51−52.
[547] *Id.* at 51.

address and issue timely written responses to licensees on rule interpretations, adopting accountability measures to increase transparency of submitting officer complaints, oversight of employee conduct, and creating a system to fairly and consistently track complaints and corrective action against officers and notify licensees of such action.[548] Finally, the LCB must create a system for internal audit and inspections to ensure compliance with law and the public goals of the LCB.[549]

### 4. Improve Consistency of Agency Enforcement

HH recommended the Board improve consistency of agency action, interpretations, and enforcement.[550] This could include having an Assistant Attorney General interpret the law when requested, creating a central repository of interpretations where internal and external stakeholders go find current interpretations and policies, making FAQs and other policy statements, newsletters, or enforcement bulletins publicly available in a database, and consistently debriefing all agency staff regarding filed observations, challenges, and changes in policy.[551]

### C. Director Garza's Response

The LCB received the HH Report in late December 2019 and spent more than a week drafting its response to issue alongside the Report. When the LCB released the Report on January 9, 2020, LCB Director Rick Garza emphasized in his response three themes from the eighteen recommendations in the HH Report that the LCB would draw upon:

> (1) interpretations of agency decisions (rules, policies, etc.) are inconsistently communicated and applied not only within the agency but with licensees;
> (2) there is a lack of transparency and understanding about "agency decisions and interpretations" by licensees; and
> (3) stronger outreach, communication, education and collaboration with the industry is needed.[552]

Director Garza noted that nothing in the report came as a "complete" surprise to the agency.[553] In his e-mail, Director Garza assured the industry that the agency was taking steps to adopt the recommendations, intending to make changes throughout the entire agency, not just Enforcement, that would reflect the agency's commitment to change, starting with those recommendations that could be implemented within the first six months:

- Revising the mission statement to emphasize role in education;

---

[548] *Id.*
[549] *Id.* at 52.
[550] *Id.* at 51.
[551] *Id.*
[552] Rick Garza, Director Washington State Liquor & Cannabis Bd., Follow Up to Regulated Communities and Stakeholders (Jan. 9, 2020), https://content.govdelivery.com/accounts/WALCB/bulletins/2755fd3.
[553] *Id.*

- Revising job descriptions and Enforcement's policies and procedures to "emphasize the importance" of outreach and education;
- Revising apparel and firearm policies for officers;
- Adding a unit to Director's Office that will focus on outreach and education;
- Creating a legal/policy team to develop and convey agency decisions;
- Creating a database where decisions are kept to promote consistency.[554]

Although it has been more than a year since the release of the HH Report, the agency still has not addressed many of the recommendations.[555] Among other things, the agency continues to (1) challenge licensees constitutional rights; (2) issue AVNs without first issuing NOCs; (3) emphasize officer training on law enforcement techniques instead of regulatory compliance; (4) reject settlement agreements approved by Enforcement as insufficiently punitive; (5) cancel licenses for "one and done" violations; and (6) apply overbroad interpretation of its rules beyond the plain language of the statute.[556]

There has been some notable progress, however, arising out of the Report. In late 2020, the LCB has reassigned its former Chief of Enforcement and Rules Coordinator to new roles in the legal and policy division where they have expressed an intent to issue interpretive guidance on certain agency rules in order to increase consistency across the agency.[557] The agency has also implemented the compliance consulting team to assist in educating licensees to avoid enforcement actions.[558] Nonetheless, there remains a long road ahead for the industry in Washington, as it continues to struggle with a regulator that seems resistant to structural change.

## VI.    CONCLUSION

While it may be too soon to say if the policy changes will happen, or for that matter if they are effective, in the first years after the Report and the implementation of 5318, it appears that the LCB has not fully bought-in to the mandate. Even now, the agency continues to apply older, harsher penalties, in direct contravention of the SB 5318, and enforcement and policy are very dependent on which officer or Division you speak with. And the agency continues to argue in legal proceedings that licensees lack basic constitutional protections. In many ways, the agency still seems to model the opposite of what the voters and the legislators keep telling them; adult cannabis use is not a crime.

---

[554] Memorandum from Rick Garza, Director, Washington State Liquor and Cannabis Board, to Regulated Communities and Stakeholders (Jan. 9, 2019).

[555] In fairness to the Board, the Report issued shortly before the emergency of COVID-19, and the panoply of issues that ultimately required regulators' attention. Among other things, the Board spent considerable time implementing new and temporary policies to allow for things like curbside pickup and has been tasked with enforcing state COVID-19 mandates for the liquor and cannabis industries. *See, e.g.,* Wash. State Liquor & Cannabis Bd., *Guidance for Cannabis Licensees During COVID-19 Restrictions* (Mar. 24, 2020), https://content.govdelivery.com/accounts/WALCB/bulletins/282f26c.

[556] Hillard Heintze Report, *supra* note 7, at 9; *see also* Garza, *supra* note 554.

[557] M. Bailey Hirschburg, *WSLCB – Executive Management Team (September 16, 2020) – Chief Nordhorn's New Role*, CANNABIS OBSERVER (Sept. 18, 2020), https://cannabis.observer/observations/wslcb-executive-management-team-september-16-2020-chief-nordhorns-new-role/ (noting that former chief of enforcement Justin Nordhorn is moving into a new role designed to "implement a consultation and education approach throughout the division.").

[558] *See* discussion *supra* note 447.

The history of cannabis regulatory enforcement in Washington is a cautionary tale. While Washington should be commended for taking on the risk as an early legalizer of cannabis, at a time when federal intervention seemed a real and tangible threat, other states should not seek to replicate its regulatory approach today. To the contrary, stakeholders and advocates that are looking for a responsible and fair approach to regulating cannabis should consider the history, limitations, concerns, and resulting reforms borne from the Washington system. If Washington's experience is any indication, regulatory enforcement through traditional policing structures may have unintended and negative consequences for a regulatory agency in 2021 and beyond—particularly in an agency struggling with antiquated misconceptions of 'marijuana.'